```
1                    UNITED STATES DISTRICT COURT

2                      DISTRICT OF CONNECTICUT

3    _____
     Connecticut Fine Wine and   )
4    Spirits, LLC                 )
                    Plaintiff.    )  NO: 3:16cv1434(JCH)
5                                 )  May 18, 2017
     vs.                          )  10:07 a.m.
6                                 )
     Jonathan A. Harris, et al    )
7                Defendants.      )
     _____
8                                    141 Church Street
                                     New Haven, Connecticut
9
                             HEARING
10

11   B E F O R E:
                     THE HONORABLE JANET C. HALL, U.S.D.J.
12

13   A P P E A R A N C E S:

14   For the Plaintiff   :       James T. Shearin
                                 Pullman & Comley
15                               850 Main Street
                                 Bridgeport, CT  06601
16
                                 William J. Murphy
17                               Zuckerman Spaeder LLP
                                 100 East Pratt St.
18                               Baltimore, MD  21202

19   For the Defendant   :       Gary M. Becker
                                 Robert J. Deichert
20                               Office of the Attorney General
                                 55 Elm Street
21                               Hartford, CT  06141

22   Intervenor Defendants:

23   Wine & Spirits Wholesalers      Deborah A. Skakel
     of CT, Inc.                     Craig Flanders
24                                   Blank Rome LLP
                                     405 Lexington Avenue
25                                   New York, NY  10174
                                     -- continued --
```

```
 1                                      Robert M. Langer
 2                                      Wiggin & Dana
                                        20 Church Street
 3                                      Hartford, CT  06103

 4   Connecticut Beer Wholesalers  David S. Hardy
     Association, Inc.             Carmody Torrance
 5                                 195 Church St. 18th floor
                                   PO Box 1950
 6                                 New Haven, CT 06510-1950

 7   Connecticut Restaurant Assn   Meredith G. Diette
                                   Siegel, O'Connor
 8                                 14 Eugene O'Neill Dr.
                                   New London, CT  06320
 9
     Connecticut Package Stores    Patrick A. Klingman
10   Association, Inc.             Klingman Law, LLC
                                   280 Trumbull Street
11                                 Hartford, CT  06103

12   Brescome Barton, Inc.         Jeffrey J. Mirman
                                   Hinckley, Allen & Snyder LLP
13                                 20 Church Street
                                   Hartford, CT  06103
14
     Court Reporter      :         Terri Fidanza, RPR
15

16

17   Proceedings recorded by mechanical stenography, transcript
     produced by computer.
18

19

20

21

22

23

24

25
```

1          THE COURT:  Let me take me a moment to get set up.

2     It is not my space.  I apologize for being a few

3     minutes late.

4          We're here this morning in the matter of Connecticut

5     Fine Wines and Spirits, LLC, versus Jonathan Harris, et al.

6     3:16CV1434.

7          If I can have appearances please.

8          MR. SHEARIN:  Good morning, Your Honor.  Timothy

9     Shearin from Pullman and Comley on behalf of the plaintiffs.

10     Along with me is Bill Murphy from the Zuckerman Spaeder firm.

11          THE COURT:  Good morning.

12          MR. BECKER:  Good morning, Your Honor.  Assistant

13     General Attorney Gary Becker for the defendants.

14          THE COURT:  Good morning.

15          MS. SKAKEL:  Good morning, Your Honor.  Deborah

16     Skakel from Blank Rome.  I'm here for one of the intervenor

17     defendants that is the Wine and Spirit Wholesalers of

18     Connecticut with co-counsel, Your Honor.

19          MR. LANGER:  Good morning, Your Honor.  Bob Langer

20     from Wiggin and Dana also on behalf of the intervenor

21     defendants Wine and Spirit Wholesalers defendants.

22          THE COURT:  Good morning.

23          MR. MIRMAN:  Jeffrey Mirman from Hinckley, Allen &

24     Snyder for the intervenor Brescome Barton, Inc.

25          THE COURT:  Good morning, sir.

1          MR. KLINGMAN:  Good morning, Your Honor.  Patrick

2     Klingman on behalf of the intervenor defendant Connecticut

3     Package Stores Association, Inc.

4          THE COURT:  Good morning, Attorney Klingman.  You

5     should watch your head on that.

6          MR. KLINGMAN:  I will, Your Honor.  Thank you.

7          MR. HARDY:  Good morning, Your Honor.  David Hardy

8     for the defendant intervenor Connecticut Beer Wholesalers

9     Association, Inc.

10          THE COURT:  Good morning.

11          MR. FLANDERS:  Craig Flanders from Blank Rome on

12     behalf of the intervenor defendant Wine & Spirits Wholesalers

13     of Connecticut.

14          THE COURT:  Good morning.

15          MR. DEICHERT:  Good morning, Your Honor.  Assistant

16     Attorney General on behalf of the state defendants. Assistant

17     Attorney General Robert Deichert on behalf of the state

18     defendants.

19          THE COURT:  Attorney Deichert, good morning.

20          MS. DIETTE:  Good morning, Your Honor.  Meredith

21     Diette from Siegel O'Connor on behalf of the intervenor

22     defendant Connecticut Restaurant Association.

23          THE COURT:  Good morning.  That's it.  All right.

24          Is it going to get cool?  It is 60 nextdoor, but we

25     have a crew of high school students here for mock trial, so

1   they are using my courtroom.

2          We're here in this case in connection with various

3   motions to dismiss.  One is Number 38 filed by the state

4   defendants.  One is 66 a joint motion to dismiss filed by

5   various intervenors and then Number 80 filed by the remaining

6   intervenor Bresome Barton, Inc.

7          I guess before we begin, I have a preliminary

8   question.  Obviously I need to start with the moving parties,

9   the defendants, which I will start with the State but have

10   the intervenors figured out how -- I have some questions for

11   the intervenors, to whom am I going to address those?

12          MR. LANGER:  Yes, Your Honor.  We have talked about

13   that and we will not have a formal presentation after

14   Assistant Attorney General Becker in the spirit of

15   efficiency.  If you have specific questions for us, you can

16   direct them to Deborah Skakel or me and depending upon the

17   specific question, we would be responsive.

18          We would like to reserve the opportunity after

19   plaintiff's counsel gives his presentation to have the

20   opportunity to make remarks, if appropriate.

21          THE COURT:  You will have remind me of that.

22   Hopefully I won't forget.  Depending on how long we're going,

23   I may forget.

24          MR. LANGER:  Thank you, Your Honor.

25          THE COURT:  Then let me start with the state

1    defendant's Motion to Dismiss and questions for you.  I will

2    start with a very easy one.  I want to be clear on the record

3    in some of the cases that I've read and that have been cited

4    by you and others, the courts have discussed Parker immunity

5    having discussed preemption and/or Twenty-First Amendment

6    issues by way of defense as justifications for upholding the

7    challenged liquor laws.  Am I correct that you are not

8    arguing either of those and you're pressing your motion to

9    dismiss on preemption grounds?

10         MR. BECKER:  That's correct, Your Honor. There's

11   been some discussion in the cases about the overlap of the

12   hybrid and lateral test and Parker immunity.  It is our

13   observation that Parker immunity usually is raised not in the

14   12(b) stage, but later in the case.

15         THE COURT:  That's fine.  This is a question that's

16   raised really I think by the plaintiff and I may have misread

17   the arguments, so hopefully I'm not taking you down a

18   rabbit's hole here.  My question will begin by asking you

19   should the Court's analysis look to the challenge provisions

20   collectively or individually in determining whether there's

21   preemption?  Is your mic on?

22         MR. BECKER:  I think it is.

23         THE COURT:  You have to be able to hear it over the

24   speakers.  Otherwise you may sound like you are loud, but you

25   are not loud to me.

1          MR. BECKER:  Thank you, Your Honor, I apologize.

2     Your Honor, I believe that that is an issue the TFWS court

3     took the provisions collectively. The Costco court took them

4     separately.  I believe the Costco approach is the right one.

5     I believe one can draw that conclusion from the Second

6     Circuit in Richmond Boro Gun Club versus City of New York, 97

7     F.3d 681, said there's a strong presumption against

8     preemption especially strong in area of judiciary operated by

9     the state such as regulation of health and safety and that --

10          THE COURT:  What does that tell me about whether I

11     look the statute separately or collectively?

12          MR. BECKER:  What that tells you, Your Honor,

13     because preemption is not presumed and actually trenches on

14     the state's sovereignty that it should be analyzed as

15     narrowly as possible so that if one of these statutes offends

16     and the others do not, then only the offending statute should

17     be preempted.

18          THE COURT:  Does the Connecticut statute on

19     severability and the bias, I will say, in the Connecticut

20     Supreme Court or it's really probably universal, but the idea

21     that most statutes, if you strike down a portion, you will

22     maintain the other.  I think actually Connecticut has a

23     statute.  I won't be able to find it, but yeah, it's 1-3.

24          MR. BECKER:  Yes, Your Honor.

25          THE COURT:  Does that bear on this question or is

1    that really a separate question?

2            MR. BECKER:  I don't think any of them should be

3    struck down, but to the extent Your Honor finds one of them

4    offensive, I believe the other two should be sustained.

5            THE COURT:  No.  I'm going more to the question.

6    That's why I suggested this may not be pertinent to statute.

7    Really my question is which I think the plaintiffs are asking

8    me to do this.  I don't know that they are right, by the way.

9    We'll explore that with them a little bit later, but I think

10   they want me to say Judge, don't just look at post and hold

11   and decide what is it.  Is it per se, et cetera, is it

12   preemptive.  Look at post and hold and look at resale

13   pricing.  Look at it all as a package and see how it

14   operates.

15           MR. BECKER:  Your Honor, I think that will be a

16   mistaken approach.  As the Norman Williams court taught us,

17   the Supreme Court says that the statute on its face, the

18   facial test, must irreconcilably conflict in all cases with

19   the Sherman Act.  It is not -- my notes have the language,

20   hypothetical or potential conflict is insufficient.  The fact

21   that state scheme might have anticompetitive effects does not

22   support the preemption claim.

23           It is our contention at this point you don't look at

24   the effect of the statute or all three statutes together, but

25   what do they say on their face, what do they require.

1              THE COURT:  I will want to follow-up with you on

2    that.  There's a quote from Freedom Holdings 1, Judge Winter

3    uses the word "effect" in a quote that's frequently quoted.

4    I'm struggling with what it means.  But again I'm sorry to be

5    pressing you on this, but I'll struggling with it myself.  I

6    wrote down here one of the questions is why do I consider

7    them separately.  And maybe Norman Williams is the answer in

8    the sense of the strong presumption against preemption, the

9    federalist sort of doctrine principle, but I mean, for

10   example, hypothetically let's say this whole liquor scheme

11   were contained in one subsection of the statute.  And it was

12   A, b and c.  Would I pull each aspect of the regulatory

13   scheme apart and look at them horizontal versus vertical,

14   whatever they were, or would I say no, this is one regime and

15   I need to look at it as a whole?

16              MR. BECKER:  Your Honor, it is quite the question,

17   but I do think that it would be a distinction without a

18   difference if it were all contained in one statutory section.

19              THE COURT:  And the reason is why?

20              MR. BECKER:  Because we have a system of dual

21   sovereigns and the senior sovereigns, the federal government,

22   should not strike down statutes unnecessarily.

23              THE COURT:  Does it have anything to do with the

24   fact that the analytical framework under the antitrust laws,

25   driven by the guidance of Norman Williams about how it has to

1    be irreconcilably in conflict, only per se, you know, struck

2    down or preempted, that I have to go to portion of the

3    statute that are horizontal or vertical because I can't

4    analyze it any other way under antitrust laws.

5         MR. BECKER:  I think Your Honor is quite correct

6    about that.  The minimum retail price statute describes a

7    vertical hold.  The post and hold provision to the extent

8    they described any restraint, the horizontal restraint among

9    the wholesalers have as the no volume discount.  Conflating

10   them together I think leads to mistaken analysis.

11        THE COURT:  I'm reminded of the Toys R Us decision

12   which I don't have fully grasped factually but I remember it

13   sort of starts out as vertical resale price case.  That's

14   what it looks like on its face but the Court ends up in terms

15   of analyzing anticompetitive impact at a horizontal agreement

16   among manufacturers basically encouraged by Toys R Us to

17   accomplish an anticompetitive edge.

18        MR. BECKER:  Yes, Your Honor.  I believe it was the

19   retailers wanted to keep out discounters and they got the

20   manufacturer to assist them in their horizontal conspiracy.

21        THE COURT:  You seem to suggest -- I'm now switching

22   gears -- you cite Iqbal versus Twombly, isn't it fun that

23   that gets cited now for something other than purely Rule 12,

24   but you are citing it for Rule 12.  You seem to suggest that

25   Twombly requires the plaintiff to plausibly allege an actual

1    agreement between actors in the market and the complaint

2    should be dismissed because it doesn't do that.  Are you sure

3    about that?

4             MR. BECKER:  Your Honor, my contention --

5             THE COURT:  Or have I read it wrong?

6             MR. BECKER:  I may have been inexact in describing

7    it in my papers, but my contention is that it is a facial

8    analysis as Norman Williams teachers, whether the wholesalers

9    are actually colluding or not really has no bearing on

10   whether the statute is facially preemptive.

11            THE COURT:  Would you agree with me that Twombly

12   involved private parties, alleged antitrust conduct, claiming

13   a violation of I don't know if it's Sherman or what act,

14   there you need to allege an agreement in conspiracy

15   understanding, correct?

16            MR. BECKER:  Yes, Your Honor.

17            THE COURT:  So we're in a preemption case.

18            MR. BECKER:  We are.

19            THE COURT:  Which I think pretty clearly Freedom

20   Holdings 1 maybe Judge Winter I thought said that an actual

21   conspiracy or agreement need not be shown at a preemption

22   attack level.

23            MR. BECKER:  Your Honor, it occurs to me that if

24   they were bringing a direct claim action against the

25   wholesalers alleging the conspiracy, they would have to have

1   plausible facts.

2           THE COURT:  Absolutely, but that's not this case.

3           MR. BECKER:  If they are suggesting that the statute

4   has irresistible pressure on the wholesalers to collude,

5   there's no reason why the pleading standard should be less

6   for that.

7           THE COURT:  But their cause of action is still only

8   for preemption.  They are not suing you, not you, I

9   apologize.  They are suing you, your clients, but they are

10  not suing Attorney Langer's client or the members of his

11  clients for price fixing section one conspiracy, et cetera in

12  this case, right?

13          MR. BECKER:  They are not.  If they think there is a

14  conspiracy, we think that's what they should do.

15          THE COURT:  I understand what they are hinting at.

16  I will get at that in a few moments, but the fact of the

17  matter is there's not a Sherman One allegation of a cause of

18  action claimed in the complaint and private parties are not

19  named as parties so given those two facts, would you agree

20  with me that a preemption cause of action, that I think is

21  attempted to be pled in this complaint, does not require an

22  allegation of plausible allegations that plausibly support

23  the inference of agreement among private actors.

24          MR. BECKER:  Your Honor, I'm sorry that I do have to

25  disagree with you on that.  I think the <u>Freedom 4</u> case which

1  is Freedom Holdings, Inc. v. Cuomo which is 624 F.3d, 38 in

2  Footnote 13 suggests that there was an argument at the lower

3  court that the Twombly plausible facts plausibly suggesting

4  an agreement would only apply for an action of damages.  The

5  Court said we disagree. It applies and you shouldn't need an

6  injunction.  They were seeking to enjoin the multistate

7  settlement agreement from the tobacco companies.

8          THE COURT:  I have a preliminary question.  Do you

9  know what page the footnote refers to in the text so I can

10  see the context?

11          MR. BECKER:  This would be Footnote 13 and 14.  I

12  believe they are brought up on pages it looks like *51 so I

13  presume it is page 51.

14          THE COURT:  Yes.  You are right.  I don't get to say

15  that I think that the circuit's just fine here, but I don't

16  think they are saying anything more than as to the cause of

17  action pled, a plaintiff has to plead plausible factual

18  allegations.  The cause of action pled here is preemption.  I

19  don't know.  Maybe the plaintiffs are going to tell me I'm

20  wrong on that.  I will owe you an apology but if their cause

21  of action is preemption, I don't understand why a cause of

22  action to preempt a state statute would require plausible

23  allegations about an agreement among private actors in the

24  industry regulated.

25          MR. BECKER:  Your Honor, if it is a facial attack on

1   the statute one looks at the statute and the language of the

2   statute and what it requires.

3           THE COURT:   That's saying it more succinctly than I

4   did.   Thank you.   That's what I'm trying to say.   It is a

5   facial attack which I think is my first question to them,

6   then you would agree with me that an allegation of an

7   agreement to fix prices or an agreement to act

8   anticompetitively is not required.

9           MR. BECKER:   Your Honor, if it is purely a facial

10   attack, correct.   I would say in this case it appears that

11   the plaintiff wants to both have their cake and eat it, too,

12   by pleading an agreement, say see there's a conspiracy.   It

13   is impermissible pressure that forced them to have a

14   conspiracy.   If that's the case then they really, really

15   should meet the Twombly standard.   It is an agreement that

16   the Sherman Act prohibits, not same pricings.

17           THE COURT:   I don't know if I would agree with you.

18   If they are going under the second prong of that test which

19   is what I think your language irresistible pressure comes

20   from.

21           MR. BECKER:   Yes, Your Honor.

22           THE COURT:   I still think that's a facial challenge

23   in a preemption claim.   It has to be analyzed both in terms

24   of the allegation is what the statute says.   I still don't

25   think if its a facial challenge that it matters what -- what

1   matters is what the statute compels people to do.

2        MR. BECKER:  Yes, Your Honor.  I one hundred percent

3   agree with that.

4        THE COURT:  Your argument about why the post and

5   hole provisions in the statute that are under attack are

6   unilateral restrain under the preemption analysis was fairly

7   brief.  I think you contend that the post and hold provision

8   is important to the Connecticut's liquor market, but I don't

9   see that as an argument for why it is unilateral.  Could you

10  tell me what your theory is I guess as to why it is not

11  hybrid.  Why it is unilateral.

12        MR. BECKER:  Your Honor, I think this goes to, for

13  instance, let's compare and contrast the Connecticut law with

14  the laws at issue in Midcal and Schwegmann that are held to

15  be hybrid restraints.

16        In Midcal, the statute required that a wholesaler

17  and a producer enter into a fair trade contract which

18  basically operate as retail price maintenance which at that

19  time was a per se violation of the Sherman Act, then file

20  with the State, then that was the price that was paid or

21  charged by every wholesaler.

22        In the Schwegmann case, the wholesaler and the

23  retailer entered into a price schedule again establishing a

24  retail price maintenance, a per se violation at that time.

25  Then filed it with the State.  It compelled every other

```
 1    retailer to observe the same minimum prices.

 2             In Connecticut, the statute does not require anybody

 3    to agree with anybody else.  All it requires is that they

 4    post their prices and it is worth spending a minute or two on

 5    what that means.  Alcohol is not a fungible commodity like,

 6    for instance, sugar.  Alcohol has different brands, different

 7    types of alcohol.  When they post every month, they post for

 8    the product that they sell.  For instance, there are two

 9    competing brands of vodka, Brand A and Brand B.  The person

10    that sells Brand A posts Brand A.  The person that

11    sales Brand B posts Brand B.  They are different prices.

12    They cannot price match under the statute because they are

13    not the same brand even though they may be head to head

14    competitors.

15             THE COURT:  I'm struggling with your -- it strikes

16    me that in Fisher, that's the Berkeley Rent Control case.

17             MR. BECKER:  Yes, Your Honor.

18             THE COURT:  There the Government, the city, the

19    state authority in effect through the city says you can't

20    price above this price.  It was a determinable price.  It

21    wasn't like Connecticut or like New York in 324 where the

22    state says you go ahead and pick whatever price you want.  In

23    Berkley's case, there was a maximum price, a dollar number in

24    effect, effectively was set by the action of the state or the

25    city regulatory action.  We don't have that here.  We have
```

1    okay, competitors in the market, you go fix whatever price

2    you want and by the way, we'll give you a window to go ahead

3    and match each other.  You are right.  They are still going

4    to compete brand to brand, but as Seagrams gin, everybody can

5    end up at the same price because of this post hold slash

6    match and hold scheme.  Not any of those prices are set by

7    the state.

8              MR. BECKER:  That's correct.  The price itself is

9    not set by the state, but, Your Honor, there's no

10   requirement.

11             THE COURT:  Why isn't your case a hybrid like 324?

12             MR. BECKER:  324 dealt with minimum dollar price.

13             THE COURT:  Of course it did, but it dealt with that

14   when it got to the second part of the analysis on whether it

15   is unilateral or hybrid, it said hybrid.   It didn't matter

16   what was the nature.  The nature of the anticompetitive

17   conduct was only them determined as a hybrid as to whether it

18   is per se or not, right?

19             MR. BECKER:  Your Honor, under the Connecticut

20   retail minimum price law, it is retail price maintenance.  It

21   is established by the state.  It is a simple markup a direct

22   based on the wholesale price how much has to be added based

23   on the number of bottles in the case.  It doesn't require the

24   retailer to sell at that minimum price.  They can sell at

25   whatever price that they feel the market would bear.

1          THE COURT:  I thought we were talking about the post

2    and hold and your argument that's unilateral and my suggest

3    that is hybrid.

4          MR. BECKER:  I'm suggesting, Your Honor, we can't

5    cherry pick out the language of 324 Liquor that applies to

6    retail price maintenance issue and apply it to post and hold.

7          THE COURT:  Why not?  When they are deciding is it

8    unilateral or hybrid, it wasn't so much retail price

9    maintenance at issue, it was the scheme in the state.

10          MR. BECKER:  I believe 324 Liquor they were

11    considering whether Parker immunity applied.

12          THE COURT:  They did eventually, but first they did

13    preemption because they conducted it was a hybrid.  I

14    understand that the resale price maintenance analysis of

15    whether that's per se or rule of reason, again with all due

16    respect to the plaintiff in my opinion yes, you can cut that

17    part of the opinion out.  But I don't know why you throw the

18    whole opinion out.

19          MR. BECKER:  Your Honor, I think where Your Honor is

20    going is the argument that's been made that if it is

21    something that was done by private agreement, the private

22    agreement which is the TFWS analysis, if it was done by

23    private agreement, then it is hybrid restraint.  I don't

24    think -- I think that goes too far.  The statute on its face

25    does not require an agreement.

1          THE COURT:  Well, I do have <u>Freedom Holdings 1</u>.

2     This is the sentence that I'm struggling with so you will

3     help explain it to me.  Judge Winter writes for the majority,

4     quote, where the anticompetitive effects of a state statute

5     obviate the need for private parties to act on their own to

6     create an anticompetitive scheme, the statute may be attacked

7     as a hybrid restraint on trade, end quote.  You would agree

8     with me that post and hold creates an anticompetitive scheme,

9     wouldn't you?

10         MR. BECKER:  Not necessarily.

11         THE COURT:  You don't think that if two wholesalers

12    got together and they are selling makeup, okay, not liquor,

13    makeup and they said to each other okay, I'm going to give

14    you my price on the first of month for Estee Lauder cream and

15    we're going to agree -- you give me your price for something

16    else or whatever else.  We'll agree that we can both match

17    each other's price until we change it in a month, that would

18    not be a violation of the Sherman Act?

19         MR. BECKER:  If they agreed.  You can contemplate,

20    Your Honor, a situation where --

21         THE COURT:  I'm sorry to interrupt you, sir, that's

22    what the quote I just gave you says.  The anticompetitive --

23    the state statute in Connecticut lets the two wholesalers do

24    that, and Judge Winter wrote where the anticompetitive

25    effects, that's what I'm struggling with, of a state statute

1   obviate the need for private parties to act on their own to

2   create an anticompetitive scheme, it's hybrid.

3           MR. BECKER:  Two problems with that.  Number one,

4   effects is not in the Norman Williams test.

5           THE COURT:  It is not the Norman Williams test,

6   right.

7           MR. BECKER:  Correct.

8           THE COURT:  It is Judge Winters in the Second

9   Circuit.  Not only is he a controlling writer for purposes of

10  this court, he's also an antitrust expert, right, I think,

11  last time I checked.

12          MR. BECKER:  Yes, Your Honor.  The issue again is

13  the agreement.  One can contemplate a situation where

14  probably see in the newspapers mattress retailer says for the

15  next two weeks only, I'm selling my queen size mattresses for

16  $100.  The competitor can say I will sell my mattresses for

17  $100 and hold it for two weeks.  And maybe the extend it.  As

18  long as they agree with each other, they haven't violated the

19  law.

20          THE COURT:  Correct.  The statute in Connecticut in

21  the post and hold section in effect creates the agreement for

22  them.

23          MR. BECKER:  But it's enclosed by the state.

24          THE COURT:  That's what Judge Winter is saying where

25  anticompetitive effect of the state statute obviates the need

1     for the parties to agree.  They don't have to agree here

2     because the state is setting the scheme up for them.  Not

3     only the exchange of prices, but the holding and the matching

4     and holding of prices, then that's hybrid.

5              MR. BECKER:  They would certainly have -- Your

6     Honor, the statute doesn't allow people to price match up.

7     Again it doesn't allow the wholesalers to match a different

8     brand, has to be the same brand, same bottle size. They would

9     have to have agreed ahead of the monthly posting to match two

10    competing brands, if they were to do that.

11             THE COURT:  Right.  I don't disagree with you.

12    Absent some agreement on the private parties part, they

13    aren't going to agree my Seagrams and Grey Goose are going to

14    be in relationship to each other at this price level.

15    Absolutely they can't do that under the statute but that

16    doesn't mean what they can do under the statute isn't

17    anticompetitive.  The fact the statute doesn't create an

18    entire price fixing scheme doesn't mean the price fixing

19    scheme it cites isn't hybrid.

20             MR. BECKER:  I think we're drifting into

21    facilitates collusion standard which I think is the wrong

22    standard.

23             THE COURT:  I'm not drifting there.  The plaintiffs

24    are going to have to take me there if I'm going there because

25    I'm not there.  They may persuade me but that isn't what's

1  causing me to ask this question.  I just am really

2  struggling.  I'll confess the cases, you know, Fisher versus

3  324 versus what all the cases I have read on hybrid versus

4  unilateral are not in my humble opinion the easiest to apply

5  as a district court judge.  They read fine.  You think you

6  understand what they are saying, but then when you go to

7  apply them it is I think not easy.

8          However, I do have the 324 decision which is awfully

9  close to this case.  This case meaning the statute in the

10  case or statutes I should say.  And I'm having trouble

11  understanding how I can ignore the analysis in 324 that leads

12  to the conclusion that these are hybrid, these are to be

13  viewed as hybrid.

14          MR. BECKER:  The only touchstone we can rely on,

15  Your Honor, is the agreement is what's prohibited, not having

16  the same price, that never changes.  If you agree to the same

17  price, you violate the Sherman Act.  Does the statute allow

18  permit or compel you to agree.  I would submit no, it

19  doesn't.

20          THE COURT:  I'm just about to finish, but I guess I

21  have to ask you the question.  Would you agree with me that

22  if two competitors in a market said to each other, I'm going

23  to post my price and once it's posted I will hold it for a

24  month.  You post yours, whoever is lower the other can go to

25  that lower price and we agree to hold it for 30 days.  You

 1    would agree with me that's a blatant violation of Section One

 2    of the Sherman Act?

 3              MR. BECKER:  Yes.  That's not what's occurring

 4    here.

 5              THE COURT:  Tell me how I misunderstood the

 6    statute.

 7              MR. BECKER:  The statute says they have to post

 8    their prices.  The statute doesn't say they need to agree on

 9    posting or holding.

10              THE COURT:  Posting or I didn't hear the last

11    word.

12              MR. BECKER:  Or holding.  The statute requires that.

13    Unilateral act of the state requires them to do those

14    things.

15              THE COURT:  But they can match the others.

16              MR. BECKER:  Price matching is not a violation of

17    Sherman Act as long as there's no collusion.

18              THE COURT:  No, no, but maybe I'm missing the point.

19    Let me try again.  What I'm asking you is if private parties

20    did on their own what the state statute says they should do,

21    are you arguing that's not a Sherman Act violation?

22              MR. BECKER:  Lets look at what the statute says.  If

23    you have to post your own price and you have to sell to all

24    the retailers for that price.

25              THE COURT:  Excuse me for a second.

1            MR. BECKER:  Your Honor, if the wholesalers post

2      their prices in accordance with the law and some do not give

3      volume discounts in accordance with the law, they all do it

4      unilaterally, not on their own, they are not required to

5      price match.  If they did it all on their own unilaterally,

6      they can comply with the statement of the Control Act and

7      also not violate the Sherman Act.

8            THE COURT:  Could you answer my question.  My

9      question was as follows: if you and I were wholesalers,

10     selling the product into a market to retailers and if we sat

11     down over lunch and we agreed that we would each post in

12     effect exchange with each other our price for the same

13     product at the first of every month, and that we would agree

14     who was lower, the other guy could match, we would both hold

15     it at that level for 30 days.  Would that violate Section One

16     of the Sherman Act?

17            MR. BECKER:  Yes, Your Honor.

18            THE COURT:  You would agree with me that, well, then

19     let me ask one other preliminary question.  Is what I just

20     described in the private parties' conduct equivalent to the

21     conduct that is described in the statute under post and hold?

22            MR. BECKER:  No, Your Honor.

23            THE COURT:  There's the rub.  What's the difference?

24            MR. BECKER:  The difference is that if parties do

25     dose not agree and they are not required to agree.

1          THE COURT:  No.  I'm not talking about the parties

2     in the statute.  I'm talking about we could never look at

3     statutes and decide are they per se or rule of reason unless

4     we think of them in the context of private party agreements.

5     So you can't keep telling me the statute doesn't require

6     collusion, okay, I'm missing, I'm missing it.

7          MR. BECKER:  Your Honor, well, I won't repeat.

8          THE COURT:  Lets say we were back in the day of Dr.

9     Miles where retail price maintenance is per se illegal. One

10    of the statutes at issue that effectively says to the parties

11    in the industry in the marketplace, you have resale price

12    maintenance. Is that a fair characterization?

13         MR. BECKER:  Yes, it is a fair characterization.

14         THE COURT:  If that's private people agreeing to it

15    in the Dr. Miles era, that would be a per se violation of the

16    antitrust laws, correct?  And even today would be analyzed

17    under a rule of reason analysis?

18         MR. BECKER:  That's correct.  That's the problem it

19    was a retail price maintenance in an era when that was

20    per se.

21         THE COURT:  Okay.  All right.  I guess you and are

22    passing in the night on the question of how do I talk about

23    the anticompetitive effect, that quote from Freedom Holdings

24    1 about the effects if I don't take what is the statute, the

25    conduct that the statute allows, calls for, mandates, and

1    translate it into private actors' conduct in an antitrust

2    analysis.

3            MR. BECKER:  If I may suggest, Your Honor, I think

4    the Leegin Creative Leathers case may offer some guidance.

5    Leegin goes through changing Dr. Miles from having resale

6    price maintenance from per se to rule of reason and they said

7    yes, we realize that vertical restraint retail price

8    maintenance can facilitate a horizontal cartel among

9    retailers or wholesalers.  If that's the case, it can be done

10   just as well under the rule of reason.

11           So my concern is and it's why I suggested at the

12   beginning not to separate the statute and not apply precepts

13   that apply to vertical arrangements to the horizontal --

14           THE COURT:  I don't disagree with you, but I was

15   talking only of post and hold but you keep telling me because

16   the statute doesn't speak in terms of the private parties

17   agree.  It doesn't because they don't have to agree.  The

18   statute tells them what they can do.

19           MR. BECKER:  Your Honor, I would point to

20   Battipaglia from the Second Circuit.  It analyzed almost the

21   exact same post and hold and said that it was fine.

22           THE COURT:  It did.  It said it was a rule of

23   reason.

24           MR. BECKER:  Right, it did.

25           THE COURT:  What's your answer to the plaintiff's

1    argument that Battipaglia is no longer good law that I should

2    take Freedom's holding One and other Supreme Court cases have

3    undercut it sufficiently that I should ignore its holding.

4           MR. BECKER:  I believe one of the arguments is that

5    324 Liquor sub silentio overruled Battipaglia.  I don't

6    believe it can do that.  It didn't mention it.  It had to do

7    with the retail price maintenance, part of the statute not

8    the post and hold part of the statute.  As far as Judge

9    Winter's words in Freedom 1, another panel in the Second

10   Circuit, under the Second Circuit rules until it's enbanc

11   overruled or overruled by the Supreme Court, then it is still

12   the law.

13          THE COURT:  All right.  Thank you very much, sir.

14          MR. BECKER:  Thank you, Your Honor.

15          THE COURT:  I have some questions for the

16   intervenors before I turn to the opposition for the various

17   motions.

18          The first thing I would like to confirm with the

19   intervenors is they are not arguing, in effect, they are in

20   lockstep with the state, there's no Parker or Twenty-First

21   Amendment argument being launched in this motion.

22          MS. SKAKEL:  That's correct.  This is a preemption

23   case where it purports to be one, so we are not there yet and

24   hopefully we'll never get there, Your Honor.

25          THE COURT:  All right.  You argue in your memorandum

```
 1    in support, I think it is Docket 66-1, that the analytical
 2    framework for analysis in a preemption case is if and only if
 3    the statute is found to be a potential per se violation in
 4    all cases, would a court that next examine whether the
 5    conduct is required by a unilateral or hybrid restrain.  I'm
 6    paraphrasing your pleading.
 7          You cite me to one case which is a Sixth Circuit
 8    case Trident International.  First of all, I would ask can
 9    you point me to any Second Circuit case that would suggest as
10    frame work of first determining the nature of the antitrust
11    conduct slash violation and then only turning to the hybrid
12    versus unilateral analysis.
13          MS. SKAKEL:  Your Honor, that structure is not at
14    all from that Sixth Circuit case.  That analysis is front and
15    center in Rice versus Norman Williams and we quoted Rice and
16    then we did paraphrase but Your Honor, that paraphrasing was
17    spot-on in terms of what the court instructs.  In other
18    words, you have to get through the hoop first to determine
19    that it is per se in all cases.  In other words, the statute
20    at question on its face has to mandate and authorize a per se
21    violation in all cases.  And Your Honor if I might, on --
22          THE COURT:  Whoa, whoa, whoa.  First of all, on page
23    13, you make the statement I just read to you and you cite
24    Trident, so you do cite me to a Sixth Circuit case for the
25    principle I articulated, correct?
```

1          MS. SKAKEL:  Yes.

2          THE COURT:  Second, I don't see any Second Circuit

3    cases, but I guess you are telling me that the Supreme Court

4    is -- in Rice is telling me to do this.  I will have to pull

5    out Rice in a minute, but I guess what I'm hung up on are the

6    language in, for example, Freedom Holdings 4, characterizing

7    the issue of whether, quote, challenge statutes are

8    unilateral acts of the state falling outside of federal

9    antitrust law, end quote, as, quote, the threshold question

10   at trial.  That suggests to me it is the first question.

11         Freedom 1, the Court wrote concluding that the

12   complaint sufficiently alleged the challenge statutes were

13   hybrid restraints before addressing other aspects of the,

14   quote, first question, whether the scheme alleged to have

15   been created would constitute a per se violation of federal

16   antitrust laws if brought about by agreement among private

17   parties, end quote.

18         Could you tell me how I should ignore both Freedom

19   holdings cases' language that I think makes clear that the

20   first or threshold question is are they hybrid or unilateral?

21         MS. SKAKEL:  Your Honor, with all due respect, I

22   think those cases are jumping the step that is clearly

23   articulated in Norman Williams, that you -- in order to get

24   to the point where you are assessing unilateral versus

25   hybrid, you have to be in rule of reason land.  In other

1   words, if, as a threshold inquiry, it is determined that the

2   statute on its face -- and remember this is a preemption case

3   -- the statute on its face mandates or authorizes, or even to

4   slide into, or creates irresistible pressure, to violate the

5   Sherman Act, that has to be a per se violation in all cases.

6          So, for example, Your Honor, the example that you

7   gave to Attorney General Becker where what if two wholesalers

8   sat down and they decided over a cup of coffee to do X, Y or

9   Z.  Well, perhaps that could happen, but two things would

10  flow from that.  First, that could be two wholesalers, not a

11  statute dictating that in all cases that must happen.

12  Right?  So we don't meet that initial test at Norman

13  Williams.  And number two, even if it did, then it would be a

14  private action by a private party, which is not what Total

15  Wine is bringing.

16         And Your Honor, we cited the Tritent case not for

17  the proposition that Norman Williams is a two-step standard,

18  but the fact that we can't find any case where to use the

19  facilitate and impel language, which is the language of the

20  Total Wine Complaint as opposed to mandate or authorize, that

21  a case where supposedly a statute facilitates that behavior

22  that has not met the Norman Williams standard.  So I just

23  wanted to clarify where we were.

24         THE COURT:  Hold just a second.

25         MS. SKAKEL:  Sure.

1          THE COURT:  Could perhaps the reason why Norman

2    Williams doesn't speak about unilateral versus hybrid be that

3    it was decided before Fisher?  Where Fisher lays out first

4    we're going to look to see it's unilateral or hybrid.  It's

5    unilateral.  End of discussion.

6          MS. SKAKEL:  Your Honor, I don't think that Fisher

7    is effectively trumping Norman Williams.

8          THE COURT:  I don't think it's trumping it. I think

9    it is laying out an analytical framework which binds me and

10   that Norman Williams doesn't speak to that framework because

11   its voice rose before the framework gets introduced by the

12   Supreme Court.

13         MS. SKAKEL:  But, Your Honor, if you look at Fisher,

14   if you look at Midcal, even if you look at 324 Duffy, what

15   they are doing and -- and likewise, TFWS and Costco, they are

16   essentially just jumping into the second part of the test

17   and, therefore, that is why you can then start conflating

18   what I'm going to call real Parker immunity, which is a

19   defense much like the Twenty-First Amendment, which is where

20   we are not, and essentially moving that up and using it as a

21   substitute to show the requisite collusion in order to then

22   get back up and show that this is a per se violation.

23         In other words, you can't sort of cherry-pick and

24   create some sort of a jumbled puzzle where you are picking

25   these doctrinal piece of antitrust law, shaking it up and

1    then saying, yes, this is a preemption case because in all

2    cases each one of these three statutes mandate and authorize

3    improper per se conduct in all cases across the board.  And

4    that's the distinction, Your Honor, that we are trying to

5    maintain because we believe, based on the case law, that

6    that's still the appropriate lens through which this analysis

7    has to be undertaken.

8         THE COURT:  Tell me one good reason I should ignore

9    the Supreme Court of the United States in the Fisher case in

10   which it starts out with the primary number one question:  Is

11   this conduct going to be analyzed as unilateral or hybrid?

12        MS. SKAKEL:  Your Honor, the predicate for Fisher or

13   Midcal and Schwegmann, right, that those are the comparative

14   statutory analyses that were undertaken there.  So in those

15   instances, and therefore also 324 Duffy, they looked at

16   whether those cases were per se under that time.  But

17   remember, Your Honor, we have Leegin.  Leegin came in and

18   said, wait a second, folks, we're giving you a history lesson

19   here, and though you may have done it one way, you need to do

20   it this way now.  And therefore, you know, you are going to

21   be looking at per se through this lens and you're going to be

22   looking at rule of reason through this lens.  And again,

23   again with all due respect, Your Honor, I believe that Total

24   Wine is trying to use 324 Duffy inappropriately because

25   Leegin did knock that out.  So we are not -- we are not in

1    324 Duffy land here.

2            THE COURT:  Well, the land I want to be in is what

3    is the analytical framework.  I'm going to start with basics.

4    Your brief argues that I turn first to the second question

5    posed in the Fisher analysis, which it never reached because

6    it decided the ordinance was unilateral.  Do you agree with

7    me so far?

8            MS. SKAKEL:  Yes, Your Honor.

9            THE COURT:  I don't want to hear about Leegin.  I

10   don't want to hear about resale price maintenance.  I don't

11   even want to hear about price fixing or per se or anything.

12   I just want to know when I open the books and I decide how to

13   write this opinion, the first question I believe Fisher tells

14   me to ask is: Is this statute presenting a unilateral or a

15   hybrid setting?  You are arguing to me, no, Judge, don't do

16   that.  And I would like to know on what basis I would do

17   that.

18           MS. SKAKEL:  Your Honor, on the basis of Rice versus

19   Norman Williams.  But if Your Honor is not comfortable that

20   that is still the controlling standard --

21           THE COURT:  No, I'm not because --

22           MS. SKAKEL:  -- then let's do it your way.  Let's do

23   it, okay, we're going to look at unilateral versus hybrid

24   first.  All right.  But -- but do you agree with me, Your

25   Honor, with all due respect, that you can't eliminate

```
 1   altogether whether it is per se or rule of reason?

 2        THE COURT:  I don't even know what that question

 3   means so I can't answer it.  Let me ask my question.  I would

 4   like to turn to something different now.  I would like you to

 5   address --

 6        MS. SKAKEL:  To punctuate -- I'm sorry, I don't mean

 7   to be disrespectful, but assuming that you look at whether it

 8   is unilateral versus hybrid initially, right?  That does not

 9   mean that you don't have to come back and make an assessment

10   as to whether it is per se.

11        THE COURT:  Sure.  Of course, that's the second

12   step.

13        MS. SKAKEL:  So --

14        THE COURT:  And that's where Norman Williams is very

15   helpful.  And I never raised the suggestion I was going to

16   ignore.  I was trying to ask you what's the first thing I

17   have to do.  It doesn't mean there isn't a second.

18        MS. SKAKEL:  But I would say to Your Honor it would

19   be a simpler exercise for you if you just follow Norman

20   Williams.  Because we believe, and our brief set this out,

21   you don't get past whether it's per se or rule of reason

22   because, again, these statutes do not mandate in all cases

23   that there be the improper per se violation of Sherman 1.

24        THE COURT:  I would like you to address the question

25   I raised with the Assistant Attorney General about whether I
```

1    should look -- I should undertake my analysis by looking at

2    the challenge provisions as an overall scheme or I should

3    parse them out individually.  And depending on what your

4    answer is, why.

5         MS. SKAKEL:  Yes, Your Honor.  They should not be

6    bundled, which is the terminology that was utilized in

7    connection with the Maryland and Washington State cases.  And

8    that is because, again, for purposes of the analytical

9    framework, each statute has to rise or fall, quote, on its

10   face.  So again --

11        THE COURT:  Well, what do you do with the subparts

12   of the section?  Do those rise and fall on their face or do

13   they get read together?

14        MS. SKAKEL:  Well, this is another -- a tricky bit,

15   Your Honor, because in the Complaint they have not, in fact,

16   made distinctions with subsections.  So they believe that the

17   entire statute should -- excuse me, the entire statutory

18   section presumably should fall.

19        THE COURT:  My question isn't in relationship to

20   what they've alleged.  My question -- actually, that one was

21   a hypothetical.  So I guess I would ask it again.

22        MS. SKAKEL:  You have to look, Your Honor -- at a

23   minimum, you have to look at each individual component of the

24   statute that they are challenging.  So, for example, Your

25   Honor, the provision --

1          THE COURT:  Why?

2          MS. SKAKEL:  Why?  Because the statutory mandate is

3     such that the statute on its face, not in combination with

4     other components of a legislative scheme, but on its face has

5     to be inappropriate under the Sherman Act.

6          THE COURT:  So if I had one section of the statute

7     and three subparts, post and hold, resale price,

8     nondiscrimination as the third, I would still analyze this in

9     three pieces?

10          MS. SKAKEL:  Your Honor, I believe that that is what

11     would have to be done, but -- but, even if you were analyzing

12     them in an appropriate way to see how they do interact --

13     we're not suggesting that you have to leave common sense at

14     the door here.  But what you can't do is effectively -- and

15     this is what Total Wine tries to do.  You can't say, well,

16     because the volume discount ban is utilized in order to

17     essentially enforce post and hold, then the volume discount

18     ban has an albatross around its neck by virtue of its

19     interaction with post and hold and, therefore, everything

20     drops down and has to be struck.

21          But what our position is that -- and Costco

22     articulated this -- you need to look at each individual

23     statute directly and what is its impact.  Not as a collective

24     bunch.  For example, Your Honor -- and this is particularly

25     important --

1          THE COURT:  Costco's -- I think -- is that the

2    Fourth or the Ninth?

3          MS. SKAKEL:  That's the Ninth, Your Honor, yes.

4          THE COURT:  That's Judge O'Scannlain's case?

5          MS. SKAKEL:  Yes, Your Honor.

6          THE COURT:  I'm not bound by that, am I?

7          MS. SKAKEL:  No.  I understand, Your Honor.  My only

8    point is that even Costco recognized that the approach taken

9    by the Fourth Circuit was inappropriate.  And the Fourth

10   Circuit, by the way, Your Honor, is the only case that's been

11   brought to the attention of us where there was this bundling

12   approach taken.  So it is definitely an outlier.  It is an

13   outlier from the Fourth Circuit.  The Ninth Circuit hasn't

14   even undertaken that same approach even though the same

15   statutes were in play in the Ninth Circuit.

16          THE COURT:  Can you suggest the Second Circuit

17   opinion in which -- well, in which if they don't directly say

18   it the way they analyzed the statute would support your

19   position that I should look at each piece of the scheme

20   separate?

21          MS. SKAKEL:  Well, Your Honor, anytime that more

22   than one statute is in play, then they all don't fall.  In

23   other words, when there is no severability argument

24   articulated, and the State has articulated none, then by the

25   way Total Wine hasn't articulated that as sort of a backup

```
1    plan that, you know, at least one, if not all, of these

2    should be struck.  So I'm not even sure whether it would be

3    appropriate in these circumstances to begin with.  But again,

4    and to echo what Attorney General Becker said, this is a

5    preemption case.  So it is particularly sensitive where you

6    are talking about the federal court coming in and wiping out

7    a state statute.

8            THE COURT:  You argue in your brief, I think in your

9    reply actually is where I have got a quote from it, but, in

10   effect, Leegin -- I don't know if that's the right way to say

11   it, but that's okay.

12           MS. SKAKEL:  I think it's Leegin, Your Honor.

13           THE COURT:  Leegin.  Yeah, it is gin like the drink.

14   Leegin.  Okay.

15           Was decided at a time when RPM was still being per

16   se.  So I should effectively throw the case out of my

17   consideration.  It is totally -- the words you used was

18   abrogated.

19           MS. SKAKEL:  That you should throw out Leegin or you

20   should throw out this case?

21           THE COURT:  No, throw out Leegin in terms that I

22   shouldn't use it.  It's been -- you argue -- I think the

23   words --

24           MS. SKAKEL:  No, no, Dr. Miles was --

25           THE COURT:  I'm sorry.  I apologize.  That it was
```

 1   abrogated by Leegin.  I've got it backwards.  So that 324 was

 2   abrogated by Leegin.  I apologize  Because of the fact of the

 3   resale price maintenance status at the time of 324 versus

 4   being thrown out by Leegin, I shouldn't look to 324.  Is that

 5   your argument?

 6         MS. SKAKEL:  Yes, Your Honor, 324 we believe, while

 7   not overtly overruled by Leegin --

 8         THE COURT:  No, no, that's not what I'm worried

 9   about.

10         MS. SKAKEL:  I'm sorry.

11         THE COURT:  What I'm worried about is let's assume

12   -- and I think you are right, but I haven't heard from the

13   plaintiff so I'll make it an assumption.  -- that Leegin --

14   you know, announce the rule of region test for resale price

15   maintenance, which is completely contrary to the portion of

16   opinion in 324, which said it was per se.  So ergo Leegin

17   overrules the portion of 324 Liquor that said resale price

18   maintenance was per se illegal.

19         MS. SKAKEL:  That certainly is our initial position,

20   Your Honor.  If Your Honor is not comfortable going that far,

21   however --

22         THE COURT:  No, no, I'm going that far.  My question

23   is why do I ignore the rest of 324?  There's nothing in

24   Leegin that addresses the rest of 324 Liquor.  I don't know

25   why the rest of 324 Liquor's analysis isn't still good law?

1          MS. SKAKEL: Your Honor, by the rest of 324, just so

2     I'm straight, are you talking about the immunity discussion?

3     Because I thought we were all on board that --

4          THE COURT:  No, I'm talking about that little nugget

5     that you wanted me to skip over, unilateral or is it hybrid?

6          MS. SKAKEL:  Yes, Your Honor.  Well, certainly to

7     the extent it is in a footnote and even if Your Honor doesn't

8     believe that Leegin wiped out all of 324, including the

9     footnote, then certainly as a footnote it shouldn't end up

10    taking and controlling what the holding is, number one.

11         Number two, again, and just to get back to the

12    notion of the unilateral versus hybrid, if we are in a rule

13    of reason situation Total Wine's case is out.  This is a

14    preemption case.  So if they can't say in per se land, they

15    are out of wood.  So to some extent, Your Honor, Footnote 8

16    you don't have to worry about that because if you are not in

17    per se, you know, again land, to use my metaphor, then if

18    they want to be in rule of reason, they need a different

19    action.

20         THE COURT:  You keep wanting to jump to the last

21    page of the novel.  And as a judge anyways, maybe not as a

22    lawyer advocating for a party, I have to analyze the case

23    under a scheme that's been laid out either by statute or by

24    Supreme Court or Second Circuit case law.  So I don't care

25    about whether it is rule of reason or it's per se because I

1    have to first decide is it unilateral or hybrid.  If it's

2    unilateral, as in Fisher, I don't ever ask the question.

3         So I'm only talking now about the portion of 324

4    Liquors which spoke about its inclusion that something was a

5    hybrid.  I don't understand why that would be abrogated by

6    Leegin.

7         MS. SKAKEL:  It perhaps is not, Your Honor, but if

8    one look as 324 Duffy, as Your Honor says the rest of the

9    opinion, then one also has to look at and analyze what are

10   the two statutory schemes that we're talking about.  The

11   first one in 324 Duffy, which was a prior New York statute

12   that was struck versus the Connecticut statute at issue here.

13   And in that regard, Your Honor, is correct, they are both

14   with respect to minimum resale price schemes.  However, a

15   very significant difference of the New York scheme that was

16   struck two-fold.  One, in that case, there was no below cost

17   prohibition in place.  In New York, there was no below cost

18   prohibition in place.  In Connecticut, there is.  And that

19   below cost prohibition cuts across all three tiers,

20   manufacturers, wholesalers and retailers.

21        So when you are looking at the below cost

22   prohibition in the context of, quote, min bot, or the minimum

23   bottle price, then that has a very different bearing than in

24   a state where you didn't have a below cost prohibition.

25        Secondly, under the New York --

1          THE COURT:  Excuse me.  I'm going to interrupt you.

2          Terri, can you tell me what my question was?

3          MS. SKAKEL:  Footnote 8, you wanted to know why you

4    have to deal with Footnote 8, right?

5          THE COURT:  Not why I have to deal it with.  Why you

6    were forthright with the Court when you wrote in your brief,

7    quote, 324 Liquor was in all respects relevant to this motion

8    abrogated by Leegin, end quote.  That's what I'm talking

9    about.  Not some analysis that you are now going into, which

10   begs my question.

11         MS. SKAKEL:  Your Honor, first of all, there was no

12   conclusion that -- we are not drawing a conclusion as to

13   whether or not it was hybrid.  And the footnote, likewise, is

14   talking about essentially a hypothetical.

15         THE COURT:  I don't understand what you mean when

16   you say we're not drawing a conclusion that it was hybrid.

17   What does that mean?

18         MS. SKAKEL:  We are saying it is not a hybrid

19   statute in place here, correct?

20         THE COURT:  That's your position.

21         MS. SKAKEL:  That's correct.  Likewise, that

22   Footnote 8 is not drawing a conclusion in and of itself that

23   it is a hybrid.  But in any event, the -- at least my

24   recollection -- and someone just handed it to me -- they are

25   not saying that, in fact, this is hybrid.  They are talking

1    about rejecting appellee's contention as to whether or not

2    essentially the argument that -- or the point you were

3    discussing with Attorney General Becker earlier, Your Honor.

4    Did that answer your question?

5         THE COURT:  No.  I guess I'm struggling first with

6    your statement in all respects Leegin abrogated 324, but I

7    will get past that, but I don't understand why the holding in

8    324 that the regulation -- the statute at issue which was

9    found to be hybrid wouldn't be relevant to my analysis here

10   today.  I gather -- I hear you saying that your view is all

11   of these are unilateral.

12        Let's assume I do not agree with you.  Isn't 324

13   then helpful in my reaching that conclusion or in supporting

14   that conclusion?

15        MS. SKAKEL:  Well, certainly, Your Honor, if you

16   were of the mind that Leegin's analysis does not indicate

17   that the appropriate analysis pro Leegin and therefore, if

18   one could turn back the clock what it should have been for

19   324 Duffy, should have --

20        THE COURT:  All that would have mattered if you

21   wrote Leegin the day before Duffy, they would have decided

22   it was hybrid, as Footnote 8 reflects, and then they would

23   have said, ahh, resale price maintenance is rule of reason.

24   End of case.  Okay.  But the Leegin coming after 324 doesn't

25   change the first part of 324's analysis or conclusion in

1    Footnote 8 that it's a hybrid.

2          MS. SKAKEL:  That is correct, Your Honor.  However

3    -- and again I don't -- I know you don't want me to reiterate

4    this, but it is our position that assuming you determine that

5    it is hybrid, you still need to go back and determine whether

6    it is per se or rule of reason.

7          THE COURT:  I don't know what I have said today that

8    caused you to be concerned that if I decide it is hybrid,

9    that's the end of the case or the end of my opinion.

10         MS. SKAKEL:  I'm not concerned that it is the end of

11   your opinion, Your Honor.  However, what I'm trying to

12   reiterate is that the -- certain indefinite importance of

13   making sure there's an analysis as to whether or not this is

14   a per se violation in all cases.  In other words --

15         THE COURT:  I haven't asked you one question about

16   that yet.

17         MS. SKAKEL:  I understand, Your Honor, but what I'm

18   saying is that -- let's assume for the moment you determine

19   that this is hybrid.  My understanding under Norman Williams,

20   and I think you agreed with me, is that you then would have

21   to go back and determine whether or not it is a per se or

22   rule of reason situation.  Right?  So our position is that --

23   I suppose even if you determine that this was hybrid, which

24   we do not believe is the case, that if you go back and look

25   at this as to whether or not it is per se or rule of reason,

1    you must be in per se because the statute does not mandate or

2    authorize improper conduct in all cases.  That's all.

3            I don't mean to repeat myself, but I think it is

4    important not to lose sight of that significant and critical

5    distinction as to is this per se or is this rule of reason.

6    Because if this is rule of reason, then Total Wine's

7    Complaint as pled is out.

8            THE COURT:  All right.  I am going to ask another

9    question that doesn't involve analyzing per se versus rule of

10   reason.

11           MS. SKAKEL:  Thank you, Your Honor.

12           THE COURT:  You don't have to thank me.

13           In Battipaglia, you claim that the Court analyzed

14   New York's post and hold statute as if its conduct at issue

15   were unilaterally mandated by state statute.  That's your

16   brief at 27.  Do you agree?

17           MS. SKAKEL:  Yes, Your Honor.

18           THE COURT:  I think you acknowledge, as you would

19   have to if you haven't already, that Battipaglia preceded

20   Fisher --

21           MS. SKAKEL:  Yes, Your Honor.

22           THE COURT:  -- temporally.  So Fisher is the first

23   time -- we've already gone over this -- it's post-Norman

24   Williams.  It's the first time the Supreme Court created the

25   analytical framework of horizontal versus -- excuse me,

1    hybrid versus unilateral.  Move from there only if hybrid to

2    per se or rule of reason.  Okay.

3            MS. SKAKEL:  Yes, Your Honor.

4            THE COURT:  So I don't understand how you can argue

5    to the Court that the unilateral nature of the post and hold

6    requirement was confirmed -- that's your word -- by

7    Battipaglia.

8            MS. SKAKEL:  Well, Your Honor, keep in mind that

9    first of all we're talking about post and hold in Battipaglia

10   and we're not talking about post and hold in Fisher.  But in

11   the analysis that Judge Friendly undertook is effectively not

12   inconsistent with the subsequent Fisher case.  In other

13   words, his analysis was that post and hold you have

14   independent wholesalers setting their own prices.  And so

15   there is no -- there is no slippage there in terms of whether

16   or not there is, in fact, an agreement because the statute is

17   not mandating that the wholesalers agree.

18           It is a function of the statute that they, first of

19   all, determine what their own price is going to be and then

20   post it.

21           THE COURT:  I don't know that any of that addresses

22   my question of how you can argue that Battipaglia supports

23   and, in effect, found the statute at issue in Battipaglia to

24   be unilateral.

25           MS. SKAKEL:  It also followed, Your Honor, the

1    predecessor case, Morgan, which was the affirmance of Serlin

2    Wine.  And that case, of course, as Your Honor may recall did

3    discuss a Connecticut statute and that case followed a

4    unilateral approach, if you will.

5           THE COURT:  I am going to be really specific.  Point

6    me to the page and paragraph in Battipaglia that would, in

7    your opinion, best support your statement that Battipaglia

8    analyzed New York's post and hold statute as if the conduct

9    at issue were unilaterally mandated by state statute.

10          MS. SKAKEL:  Your Honor, in that regard, shall I

11   provide you with the page in which Judge Friendly is

12   discussing the Connecticut and federal court cases?

13          THE COURT:  I don't know.  I want you to provide me

14   with the page that answers my question.

15          MS. SKAKEL:  Well, Your Honor, he certainly is --

16   one of the other sort of pieces of the framework that he's

17   providing, of course, is his discussion of Midcal.  And I

18   think he's contrasting what was going on with Midcal and the

19   -- and the analysis the court undertook there with the

20   analysis that, as we have noted in our brief is, if you will,

21   a unilateral approach.  And the discussion -- let's see here.

22   I mean, we cite page 170 in our brief, and then likewise it

23   continues -- again this discussion of the prior cases

24   continues on to page 173.

25          So without going back, Your Honor, and literally

1    rereading, my sense is that, you know, again, his notion of

2    going through the prior Connecticut cases as well as going

3    through Midcal and comparing and contrasting, that is

4    creating the appropriate analysis that should apply here,

5    which is one where the post and hold statute is viewed as a

6    unilateral restraint.

7              THE COURT:  Thank you very much.  Who is going to

8    argue for the plaintiff?

9              MR. MURPHY:  I am, Your Honor.

10             THE COURT:  It's Attorney Murphy?

11             MR. MURPHY:  Yes, Your Honor.  Nice to meet you.

12             THE COURT:  Would you make sure the mic is in front

13   of you, sir, so your voice is being picked up by the system.

14             It seems to me, and you correct me if I'm wrong, but

15   your view is that I should look at the challenge scheme

16   provisions collectively.  Am I correctly reading your

17   arguments?

18             MR. MURPHY:  Yes, Your Honor, although that's I

19   don't believe essential, but that is how we think the Court

20   ought to proceed.

21             THE COURT:  Okay.  Page 1 of your brief, you say the

22   three aspects of the Liquor Control Act taken together...

23             MR. MURPHY:  Yes.

24             THE COURT:  So I guess I am going to proceed on the

25   assumption that's what you are asking me to do.

1          MR. MURPHY:  I think it is the preferred way to do

2     it.

3          THE COURT:  Why?  What do you mean by -- forget

4     about preferred.  What case or law, statute or otherwise

5     would tell me that's how I would analyze the situation in

6     front of me?

7          MR. MURPHY:  The statutes work together and the

8     statutes refer to each other.

9          THE COURT:  But I have a lot of liquor cases here,

10     including from New York, which have many of the same

11     features.  And when they are talking about -- I don't know,

12     I'm going to have the wrong cases, but in one case they're

13     talking about resale price maintenance.  I guess 324.  They

14     don't go and say, oh, by the way, you have got to look at

15     this to see are there four other sections of the New York

16     statute that could affect how anticompetitive this resale

17     price piece is.

18          MR. MURPHY:  I think that was a function of the

19     plaintiff's challenge in that case, or the party that was

20     challenging the statute because in 324, it was actually a

21     defendant. But, for example, in the Total Wine case in the

22     Fourth Circuit, TFWS, which was a Total Wine case, we

23     challenged two aspects of the Maryland statute.  And the

24     Court agreed and considered them together.

25          In Costco, which I was not involved in, the parties

1    challenged nine different provisions and the appellate court

2    felt, well, some of these provisions interrelate and some

3    don't.  And so the court ended up looking at them all

4    individually.

5            Here, in Connecticut, the below cost prohibition,

6    what's been referred to as a resale price maintenance

7    situation, is part and parcel of the post and hold.  Because

8    cost is defined as the lowest -- the posted bottle price that

9    the wholesaler posts.  Now, the posted bottle price is

10   defined by the post and hold statute.  There's two different

11   statutes.  But what is being challenged -- what we're

12   challenging is the interaction of the two.

13           So we do challenge post and hold.  We also challenge

14   the resale price maintenance.  We challenge the quantity

15   discount because, as Judge Michael found in TFWS, it has the

16   effect of enabling people to enforce -- enabling the State to

17   enforce more readily the post and hold provision.

18           THE COURT:  Was that Blaine Michael?

19           MR. MURPHY:  Blaine Michael.

20           THE COURT:  Michael?

21           MR. MURPHY:  Yes, Your Honor.

22           THE COURT:  Well, I'm an old antitrust lawyer.  I

23   emphasize old, and I don't do much antitrust law.  Haven't

24   done it for a really long time, but I still remember that we,

25   I thought, always framed antitrust analysis into horizontal

1    and vertical restraints.  Would you agree with me?

2             MR. MURPHY:  I agree that that is certainly a

3    construct that is often applied.

4             THE COURT:  So I'm struggling with how I take post

5    and hold, which seems to me to be a horizontal scheme.

6             MR. MURPHY: Yes.

7             THE COURT:  It relates to what the wholesalers or

8    bottlers get to do or not do vis-a-vis the prices they set

9    with the pricing by a retailer, which to me looks to be a

10   vertical issue.

11            MR. MURPHY:  It certainly has a vertical aspect.

12   But, Your Honor, because of the way the statute works, every

13   wholesaler is posting a bottle price for every retailer for

14   every product and every retailer must charge at least that

15   posted bottle price in every store in Connecticut.  So there

16   are horizontal aspects as well as vertical aspects.

17            This is not a case like <u>Leegin</u> where an individual

18   leather producer wants to induce his retailers to provide

19   better service and maintain higher prices and avoid the

20   discounters.  That's not what this case is.

21            THE COURT:  Okay.  I think I understand you, but I

22   don't think it is going to help you.  Let me try to explain.

23   I will tell you what my reading is and then you tell me why

24   I'm wrong.

25            In my view, <u>Leegin</u> announced a blanket rule vertical

1    resale price maintenance schemes, wholesaler maker of product

2    compelling a price at the level below will never be per se

3    illegal under the antitrust laws.  It may violate the

4    antitrust laws under a rule of reason analysis if the

5    benefits we identify in this little case, you know, small

6    manufacturer, small share of the market, trying to support

7    the little mom and pops that are the outlets of their product

8    against the mega competition.  That's all pro competitive we

9    think nowadays in the light of the '80s, or whenever it was

10   decided, as opposed to the dark ages of Dr. Miles.  Right?

11          But Leegin goes on to educate us don't be so

12   comforted by the fact that it isn't a per se rule that all

13   resale price maintenance is rule of reason.  It is that.  It

14   is going to be a standard blanket test rule of reason, but

15   not all defendants will win under the rule of reason test for

16   resale price maintenance.  And you have just suggested in

17   this case that, well, look, here we have got every player in

18   the market, it's not just the little guy with the small share

19   like in Leegin.  We've got everybody up here at the top

20   fixing a price and then driving that price down to their

21   retailers.  Correct?

22          MR. MURPHY:  Yes, Your Honor.

23          THE COURT:  Okay.  So if we didn't have preemption,

24   if you can preempt the statute, I might be thinking you've

25   got a good shot of winning this case under rule of reason as

1   anti-competitive because of the nature of the whole market

2   being involved.  The warning signs that Leegin said let's not

3   lose sight of this.

4        The problem for you -- give me a minute to try to

5   frame it.  The problem for you is Rice, I think, Norman

6   Williams and everything I have been attacking the other

7   counsel over, this two-step construct, let's assume I find it

8   is hybrid and then I move to rule it has to be under Norman

9   Williams irreconcilably in conflict, and there's language

10  swear about it has to be a per se rule, you're under a rule

11  of reason rule for that analysis that you want me to look at

12  the whole market of how this resale price maintenance works,

13  and therefore, you don't preempt.

14       MR. MURPHY:  Your Honor, I don't think so.  And the

15  reason I don't think so is because 324 Liquor versus Duffy

16  anticipated your question.  And in that decision, Justice

17  Powell wrote the following, mandatory industry-wide resale

18  price fixing is virtually certain to reduce inter-brand

19  competition as well as intra-brand competition because it

20  prevents manufacturers and wholesalers from allowing or

21  requiring retail price competition.  The New York statute at

22  issue in 324 Liquor specifically forbids retailers from

23  reducing the minimum prices set by wholesalers.

24       Now, when the Supreme Court decided Leegin, it did

25  not overrule 324 Liquor.  It didn't discuss 324 Liquor.  And

1    the Supreme Court recognized along the way in its historical

2    analysis of Dr. Miles and all the vertical restraints and how

3    they gradually all became rule of reason, it recognized,

4    though, that there was still this notion that industry-wide

5    resale price maintenance is different.  And that's what

6    Justice Powell wrote in 324 Liquor.  It hasn't been

7    overruled.

8            I don't know how the Supreme Court will decide it,

9    but this is not a case involving the typical vertical resale

10   price maintenance where a manufacturer tells a retailer here

11   is what you're going to charge.  This is something entirely

12   different, and it is system-wide industry-wide.  I think that

13   the Supreme Court may decide that, you know, this has got

14   horizontal aspects and that makes it different.

15           THE COURT:  I would give you a good shot at it,

16   actually.  I think -- if I now understand your argument, it

17   is not a bad argument.

18           MR. MURPHY:  Thank you, Your Honor.

19           THE COURT:  But the fact of the matter is I have

20   precedence that binds me.  And the precedence says -- Supreme

21   Court, if it's hybrid, it is preempted only if it is per se.

22   There's all that strong language in Norman.  Really, really

23   strong.  And then the Supreme Court says resale price

24   maintenance is not per se.  I don't see how I fit.  I don't

25   disagree, Justice Powell did a very fine analysis of how this

1  particular construct of statutes can create an

2  anti-competitive effect, but it's an analysis.  It's not a

3  per se rule anymore.

4          MR. MURPHY:  It was when he wrote it.

5          THE COURT:  It was, but it isn't anymore.

6          MR. MURPHY:  It hasn't been overruled, Your Honor. I

7  mean, the Supreme Court doesn't go out of its way to overrule

8  random court of appeals decision that it finds throughout the

9  country that it might be at odds with the decision.  The

10  Supreme Court does not overrule sub silentio a decision of

11  the Court rendered a few years before.  324 Liquor on this

12  point, Your Honor, was unanimous.

13          THE COURT:  But it relied on Dr. Miles in that very

14  paragraph you quoted to me.  Tell me anywhere that says that

15  when the Supreme Court announces an -- overruling a case

16  which is the doctrinal case, it is the case which has been

17  followed in hundreds of cases, including Supreme Court cases,

18  I don't know of any principle that says that unless the

19  Supreme Court names every case that relied on Dr. Miles, it

20  isn't overruling those cases to the extent that they relied

21  on Dr. Miles.  That's can't be, sir.

22          MR. MURPHY:  Your Honor, I think that it is.  In

23  324, Justice Powell recognized the tension with Dr. Miles,

24  recognized the criticisms of Dr. Miles, recognized the ways

25  in which the Court had narrowed the per se rules with respect

1      to vertical restrictions, and did all of that.  And in Leegin

2      itself, the Court recognized that what it was doing with

3      respect to a private cartel would lead perhaps to unfortunate

4      consequences if it was not a private cartel involving a small

5      segment of the market, but indeed the entire market.

6            THE COURT:  But it didn't say -- what it didn't say,

7      sir, is it didn't say we're going to overrule Dr. Miles which

8      said per se analysis for resale price maintenance.  It didn't

9      say we're going to overrule that for rule of reason with

10     little industry participants, but when they are everybody or

11     all the big boys, that's a per se rule.

12           MR. MURPHY:  It also didn't, Your Honor, distinguish

13     between statutorily imposed restraints and private agreements

14     because it wasn't dealing with the statutorily imposed

15     restraint.

16           THE COURT:  No.

17           MR. MURPHY:   This case is one and 324 Liquor is

18     one.

19           THE COURT:  When I'm at the second step of my

20     analytical framework, I'm looking at it under antitrust

21     principles, per se rules, rule of reason.  I understand I'm

22     looking at it in the context of the state statute because I'm

23     in the box because it's a preemption question.  But I'm still

24     analyzing it under universal, I'll call them, antitrust

25     principles.  Right?

1          MR. MURPHY:  You're right, Your Honor.  But we are

2   also challenging this aspect of the statutory scheme as a

3   horizontal restraint.

4          THE COURT:  I understand that.  Maybe we'll get to

5   that in a minute.  You've got me all over my questions,

6   though, I'm trying to -- I think that takes care of that one.

7   Let me get back to some of my earlier ones.

8          I just want to be clear you're making a facial

9   challenge to the statute?

10         MR. MURPHY:  Yes.

11         THE COURT:  That's why you named, you know, the

12  Assistant A.G.'s clients, right?

13         MR. MURPHY:  We're seeking injunctive relief to

14  declare the statute unconstitutional as -- on contravention

15  of the Sherman Act.

16         THE COURT:  On its face.

17         MR. MURPHY:  On its face.

18         THE COURT:  Period, end of answer.

19         MR. MURPHY:  On its face.

20         THE COURT:  So to the extent I might find a few

21  words here or there in the Complaint that try to tip their

22  hat at private participants and what they are doing as a

23  result of having this umbrella of the statute, that can only

24  be understood in the context of a facial challenge, in other

25  words, something on the face of the statute.

1          MR. MURPHY:  Yes, Your Honor.  Can I explain that?

2          THE COURT:  I think, as long as you don't take back

3    what you just said.

4          MR. MURPHY:  I'm not going to take anything back.

5    I'm going to explain why it's there.

6          THE COURT:  Go ahead.

7          MR. MURPHY:   Because in Midcal, for example, the

8    Supreme Court analyzed what had been the impact of the

9    statutes being challenged on prices and analyzed the price

10   impact.  In Battipaglia, Judge Friendly stated that there was

11   not the kind of evidence that he would have expected to see

12   on the impact on prices if the statute was as bad as the

13   plaintiffs there was alleging.

14          This happens to be a case in which we can tell

15   pretty readily what the impact of a statutory scheme is, and

16   that's what those charts attached to the Complaint do.

17          THE COURT:  I'm paying too much for my alcohol,

18   right?

19          MR. MURPHY:  You are paying too much for your

20   alcohol.

21          THE COURT:  While we're on this -- I'm sorry I

22   interrupted you, but I'll just keep interrupting you.

23          You make some statement or arguments in your brief,

24   they are very well framed but I think irrelevant to me, about

25   the whole question of whether this is a good choice for the

1    State of Connecticut, its consumers, even its business

2    people.  That's not my decision, correct?  I might think that

3    your position is the best position in the world in the sense

4    of we don't need this scheme, but that isn't what I'm

5    deciding here.  Do you agree?

6              MR. MURPHY:  You have to decide whether it is

7    consistent with the Sherman Act.

8              THE COURT:  I have to decide if it is preempted.

9              MR. MURPHY:  Right.

10             THE COURT:  That's fine.  I interrupted you.  So if

11   you can remember where you, you can please proceed.

12             MR. MURPHY:  So in some of these cases, the Court --

13   and including the Supreme Court -- has clearly looked at how

14   does the statute work in the real world.  And what our charts

15   show is that in the real world what happens is every

16   wholesaler that sells Tanqueray gin or a particular brand of

17   vodka, whether a dual wholesale arrangement, the case price

18   is identical every month to the penny because the competing

19   wholesalers and the bottle price is identical every month.

20   And when the case prices change to give the retailer a break

21   and a discount from the usual price, bottle price remains the

22   same.  The retailer can never pass on the benefit to the

23   consumer.  That's why it is --

24             THE COURT:  That's not what the statute

25   contemplates, is it?

1          MR. MURPHY:  I'm not sure the statute contemplates

2   that.  The statute has caused that.

3          THE COURT:  Allows it.

4          MR. MURPHY:  Caused it.  Allows it.

5          THE COURT:  We won't quibble.

6          MR. MURPHY:  It is anti-competitive.

7          THE COURT:  Of course it is.

8          MR. MURPHY:  That is the major concern of the

9   Sherman Act.

10          THE COURT:  Right, but we have lots of -- we have

11   lots of state statutes to which the antitrust laws don't

12   apply, right?  I might like to see more competition in my

13   electric bill.

14          MR. MURPHY:  Absolutely.  It is one thing to have a

15   regulated utility and it's another thing to have an

16   unregulated liquor industry that has what the Supreme Court

17   is Midcal called a gauzy veil of state enforcement over top

18   of private market decisions.  And these are private market

19   decisions.

20          THE COURT:  Well, but -- well, that's fine.

21          The intervenors in their reply write that, quote,

22   you, the plaintiff, do not assert irresistible pressure

23   either in your Complaint or as a basis for your opposition,

24   in other words, that second prong of the test.  Are they

25   correct?

1          MR. MURPHY:  Your Honor, I would like to say we'll

2     allege whatever we need to allege to have our Complaint

3     survive.

4          THE COURT:  Tell me what you have argued.

5          MR. MURPHY:  What we have argued is that this

6     statute -- I think we use the word facilitates and impels.

7          THE COURT:  Right.  That isn't in the test.  That's

8     why I think I'm having trouble with it.

9          MR. MURPHY:  Maybe the word should have been

10    compels, but it compels a uniform pricing system.

11         THE COURT:  I really hate to -- I'm very pedantic,

12    you know.  I have boxes.  Is it in the mandate or authorize

13    box or is it in the irresistible pressure?

14         MR. MURPHY:  I think what we argue is mandate and

15    authorize.

16         THE COURT:  I think that's right.  I just wanted to

17    be sure.  You argue in your brief, quoting -- relying on the

18    Costco decision, that a statute -- this is on the hybrid

19    unilateral issue.  That a statute is hybrid so long as

20    private parties have any power to set prices.  That is -- and

21    I will finish your thought -- pubic officials do not have

22    exclusive authority to determine the nature and extent of the

23    resulting consumer injury, end quote.

24          I don't see how that can be a correct framing

25    because Fisher, which, of course, found the unilateral

1    violation, the City -- I'm going to frame this backwards, but

2    I will just state the facts.  The City said you can't set the

3    price at least to the extent it said it cannot be higher than

4    X dollars for that apartment.  So I don't know how you can

5    argue -- I mean, so that in -- I have to finish my thought.

6    I apologize.

7            In Berkeley, while the City set the maximum, the

8    parties were free to set prices below that.  So the private

9    parties had some power to set prices.  Not all of it, but

10   some.  And in that case, it was unilateral.  Why is our case

11   -- why is.  My problem is how you framed your argument, so I

12   will go back to what you said.

13           The statute is it hybrid so long as private parties

14   have any power to set price, that is where public officials

15   do not have exclusive authority to determine the nature and

16   extent of the resulting injury.

17           MR. MURPHY:  I guess, Your Honor, I would start with

18   the premise that if the result is anti-competitive, then I

19   would look at the role of the state and the role of the

20   private parties.

21           THE COURT:  Maximum pricing is anti-competitive.  We

22   have cases if two private parties agree on a maximum price,

23   that would be anti-competitive per se, right?  I can't

24   remember the name of the case.  I learned it a long time ago.

25   Had to be decided before the '70s.  Maybe it is not good law

1    anymore.  You don't remember maximum pricing?

2            MR. MURPHY:  I'm not familiar with --

3            MR. LANGER: Yeah, horizontal maximums are no longer

4    per se.

5            THE COURT:  See I told you I was an old antitrust

6    lawyer.  It's not per se, but it can be anti-competitive.

7            MR. LANGER:  Yes.

8            MR. MURPHY:  What I'm really relying on.  In the

9    language in Fisher itself says that not all restraints

10   imposed upon private actors by government units necessarily

11   constitute unilateral action outside the purview of Section

12   1.  Certain restraints may be characterized as hybrid and

13   that non-market mechanisms merely enforce private marketing

14   decisions where private actors are thus granted a degree of

15   private regulatory power.  The regulatory scheme may be

16   attacked under Section 1.  Indeed, this Court has twice found

17   such hybrid restraints to violate the Sherman Act.  That's a

18   passage from Fisher that discusses unilateral versus hybrid.

19   And at that time, of course, 324 had not yet been decided so

20   there were two examples, now there are three.

21           THE COURT:  But this is the part of where I was sort

22   of stifling the defendants and intervenors in trying to talk

23   to me about how there's nothing compelled in the statute that

24   make these people have to agree on things.  I'll give them a

25   chance to respond.  But what is it in the scheme here that --

1    what's the difference?  In Berkeley -- okay.  It is not

2    per se anymore, but the City set the maximum and each

3    landlord assuming there's not further antitrust violations

4    individually decides, okay, Unit B is going to be this much

5    below the max, but I'm charging the max on this one.  He

6    didn't have to get with anybody else.  What's in this scheme

7    that's any different than that?

8         MR. MURPHY:  The rent control ordinance in Berkeley

9    established what the base rentals would be based on the

10   historical data, and they said that's it, and you can't raise

11   your rents.  And then they had some incrementals, I think,

12   over time, you can raise it a little bit, raise a little bit.

13   And you could come in, if you had a compelling case to make,

14   and argue before the Rent Stabilization Board why you needed

15   more rent for this unit in this building in this

16   neighborhood.  And the Board then would adjudicate that.

17        Not too dissimilar in a situation where you would

18   have a private electric utility back in the old days that

19   would justify its rates and there's a regulatory board to

20   decide whether those rates are reasonable or not.  That's not

21   what we have in Connecticut with respect to liquor prices.

22   What we have instead is that each wholesaler sets a price for

23   not only the case price that he's going to offer to his

24   retailers, but also the bottle price that will dictate what

25   the retailer can sell to the consumer.  He does it every

1    month.

2              THE COURT:  Unilaterally.

3              MR. MURPHY:  It could be unilateral.  He posts it.

4    Everybody sees it.  Everybody can match it if they have a

5    comparable product, and then they have to hold it for 30

6    days.

7              THE COURT:  It is the match and hold?

8              MR. MURPHY:  That's certainly an aspect of it.  It

9    is the match and the hold.  And it is the hold that creates

10   the per se violation of the antitrust laws.

11             THE COURT:  Except we have got Battipaglia to deal

12   with.

13             MR. MURPHY:  I mean, that was Judge Winter's

14   dissent in Battipaglia.  He said --

15             THE COURT:  That's great, and I have the most

16   respect for Judge Winter that I could possibly articulate.

17   In fact, I could say I agree with him.  But he didn't write

18   the majority opinion.

19             MR. MURPHY:  I understand that, Your Honor.

20             THE COURT:  And Judge Friendly is no slouch.  You

21   are going to tell me that I should overrule Judge Friendly?

22             MR. MURPHY:  No.

23             THE COURT:  I don't think so.

24             MR. MURPHY:  I'm going to tell you that Justice

25   Powell overruled Judge Friendly --

1          THE COURT:  Where?

2          MR. MURPHY:  -- in 324.

3          THE COURT:  Well, no.  How did he do that?

4          MR. MURPHY:  Because he took a case that's just like

5     the New York statute in every material respect and he said in

6     324, not only was it Justice Powell -- on the issue of

7     whether this is a hybrid restraint that has per se effects

8     and that is a violation of the Sherman Act, setting aside the

9     Twenty-First Amendment defense, the Supreme Court was

10    unanimous on that.  The only dissents were dissented on the

11    Twenty-First Amendment analysis, which is not at issue in

12    this case.  So it was a unanimous Supreme Court opinion.

13         And unlike the situation with court of appeals

14    decisions, it is not all that surprising that Justice Powell

15    didn't talk about Battipaglia.  But it is interesting that he

16    did talk about the earlier decision of the Second Circuit

17    involving the Connecticut statutes and said they might

18    survive this analysis.  They might.  But he's dealing with

19    New York and he didn't cite Judge Friendly's opinion.  And I

20    don't think they can be reconciled.  Other courts have agreed

21    that they can't be reconciled, including the Fourth Circuit

22    in TFWS.

23         THE COURT:  I have to, in order to be fair, take you

24    to task on your brief.  You write at page 28 of your brief

25    that mandatory industry-wide resale price fixing -- that's a

1    quote from 324 Liquors in your brief.  Then you stop the

2    quote and say which... is precisely what is accomplished by a

3    post and hold regime - is a per se violation of the Sherman

4    Act.

5           I don't understand the jump from resale price

6    fixing/maintenance which is what was at issue in 324 to its

7    equation to a post and hold regime.  Again, I'm in my boxes,

8    I've got vertical, I've got horizontal.  I don't know -- you

9    are making this very --  I don't want to say clever.  If it

10   held, it would be a great argument, but I don't see how you

11   can make the illative leap from the 324 analysis of resale

12   price maintenance and equate it to post and hold.  Maybe I --

13   no, I didn't misquote you.  I'm at the bottom, the last

14   paragraph, third line.

15          MR. MURPHY:  I'm with you, Your Honor.  It's not an

16   ellipsis.  It is a dash.

17          THE COURT:  But it is still a quote, then a dash,

18   which as noted above is precisely what's accomplished by a

19   post and hold regime.  Is that the decision we had earlier

20   about how you want to morph the post and hold with the resale

21   price maintenance?

22          MR. MURPHY:  Really, that post and hold has been

23   recognized both in Costco and in TFWS to be horizontal price

24   fixing.  That's what those courts held.

25          THE COURT:  Not in 324.

1          MR. MURPHY:  No, not in 324.  324 did not involve a

2  post and hold statute.  It involved --

3          THE COURT:  It involves retail price maintenance

4  statute, which I have here.

5          MR. MURPHY:  Yes, it did.  But you have both here.

6          THE COURT:  Let's get back to Battipaglia.  324 --

7  well -- Battipaglia was analyzed in the post and hold

8  statute, right?

9          MR. MURPHY:  It was.

10         THE COURT:  So one would think that it would be very

11  helpful to me in analyzing this case, would you agree?

12         MR. MURPHY:  I would generally agree.

13         THE COURT:  The Second Circuit decision written by

14  Judge Friendly.

15         MR. MURPHY:  I would generally agree with that,

16  sure.  Can I say something?  There's a major distinction in

17  Battipaglia between the New York statute and the Connecticut

18  statutes that Judge Friendly thought was important.  If I can

19  direct the Court's attention to it, I would like to.

20         THE COURT:  Go ahead.

21         MR. MURPHY:  On page 172 of the opinion, Judge

22  Friendly noted that the challenge sections of the ABC law

23  plainly are not resale price maintenance, a scheme of the

24  sort, and then to Midcal.  In contrast to Midcal, each

25  wholesaler is completely free to file whatever price schedule

1    he desires, and his schedule now has no controlling effect on

2    retail prices since the statute which prohibited retail

3    prices at a price less than that established in the schedule

4    has been declared to be unconstitutional by the New York

5    Court of Appeals.

6         So Judge Friendly was looking at the interaction of

7    this statute with the other statute that had imposed the

8    prices on the retail level, noted that the New York Court of

9    Appeals had declared that statute to be unconstitutional and

10   thought that that was significant to his opinion because it

11   really distinguished the case from Midcal.

12        THE COURT:  Right.  But it also distinguishes the

13   post and hold from resale price maintenance sections.

14        MR. MURPHY:  I think that's right.  We have both in

15   this case.

16        THE COURT:  Okay.  And so I don't understand how you

17   equate the 324 holding that mandatory industry-wide retail

18   price maintenance is precisely what the post and hold regime

19   accomplishes.  I'm still hung up on page 28 of your brief.

20        MR. MURPHY:  I'm still trying to convince you, Your

21   Honor, that when you have resale price maintenance across an

22   entire industry, applies to every wholesaler, applies to

23   every retailer, applies to every product, that that in effect

24   creates horizontal price fixing.

25        THE COURT:  But we had that in 324, didn't we?  You

1    may not have had post and hold, but you had every participant

2    having to do resale price maintenance, right, or am I

3    misremembering the case?

4           MR. MURPHY:  No.  Every participant was required to

5    jack up their prices by a fixed 12 percent at the retail

6    level, yes.

7           THE COURT:  At the retail level, right.  So we had

8    what you just said we didn't have, we did have in 324.

9    Everybody in the industry was doing resale price maintenance.

10          MR. MURPHY:  Everybody was required to, yes.  Which

11   is why I say it hasn't necessarily been overruled by Leegin.

12          THE COURT:  It hasn't what?

13          MR. MURPHY:  It has not necessarily been overruled

14   by Leegin or Leegin.

15          THE COURT:  I don't understand.  The section you

16   quote at page 28, which I think is relying on Dr. Miles at

17   that point -- wait a minute.  It is not in that paragraph.

18          Okay.  Let me -- if I understand, you're saying that

19   nothing in -- Leegin speaks about an resale price agreement

20   and said we're going to reverse Dr. Miles' resale price

21   agreements between that manufacturer and the retail

22   distributors is not per se illegal.  Okay.  And you say that

23   the flipping of the rule, the analytics of vertical

24   agreements will now be rule of reason doesn't touch the rule

25   that should be applied when there's more than one player or

1    one stream and it is everybody.  Is that really what you are

2    arguing?

3              MR. MURPHY:  I'm really arguing that if it's

4    industry-wide, then that's a different analysis.

5              THE COURT:  That's fine.  You say Leegin is one

6    actor or one stream and here it is industry-wide and,

7    therefore, Leegin doesn't give us an answer on the test to

8    apply when it is industry-wide.

9              MR. MURPHY:  That's right.

10             THE COURT:  First of all, you would agree with me

11   nothing in Leegin said that.  They don't say, oh, by the

12   way, this is only limited to the individual stream.

13             MR. MURPHY:  They talk about the prospects of, you

14   know, wide resale price maintenance can be anti-competitive

15   and might be violative of the antitrust laws under rule of

16   reason.

17             THE COURT:  Right.

18             MR. MURPHY:  They talk a lot about broader aspects

19   of it, but they don't ever say, and by the way, if you had a

20   statute like the one in 324 Liquor, that would still be

21   subject to the per se rule.  They don't say that.

22             THE COURT:  No, because what they have said is

23   resale price maintenance is subject to rule of reason.  And

24   we'll point out to courts like me who have to have these

25   questions answered by a trial level court about is something

 1    rule of reason, what are we going to tell a jury to look for

 2    in a rule of reason resale price maintenance case?  Well,

 3    basically, they have written my charge for me.  They have

 4    told me here's some characteristics that may drive up the

 5    anti-competitive side of the equation in the balance with

 6    pro-competitive or no pro-competitive in those instances that

 7    drive you to the conclusion that under the rule of reason, it

 8    is an antitrust violation.

 9         To me, I don't know how you can take that discussion

10    which I find very helpful and I agree with them, that it does

11    matter the context of the resale price agreement and I agree

12    with you when it's industry-wide, it's likely to be more

13    anti-competitive.  But Norman Williams' language about it --

14    I cannot remember it.  But, you know, it has to compel the

15    result that it is always anti-competitive is belied by that

16    discussion.

17         So I don't know what in Leegin comforts you that

18    they were not taking an eraser to Dr. Miles and every case

19    that relied on that aspect of Dr. Miles and took out per se

20    and put rule of reason.  Now, they weren't saying every case

21    will be found under rule of reason to be competitive, not

22    anti-competitive.

23         MR. MURPHY:  I understand your position, Your Honor.

24    Mine is that they haven't overruled 324 Liquor.  I still

25    think you can instruct the jury today on 324 Liquor and what

1    its holding is and that would be a valid instruction.  And

2    until the Supreme Court tells us otherwise --

3            THE COURT:  What part of 324's holding?  The per se

4    part?

5            MR. MURPHY:  Yes, the per se part.

6            THE COURT:  Okay.  When we're talking about not

7    overruling things, I mean, why isn't Battipaglia controlling

8    on you here?

9            MR. MURPHY:  Because it's not consistent with 324

10   Liquor.  The Supreme Court, I think, took out the footing

11   from Battipaglia on that issue.

12           THE COURT:  Where?  When it did or said what?

13           MR. MURPHY:  When it said that this resale price

14   maintenance scheme and the way that it worked was a per se

15   violation.

16           THE COURT:  Because it had Dr. Miles controlling it.

17   Battipaglia isn't about resale price maintenance.  It's about

18   post and hold.  As I told you, I'm still in those boxes.

19   I've got to analyze for anti-competitive purposes is

20   something vertical or horizontal.  To the extent I analyze

21   post and hold as a horizontal arrangement, blessed by the

22   state statute, I don't see how I don't apply Battipaglia.

23           MR. MURPHY:   I would be repeating myself, Your

24   Honor, but I think if you read the passage in 324 Liquor that

25   talks about the history of vertical restraints, the Court

1   recognizes that Dr. Miles is on shaky footing.  Our recent

2   decisions recognize the possibility that a vertical restraint

3   imposed by a single manufacturer or wholesaler may stimulate

4   inter-brand competition, even as it reduces intra-brand

5   competition cites Continental TV versus GTE Sylvania.  And

6   we've held that concerted non-price restrictions imposed by

7   the single manufacturer ought to be judged under the rule of

8   reason.

9        So there's a lot of analysis in 324 Liquor about

10   whether or not this could be per se or rule of reason

11   depending on the context.  And what the Court said is if

12   you've got an industry-wide retail price fixing on the

13   vertical level and it is industry-wide, then it is still

14   per se.  I think that until the Supreme Court says otherwise,

15   I think it's too much to read into Leegin because of the

16   context of Leegin.

17        THE COURT:  I'm --

18        MR. MURPHY:  It is not dealing with one of these

19   sort of statutes.

20        THE COURT:  I'm still stuck on Battipaglia.

21   Battipaglia is not about resale price maintenance, so I don't

22   understand how any of that -- and that's why I was struck by

23   how pressing it they were about Leegin coming down the road.

24   I mean, obviously, this is an evolution of courts thinking,

25   but -- keeping up with economics, but I don't see anything of

1   that that's relevant to the majority opinion in Battipaglia,

2   which is addressing the New York statute on post and maintain

3   schedules or prices and discounts.  That's what Battipaglia

4   is about.

5         And I guess I could agree with you, which I don't

6   think I'm going to, that I have to read all three of these

7   together and I have to look at vertical and horizontal as

8   something other than either of those two constructs and,

9   therefore, decide that the mush of all of it is a per se

10   violation, even though I have got Leegin saying the vertical

11   part can't be.  But -- okay.  I think I understand your

12   position, which is helpful.  Thank you.

13         MR. MURPHY:  Okay.

14         THE COURT:  You did argue -- you do try to take on

15   this argument of the intervenors that Battipaglia shouldn't

16   govern here by referencing Freedom Holding 1, Judge Winter's

17   opinion in that case.  Judge Winter was the dissenter in

18   Battipaglia.

19         MR. MURPHY: Yes.

20         THE COURT:  You suggest that Freedom 1 says that the

21   Court apply a per se scrutiny to post and hold provisions

22   because they contemplate conduct that if done by private

23   agreement would be construed as horizontal price fixing.

24   Right?  That's your argument at 26 through 29.

25         I guess what I'm having trouble with -- in the

1    abstract, I probably agree with you.  Horizontal price fixing

2    is per se -- it is a per se violation.  But I don't see

3    anything in Freedom Holdings 1 that explicitly overrules

4    Battipaglia or even suggests that it was overruled.

5          MR. MURPHY:  I think the only extent to which

6    Freedom 1 I think criticizes Battipaglia, it is not really a

7    criticism so much.  In Battipaglia, Judge Friendly talked

8    about the question whether there could be a hybrid restraint

9    or was there a requirement that there be some private

10   agreement combination or conspiracy that had to be alleged

11   and proven in order to make out an antitrust violation.  And

12   Judge Winter in Freedom 1 points out that any doubt about

13   that, which we struggled with in Battipaglia, has been

14   resolved by the Supreme Court in 324.

15         So to that extent, I think Freedom 1 takes away any

16   effect that Judge Friendly's observations had about that

17   argument about whether there has to be a contract agreement

18   combination as there would be in a normal private antitrust

19   action.

20         THE COURT:  You would agree with me that one panel

21   of the circuit can't overrule another panel?

22         MR. MURPHY:  I believe --

23         THE COURT:  There can't be an overruling of

24   Battipaglia by Freedom 1?

25         MR. MURPHY:  Right.

1          THE COURT:  It seems -- I guess I will just tell you

2     what I have in mind and you can -- it is not really a

3     question, but you tell me why I'm wrong.

4          I read Battipaglia, Judge Friendly's part of the

5     majority.  He talks a lot about exchange of information,

6     price information not per se illegal, there's nothing wrong

7     with it, you need something else.  Okay.  Of course, your

8     position is there is something else in this scheme.  Even

9     just in the post and hold is something else.

10          MR. MURPHY:  Yes.

11          THE COURT:  But Judge Friendly, while he does seem

12     to be focused on the exchange part of it, he does assume,

13     quote, that an exchange of price information and price and

14     adherence compelled by the State are to be treated for the

15     purposes of antitrust preemption analysis as if they were

16     voluntarily.  So even though Battipaglia seems to reach a

17     different conclusion than the Freedom 1 case did with regard

18     to whether the challenge provisions are preempted, it strikes

19     me that the language in Battipaglia reflects the thinking of

20     the majority panel that is consistent with the passage in

21     Freedom 1 that you -- quote, you want me to pound Battipaglia

22     with.  It doesn't seem like it's inconsistent.

23          MR. MURPHY:  I think, Your Honor, that we're --

24     Judge Friendly, I think, missed it in Battipaglia.

25          THE COURT:  I'm glad you said that.

1          MR. MURPHY:  And where -- right.  And where Judge

2     Winter got it right, which, you know, Professors Areeda and

3     Hovenkamp actually in their treatise write about this and say

4     that Judge Winter got it right, Judge Friendly got it wrong.

5          The reason is because I think failed to take into

6     account the Supreme Court's fairly ancient decision in Sugar

7     Institute.

8          THE COURT:  Right.

9          MR. MURPHY:  And in Sugar Institute, part of the

10     injunction in that case was an injunction against an

11     agreement to adhere to posted prices.  And an agreement to

12     adhere to posted prices is the same as a price fix.  It is a

13     species of price fix, and has been since 1937, which the

14     Court in Costco recognized and the Court in TFWS recognized.

15     And there's -- that's -- there's never been any challenge to

16     Sugar Institute.  It's is one of the --

17          THE COURT:  Yeah, but, you know, it is interesting

18     Judge Friendly didn't forget Sugar Institute.  He cites it at

19     page 175, and exactly correctly cites it.  He's writing a

20     sentence that says, although Container Corp. upheld the

21     sufficiency of a complaint charging, quote, an exchange of

22     price information but no agreement to adhere to a price

23     schedule, as in Sugar Institute or Socony Vacuum, end quote.

24     The decision was fact bound, et cetera, et cetera.

25          So it's not like Judge Friendly forgot to cast a

1   broad net in thinking about what was in front of him and that

2   it was in agreement.  And I think he explains it with the

3   analysis that the defendants and intervenors are trying to

4   hang their hat on, which I was going to get back to them.  It

5   is going to be a long argument here.  But the idea that the

6   market participants can fulfill their obligations under the

7   statute without conspiring to fix prices or engaging in

8   conscious parallel pricing -- that's what Friendly says

9   --doesn't place irresistible pressure, another thing.  And

10  that, therefore, on a facial challenge, it doesn't meet the

11  Norman Williams test.

12          MR. MURPHY:  I think the problem with it is that

13  this is a case in which there is, in effect, an agreement to

14  adhere to the price schedule because all of the participants

15  in this industry are required to adhere to the posted prices

16  at least for a period of 30 days once they have been set.

17          And so I think that's what Judge Friendly just

18  really didn't come to grips with about the New York statute.

19          THE COURT:  Okay.  I have quite a few questions for

20  you, so I have to move on.  Well, maybe it is not moving on.

21          You say in your brief, at 25, that each of the three

22  challenge provisions authorize, mandates or otherwise

23  pressures industry participants to engage in horizontal price

24  fixing and industry-wide vertical price fixing.  Your two

25  counts.  Both of which are per se illegal.  I am only going

1    to focus on horizontal.  We have already beat the vertical

2    horse.

3         So taking your argument seriously that each

4    provision are unlawful horizontal and vertical restraint, I'd

5    like you to tell me how the post and hold provisions have any

6    -- are -- have any operation at or between different levels

7    of the liquor market.  In other words, the post and hold by

8    itself talks about the prices the wholesalers will set.

9    Right?

10        MR. MURPHY:  Right.

11        THE COURT:  So how does that provision which you

12   argued each of the challenged provisions mandates that they

13   engage in horizontal and vertical price fixing.  Where's the

14   vertical in the post and hold section?

15        MR. MURPHY:  Well, as I mentioned earlier, that the

16   post and hold statute says that you have to post the case --

17        THE COURT:  Case and bottle.

18        MR. MURPHY:  -- and you have to post the bottle

19   price.  The bottle price is meaningless at the wholesale

20   level.  Nobody buys bottles from a wholesaler.  The bottle

21   price only is effective at the retail level and the statute

22   requires that the retailer not sell below the minimum bottle

23   price as posted by the wholesaler.

24        THE COURT:  But then you are bringing in the second

25   piece of the statute that we are looking at.

1                    MR. MURPHY:  That's right.

2              THE COURT:  So it's not the post and hold

3      individually achieves that result.

4              MR. MURPHY:  I think it does because it says that

5      for alcoholic liquor other than beer, each manufacturer

6      wholesaler and out-of-state permittee shall post on a monthly

7      basis the bottle, can and case price of any brand of goods

8      offered for sale in Connecticut.  I am not bringing it in

9      from somewhere else.  The bottle price is right here in the

10     post and hold statute.

11             THE COURT:  Right.  But nothing in the post and hold

12     statute speaks to what the price in my local liquor store is

13     going to be.  I understand you are telling me the second

14     statute drives what that price is based on that bottle price,

15     but your claim was in your brief was that each of them is a

16     horizontal price fixing violation and a vertical price fixing

17     violation.  And I'm struggling with how if I just had post

18     and hold in this state -- just post and hold.

19             MR. MURPHY:  It didn't talk about bottle prices?

20             THE COURT:  No, it talks about bottle prices, but

21     it's just post and hold.  I don't see where you could make

22     the argument you make.

23             MR. MURPHY:  I guess, Your Honor, if the bottle

24     prices were totally meaningless, I wouldn't make the

25     argument.  Since the bottle prices only have meaning at the

1   retail level, that's why I say it affects a vertical as well

2   as a horizontal price fix.

3          THE COURT:  I mean, basically the statute then under

4   that construct would say you are setting a price for

5   something you never sell the product at.  That's not a

6   vertical price fixing agreement.

7          MR. MURPHY:  It is at the retailer.

8          THE COURT:  Only when I add the second part of the

9   statute.

10         MR. MURPHY:  That's why I think they have to be read

11  together.

12         THE COURT:  That's what I'm trying to -- then you

13  want me to strike that sentence in the brief where you argue

14  that each of this is a violation of horizontal and vertical?

15         MR. MURPHY:  Your Honor, if you want to strike it,

16  you can strike it.  I would then say each of them or in

17  combination, they are, you know.

18         THE COURT:  This is really to all patties, I do read

19  the briefs.  I am trying to understand what the parties'

20  arguments are.  I had the sense you want me to mush them all

21  together.

22         MR. MURPHY:  I do.

23         THE COURT:  But then I come across the sentence like

24  that and I say, what's his argument.

25         MR. MURPHY:  That's why I told you at the start that

1    we think it is best to mush them all together, but even if

2    you view them separately, they are problematic from an

3    antitrust perspective.

4         THE COURT:  Of course they are.  The antitrust laws,

5    it's good argument, are preempted.  They don't apply so it's

6    irrelevant whether they are problematic.

7         MR. MURPHY:  We say they are preempted.

8         THE COURT:  I understand.  I guess we are going to

9    get to the same circle if I were to flip this instead of

10   focusing on your argument that post and hold is -- it ties

11   into a vertical problem.  If I were to look at just the

12   minimal retail provisions you argue there's horizontal

13   restraints, I need to pull back in the post and hold to

14   support your argument.

15        MR. MURPHY:  That's right, Your Honor.

16        THE COURT:  I think we have covered a lot out of

17   order, I guess I would say, so I actually had less than I

18   thought.  I don't know if you want to clarify or add to

19   anything briefly.

20        I did say that I would allow movants the last word,

21   which will also be brief, but I don't know if you would like

22   to get a word in edgewise that's not driven by my questions.

23        MR. MURPHY:  Your Honor, I think that part of what

24   has been revealed in the argument today is that, at least

25   from our perspective, the statutes ought to be looked at in

1   combination, but they ought to be also looked at in terms of

2   what their effect is on the marketplace.  I think that for

3   that reason it is premature for the Court to dismiss the

4   Complaint.

5          We have had no discovery.  We have shown the Court

6   through a chart that we created of posted prices what the

7   impact of the statutes looks like in the marketplace

8   probably, but we ought to be able to do a little bit more.

9   And this strikes me as a case -- many of these cases get

10  resolved on motions for judgment or following trials.  Most

11  of the cases we have been looking at, I think very few of

12  them were on a 12(b)(6) motion.

13         So with that, I will sit down.

14         THE COURT:  I'm puzzling because you may be right

15  about the other cases, but I don't understand what discovery

16  would help with the issue of whether these on their face,

17  which you told me you are going to take that back -- on their

18  face, they are preempted.  I'm going to assume -- it is not

19  that I'm going to.  It could be assumed that these are the

20  most anti-competitive statutes ever created by man.  Okay.  I

21  mean, let's assume they make me pay 200 percent more for any

22  Tanqueray Gin than what somebody in New Hampshire or New York

23  State is paying.  But that isn't the question.  Right?

24         MR. MURPHY:  Well, how do --

25         THE COURT:  I know you want me to think about that.

1   You want me to be influenced by that, but that's -- that's

2   not the right way for a Court to analyze this question on a

3   preemption case.  It is the legislature's decision.

4        MR. MURPHY:  We're saying that the statutes really

5   in effect mandate and authorize horizontal price fixing.  Let

6   us do some discovery and figure out how it is that the

7   wholesalers manage to come up with prices like this that

8   match every product to the penny.

9        THE COURT:  The statute says post and then the

10  statute says everybody gets to look at everybody, and then it

11  says you can match for a period of time and then you can

12  hold.  What do you think happens when two people are selling

13  Tanqueray gin and they see their competitor is selling it for

14  less, they are going to match it.

15       MR. MURPHY:  When there are three wholesalers

16  selling Tanqueray gin and they offer it for $10 a bottle

17  during a post-off month but they keep the bottle price at 12,

18  why?  Because there's no requirement that they do that, and

19  yet they do that.  Why is it?  Why is it?

20       THE COURT:  We're talking about statutory scheme

21  that says they can do it.  Again, that's why I don't know if

22  my first question was is it a facial attack, but that's why

23  one of any earlier questions was that.

24       MR. MURPHY:  It is definitely a facial attack.  I

25  think Your Honor would benefit some from some limited

1    discovery.  Thank you.

2            THE COURT:  Thank you very much.

3            You asked, Attorney Langer, for your -- I guess I

4    will turn to Assistant Attorney General first.  Attorney

5    Becker.

6            MR. BECKER:  Yes, Your Honor.  I would say that

7    Mr. Murphy is maybe in the right pew but the wrong church.

8    If he's going to believe that there is collusion among the

9    wholesalers, he should bring a claim back challenge, not a

10   preemption challenge against the statute.  My job here is to

11   defend the statute.

12           Your Honor, there was some discussion the

13   wholesalers post the case and bottle price.  I didn't want

14   Your Honor to leave the misimpression they choose each of

15   those.  But the bottle price is derived by a statutory

16   formula that says you divide by the number of bottles in the

17   case and add two, four, eight cents, I believe.

18           THE COURT:  Right.

19           MR. BECKER:  Depending on how many.  Those are not

20   independently chosen.  It is also my understanding the way

21   the statute works when there's a post off month, the posted

22   case price doesn't really change it, therefore the bottle

23   price doesn't change.  Those things are statutorily mandated

24   to stay the same.

25           Finally, Your Honor, this goes to one of the things

1    that you touched on several times in anticipating your brief

2    in North Carolina Dental -- State Board of Dental Examiners,

3    135 S.Ct. 1101.  The court said if every duly enacted state

4    law or policy were required to conform the mandates of the

5    Sherman Act, thus promoting competition at the expense of

6    other values a state may deem fundamental, federal antitrust

7    law would impose an impermissible burden on the state's power

8    to regulate.

9         I think that's important to keep in mind.

10        THE COURT:  I would like to ask you -- there's

11   language that counsel -- Attorney Murphy I think it is, sort

12   of highlighted in Battipaglia at page 172.  In contrasting

13   the ABC law at issue in Battipaglia with Midcal where Midcal,

14   the posting prices -- posted prices had no controlling effect

15   on resale.  In other words, this case is not really very

16   helpful to me because in Connecticut, clearly, the posted

17   prices have -- eventually end up working in effect at the

18   retail level because of another section of the statute.

19        MR. MURPHY:  Yes, Your Honor.  I think you know our

20   position is that that statute should be analyzed

21   independently as the Fourth Circuit did in saying, well, if

22   there were no post and hold, then the resale price

23   maintenance would be not a problem, and he upheld it.

24        THE COURT:  All right.  And Attorney Skakel, do you

25   have anything you'd like to add?

1        MS. SKAKEL:  Your Honor, one quick point.  There's a

2    fair amount of discussion about Leegin, otherwise known as

3    Leegin, and Mr. Murphy's position on the industry-wide

4    component.  I just wanted to point Your Honor to specific

5    language in that opinion, more particularly, 551 U.S. at 897.

6    The Court does, in fact, talk about --

7        THE COURT:  What was the page?

8        MS. SKAKEL:  I'm sorry, Your Honor.  897 in the

9    Official Reporter.

10        Specifically, Your Honor, it says -- it's part of a

11    larger paragraph, but to be brief, resale price maintenance

12    should be subject to more careful scrutiny, by contrast if

13    many competing manufacturers adopt the practice.  So it was

14    discussed and it did fall within rule of reason.

15        Thank you, Your Honor.

16        THE COURT:  All right.  Unless there's anything

17    further, but -- all right.  The Court will take -- I didn't

18    ask -- I assumed your agreement, Attorney Langer, that I

19    inquired of included the independent or standing alone

20    intervenor of Brescome Barton because he joined in the reply,

21    so I figured that he's in the same boat with you-all.

22        MR. LANGER:  That's correct.

23        THE COURT:  I didn't want to ignore you because you

24    had a separate motion.

25        All right.  The Court will take the matter under

1    advisement.  I know this case -- these motions have been

2    pending longer than I would have liked and I expect to get a

3    decision out shortly.  Hopefully, that won't be a promise I

4    break.  So -- but they are all taken under advisement, and

5    the Court will stand will recess.  Thank you all very much.

6              (Whereupon, the above hearing adjourned at 12:20

7    p.m.)

8

9

10

11   <u>COURT REPORTER'S TRANSCRIPT CERTIFICATE</u>

12   I hereby certify that the within and foregoing is a true and

13   correct transcript taken from the proceedings in the

14   above-entitled matter.

15

16   <u>/s/  Terri Fidanza</u>

17   Terri Fidanza, RPR

18   Official Court Reporter

19

20

21

22

23

24

25