**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| CONNECTICUT FINE WINE & | : | |
| SPIRITS, LLC, | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:16–cv–1434 (JCH) |
| v. | : | |
| | : | |
| JONATHAN A. HARRIS et al., | : | JUNE 6, 2017 |
| Defendants. | : | |

**RULING RE: MOTIONS TO DISMISS (DOC. NOS. 38, 66, 80)**

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................2

II.    BACKGROUND ................................................................................................3

    A.    Connecticut's Liquor Marketplace ................................................................3

    B.    Total Wine ................................................................................................6

III.    LEGAL STANDARDS ................................................................................7

    A.    Motions to Dismiss: Rule 12(b)(6) ................................................................7

    B.    Sherman Act Preemption of State Statutes ................................................7

IV.    DISCUSSION ................................................................................................12

    A.    Post and Hold Provisions ................................................................15

        1.    Unilateral or Hybrid Restraint ................................................15

        2.    Per Se Violation or Rule of Reason Analysis ................................19

            a.    Count One: Horizontal Price Fixing ................................20

            b.    Count Two: Vertical Price Fixing ................................25

    B.    Minimum Retail Price Provisions ................................................27

        1.    Unilateral or Hybrid Restraint ................................................27

        2.    Per Se Violation or Rule of Reason Analysis ................................29

            a.    Count One: Horizontal Price Fixing ................................30

            b.    Count Two: Vertical Price Fixing ................................31

    C.    Price Discrimination Prohibition ................................................36

V.    CONCLUSION ................................................................................................39

## I.    INTRODUCTION

Plaintiff Connecticut Fine Wine & Spirits, LLC ("Total Wine") instituted this action against defendants Jonathan A. Harris, Commissioner of the Connecticut Department of Consumer Protection, and John Suchy, Director of the Connecticut Division of Liquor Control (collectively, the "state defendants"), in their official capacities.  Compl. (Doc. No. 1) at 1.  Total Wine alleges that certain state statutory and regulatory provisions governing the distribution and sale of alcoholic beverages are preempted by federal antitrust law.[1]  See id. ¶¶ 28, 33.  Total Wine seeks declaratory and injunctive relief. See id. ¶ 34.

Four trade associations—the Wine & Spirit Wholesalers of Connecticut ("WSWC"), Connecticut Beer Wholesalers Association ("CBWA"), Connecticut Restaurant Association ("CRA"), and Connecticut Package Stores Association ("CPSA") (collectively, the "trade associations")—filed Motions to Intervene (Doc. Nos. 27, 30, 39, 47).  The court granted the motions, see Ruling (Doc. No. 62) at 2, as well as a subsequent Motion to Intervene (Doc. No. 69) filed by Brescome Barton, Inc. ("Brescome" and, with the trade associations, "intervenors"), see Order (Doc. No. 75).

Harris and Suchy filed a joint Motion to Dismiss, see generally Mot. to Dismiss ("State Defs. Mot.") (Doc. No. 38), as did the trade associations, see generally Mot. to Dismiss by Wine & Spirits Wholesalers of Conn., Conn. Beer Wholesalers Ass'n, Conn. Rest. Ass'n, & Conn. Package Stores Ass'n ("Trade Ass'ns Mot.") (Doc. No. 66).

---

[1] The "challenged provisions" Total Wine alleges are preempted by the Sherman Act are: (1) section 30-63 of the Connecticut General Statutes and section 30-6-B12 of the Regulations of Connecticut State Agencies ("post and hold provisions"); (2) sections 30-68m(a)(1) and 30-68m(b) of the Connecticut General Statutes ("minimum retail price provisions"); and (3) sections 30-63(b), 30-68k, and 30-94(b) of the Connecticut General Statutes and section 30-6-A29(a) of the Regulations of Connecticut State Agencies ("price discrimination prohibition provisions").  See Compl. ¶¶ 12–14.

Brescome filed an additional Motion to Dismiss.  <u>See generally</u> Def. Brescome Barton,

Inc.'s Mot. to Dismiss ("Brescome Mot.") (Doc. No. 80).  Each Motion to Dismiss relies

on Federal Rule of Civil Procedure 12(b)(6).  <u>See</u> State Defs. Mot. at 1; Trade Ass'ns

Mot. at 1; Brescome Mot. at 1.  Total Wine filed a consolidated opposition to the

Motions, <u>see generally</u> Pl.'s Consolidated Opp'n to Defs.' & Intervenors' Mots. to

Dismiss ("Opp'n" or "Opposition") (Doc. No. 82), and the state defendants and

intervenors replied in a timely manner, <u>see generally</u> State Defs.' Reply Mem. in Supp.

of Mot. to Dismiss ("State Defs. Reply") (Doc. No. 84); Intervenors' Joint Reply in Supp.

of their Mots. to Dismiss ("Intervenors Reply") (Doc. No. 85).  The court heard oral

argument on the pending Motions on May 18, 2017.

　　　For the reasons set forth below, the Motions to Dismiss are **GRANTED**.

## II.　　BACKGROUND[2]

### 　　　A.　　Connecticut's Liquor Marketplace

　　　The sale of alcoholic beverages in Connecticut is prohibited, except as permitted

by Connecticut's Liquor Control Act.  Conn. Gen. Stat. § 30-74(a).  "Connecticut has

what may be characterized as a tripartite pricing mechanism establishing the method by

which liquor prices are set by the manufacturer, . . . the wholesaler[,] and the retailer."

<u>Serlin Wine & Spirit Merchs., Inc. v. Healy</u>, 512 F. Supp. 936, 937–38 (D. Conn. 1981).

Most relevant here are three sets of requirements: the post and hold provisions,

minimum retail price provisions, and price discrimination prohibition.

---

[2] For the purposes of ruling on the pending Motions to Dismiss, the court accepts as true all well-pled facts in the Complaint.  <u>See</u> <u>Simon v. KeySpan Corp.</u>, 694 F.3d 196, 201 (2d Cir. 2012).  The facts included here are limited to those necessary to rule on the pending Motions.

First, Connecticut's post and hold provisions require state-licensed manufacturers and wholesalers to post a "bottle price" and a "case price" each month with the Department of Consumer Protection. See Compl. ¶ 12. Posted prices are then made available to industry participants, who may, and often do, amend their own postings to match competitors' lower prices. See id. ¶¶ 12, 16. Once these prices are finalized, the manufacturer or wholesaler must maintain its posted prices for the following month.[3] See id. ¶ 12.

---

[3] Section 30-63(c) of the Connecticut General Statutes sets forth the post and hold requirement as follows:

> For alcoholic liquor other than beer, each manufacturer, wholesaler and out-of-state shipper permittee shall post with the department, on a monthly basis, the bottle, can and case price of any brand of goods offered for sale in Connecticut, which price when so posted shall be the controlling price for such manufacturer, wholesaler or out-of-state permittee for the month following such posting. On and after July 1, 2005, for beer, each manufacturer, wholesaler and out-of-state shipper permittee shall post with the department, on a monthly basis, the bottle, can and case price, and the price per keg or barrel or fractional unit thereof for any brand of goods offered for sale in Connecticut which price when so posted shall be the controlling price for such brand of goods offered for sale in this state for the month following such posting. Such manufacturer, wholesaler and out-of-state shipper permittee may also post additional prices for such bottle, can, case, keg or barrel or fractional unit thereof for a specified portion of the following month which prices when so posted shall be the controlling prices for such bottle, can, case, keg or barrel or fractional unit thereof for such specified portion of the following month. Notice of all manufacturer, wholesaler and out-of-state shipper permittee prices shall be given to permittee purchasers by direct mail, Internet web site or advertising in a trade publication having circulation among the retail permittees except a wholesaler permittee may give such notice by hand delivery. Price postings with the department setting forth wholesale prices to retailers shall be available for inspection during regular business hours at the offices of the department by manufacturers and wholesalers until three o'clock p.m. of the first business day after the last day for posting prices. A manufacturer or wholesaler may amend such manufacturer's or wholesaler's posted price for any month to meet a lower price posted by another manufacturer or wholesaler with respect to alcoholic liquor bearing the same brand or trade name and of like age, vintage, quality and unit container size; provided that any such amended price posting shall be filed before three o'clock p.m. of the fourth business day after the last day for posting prices; and provided further such amended posting shall not set forth prices lower than those being met. Any manufacturer or wholesaler posting an amended price shall, at the time of posting, identify in writing the specific posting being met. On and after July 1, 2005, all wholesaler postings, other than for beer, for the following month shall be provided to retail permittees not later than the twenty-seventh day of the month prior to such posting. All wholesaler postings for beer shall be provided to retail permittees not later than the twentieth day of the month prior to such posting.

Conn. Gen. Stat. § 30-63(c). Section 30-6-B12 of the Regulations of Connecticut State Agencies further clarifies these requirements. See, e.g., Conn. Agencies Regs. § 30-6-B12(d) (allowing amendments to posted price schedules to correct "obvious typographical errors").

Second, the minimum retail price provisions require that retailers sell to customers at or above a statutorily defined "cost." See id. ¶ 13. Generally, a retailer's "cost" for a given alcoholic beverage is determined by adding the posted bottle price—as set by the wholesaler—and a markup for shipping and delivery.[4] See id. Wholesalers occasionally lower their posted case prices for a given month, without lowering posted bottle prices, during what are referred to as "off-post" months. See id. Although retailers buy almost exclusively by the case, their prices remain fixed by the minimum retail price provisions, which reference posted bottle prices, rather than posted case prices. See id.

Finally, wholesalers must sell a given product to all retailers at the same price.[5] See id. ¶ 14. Specifically, wholesalers may not offer discounts to retailers who are high volume purchasers. See Compl. ¶ 14.

---

[4] Section 30-68m(b) of the Connecticut General Statutes sets forth the mandate that "[n]o retail permittee shall sell alcoholic liquor at a price below his or her cost." "Cost" is in turn defined as follows:

(A) for alcoholic liquor other than beer, the posted bottle price from the wholesaler plus any charge for shipping or delivery to the retail permittee's place of business paid by the retail permittee in addition to the posted price, and (B) for beer, the lowest posted price during the month in which the retail permittee is selling plus any charge for shipping or delivery to the retail permittee's place of business paid by the retail permittee in addition to the price originally paid by the retail permittee . . . .

Conn. Gen. Stat. § 30-68m(a)(1).

[5] Section 30-68k of the Connecticut General Statutes provides:

No holder of any wholesaler's permit shall ship, transport or deliver within this state or any territory therein or sell or offer for sale, to a purchaser holding a permit for the sale of alcoholic liquor for on or off premises consumption, any brand of alcoholic liquor, including cordials, . . . at a bottle, can or case price higher than the lowest price at which such item is then being sold or offered for sale or shipped, transported or delivered by such wholesaler to any other such purchaser to which the wholesaler sells, offers for sale, ships, transports or delivers that brand of alcoholic liquor within this state.

Similarly, manufacturers and wholesalers are prohibited from:

(1) "discriminat[ing] in any manner in price discounts between one permittee and another on sales or purchases of alcoholic liquors bearing the same brand or trade name and of like age, size and

5

No Connecticut agency or instrumentality actively supervises the price posting and matching processes.  See id. ¶ 21.  Rather, manufacturers and wholesalers are left to post prices as they see fit, without review by the state.  See id.

B.     Total Wine

Total Wine owns and operates four retail beverage stores in Connecticut.  Compl. ¶ 1.  It holds package store permits for its four retail locations.  See id. ¶ 9.  Total Wine strives "to offer[ ] the nation's best selection of alcoholic beverages, and to hav[e] the lowest prices on wine, spirits, and beer."  See id. ¶ 7.  Total Wine alleges that the challenged provisions prevent it from using its "efficiencies" to reduce the prices at which it sells to consumers.  See id. ¶¶ 17, 22.  It has not lowered its prices below its "cost," for fear of being subject to civil and criminal penalties.  See id. ¶ 22; see also id. ¶ 15 (discussing penalties for violations of Liquor Control Act).[6]  As Total Wine acknowledged at oral argument, its antitrust preemption claims are facial challenges.

---

quality," or (2) "allow[ing] in any form any discount, rebate, free goods, allowance or other inducement for the purpose of making sales or purchases."

Conn. Gen. Stat. § 30-63(b).

Section 30-94(b) of the Connecticut General Statutes and section 30-6-A29(a) of the Regulations of Connecticut Agencies further limit the ability of participants in Connecticut's liquor market to offer discounts to their customers.

[6] The court notes that Total Wine's Complaint includes several allegations that suggest the Connecticut liquor regime is unfair to consumers.  See, e.g., Compl. ¶ 17 ("Under this anticompetitive regime, a retailer like Total Wine & More cannot use its market and business efficiencies to reduce the prices offered to consumers.").  Whether or not the statutory and regulatory scheme implemented by the State of Connecticut is wise is not a question for this court.  Rather, the court can only be asked to determine whether the challenged provisions are preempted by federal law.  Arguments as to the harm inflicted on consumers by this scheme are more appropriately directed to Connecticut's executive and legislative branches of government.

### III.    LEGAL STANDARDS

#### A.    Motions to Dismiss: Rule 12(b)(6)

In ruling on a Motion to Dismiss, the court "accept[s] all factual claims in the complaint as true and draw[s] all reasonable inferences in the plaintiff's favor." Simon v. Key Span Corp., 694 F.3d 196, 201 (2d Cir. 2012) (citing Famous Horse Inc. v. 5th Ave. Photo Inc., 624 F.3d 106, 108 (2d Cir. 2010)). "[T]he court, in judging the sufficiency of the complaint, must accept the facts alleged and construe ambiguities in the light most favorable to upholding the plaintiff's claim." Doe v. Columbia Univ., 831 F.3d 46, 48 (2d Cir. 2016). However, the court need not "accept conclusory allegations or legal conclusions masquerading as factual conclusions." Faber v. Metro. Life Ins. Co., 648 F.3d 98, 104 (2d Cir. 2011) (quoting Rolon v. Henneman, 517 F.3d 140, 149 (2d Cir. 2008)). Instead, "[t]o survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient to raise a right to relief above the speculative level." Lanier v. Bats Exch., Inc., 838 F.3d 139, 150 (2d Cir. 2016) (quoting ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007)). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions . . . ." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quotation marks and citations omitted).

#### B.    Sherman Act Preemption of State Statutes

Section 1 of the Sherman Act provides that "[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce . . . is declared to be illegal." 15 U.S.C. § 1. The Supreme Court has made clear that, "[i]n determining whether the Sherman

Act pre-empts a state statute, [courts] apply principles similar to those . . . employ[ed] in considering whether any state statute is pre-empted by a federal statute pursuant to the Supremacy Clause." <u>Rice v. Norman Williams Co.</u>, 458 U.S. 654, 659 (1982).[7] "[T]he party asserting preemption must demonstrate an 'irreconcilable conflict' between the challenged statute and the Sherman Act. Such a conflict will be found only 'when the conduct contemplated by the statute is in all cases a <u>per</u> <u>se</u> violation' of the antitrust laws." <u>Freedom Holdings v. Cuomo</u> ("<u>Freedom Holdings IV</u>"), 624 F.3d 38, 49–50 (2d Cir. 2010) (quoting <u>Norman Williams</u>, 458 U.S. at 659, 661). "A state regulatory scheme is not pre-empted by the federal antitrust laws simply because in a hypothetical situation a private party's compliance with the statute might cause him to violate the antitrust laws," nor is it preempted solely because "the state scheme might have an anticompetitive effect." <u>Norman Williams</u>, 458 U.S. at 659. As the state defendants pointed out at oral argument, <u>see</u> Hr'g Tr. (Doc. No. 89) at 11:6–11:10, whether or not private parties are actually colluding has no import in the preemption analysis, which focuses on the text and face of the statutes at issue.

Ordinarily, "a two-step inquiry guides analysis of" claims that state statutes are preempted by the Sherman Act. <u>Freedom Holdings IV</u>, 624 F.3d at 49. At the first step, the court must determine whether the state statutes "mandate or authorize a <u>per</u> <u>se</u> antitrust violation." <u>Id.</u> at 50 (quotation marks and citation omitted). Then, "[e]ven if plaintiffs showed that the challenged statutes mandate or authorize a <u>per</u> <u>se</u> antitrust

---

[7] The parties agree that <u>Norman Williams</u> provides at least part of the framework governing the court's analysis. <u>See</u> Mem. of Law in Supp. of Mot. to Dismiss ("State Defs. Mem. in Supp.") (Doc. No. 38-1) at 7; Joint Mem. of Law by Wine & Spirits Wholesalers of Conn., Conn. Beer Wholesalers Ass'n, Conn. Rest. Ass'n, & Conn. Package Stores Ass'n in Supp. of their Mot. to Dismiss ("Trade Ass'ns Mem. in Supp.") (Doc. No. 66-1) at 10; Brescome Barton, Inc's Mem. of Law in Supp. of its Mot. to Dismiss ("Brescome Mem. in Supp.") (Doc. No. 80-1) at 4; Opp'n at 11.

violation, those laws might still be saved from preemption by the doctrine of state action immunity, if the anti-competitive conduct is both clearly articulated and affirmatively expressed as state policy and actively supervised by the [s]tate itself." Id. (internal quotation marks and citations omitted).  Neither the defendants nor any of the intervenors have suggested at this time that Total Wine's claims should be dismissed at the second step of this analysis.  See Opp'n at 12 n.4 (discussing the second step—so-called Parker immunity—and defendants' failure to raise it as grounds for dismissal). Similarly, neither the defendants nor the intervenors have suggested at this time that any of the challenged provisions might be saved by the Twenty-first Amendment.  Cf. Costco Wholesale Corp. v. Maleng, 522 F.3d 874, 901–04 (9th Cir. 2008) (discussing permissibility of Washington's post and hold provisions under Twenty-first Amendment). Therefore, the court's analysis in this Ruling focuses solely on the first step of the above inquiry: determining whether the state statutes "mandate or authorize a per se antitrust violation."  Freedom Holdings IV, 624 F.3d at 49 (quotation marks and citation omitted).

In determining whether there is an irreconcilable conflict between the state and federal statutes, the court must determine whether the challenged state statutes qualify as unilateral or hybrid restraints.  "[R]estraints 'unilaterally imposed by government . . . to the exclusion of private control' do not violate the antitrust laws."  Freedom Holdings IV, 624 F.3d at 50 (quoting Fisher v. City of Berkeley, Cal., 475 U.S. 260, 266 (1986)); see also Fisher, 475 U.S. at 267 (characterizing unilateral restraints as "outside the purview of § 1" of Sherman Act).  "Where, however, state law does not regulate unilaterally but, rather, grants private actors a degree of regulatory control over competition, the statute may be preempted as a 'hybrid' restraint on trade."  Freedom

<u>Holdings IV</u>, 624 F.3d at 50 (citing, <u>inter</u> <u>alia</u>, <u>324 Liquor Corp. v. Duffy</u>, 479 U.S. 335, 345–46 & n.8 (1987)).

If the statute qualifies as a hybrid restraint, the court then must determine whether the conduct envisioned by the statute constitutes a <u>per se</u> violation of the Sherman Act, or instead would receive rule of reason scrutiny.  <u>See</u> <u>Norman Williams</u>, 458 U.S. at 661.  "[A] state statute, when considered in the abstract, may be condemned under the antitrust laws only if it mandates or authorizes conduct that necessarily constitutes a violation of the antitrust laws in all cases, or if it places irresistible pressure on a private party to violate the antitrust laws in order to comply with the statute."  <u>Id.</u>  In other words, if a state statute "mandates or authorizes conduct" that is a <u>per se</u> violation of the Sherman Act, it is preempted; however, if the "activity addressed by the statute does not fall into that category, and therefore must be analyzed under the rule of reason, the statute cannot be condemned in the abstract." <u>Id.</u> (noting that rule of reason analysis "requires an examination of the circumstances underlying a particular economic practice, and therefore does not lend itself to a conclusion that a statute is facially inconsistent with federal antitrust laws").

The trade associations insist that the court must invert the analytical framework set out above and instead consider whether the state statutes constitute a unilateral restraint only after determining that they "present a potential <u>per se</u> violation in all cases."  Trade Ass'ns Mem. in Supp. at 13.[8]  The trade associations cite only one

_____

[8] The state defendants—who also ask the court to uphold the challenged provisions—appear to disagree with the trade associations' argument that the court can only determine if the challenged statutes are unilateral or hybrid restraints after evaluating whether they are <u>per se</u> violations of the Sherman Act.  <u>See</u> State Defs. Mem. in Supp. at 4 ("The Challenged Provisions are Unilateral Restraints Imposed by the State of Connecticut and May Not be Preempted."), 7 ("Federal Preemption May Not be Founded Upon Conduct Analyzed Under a Rule of Reason Standard.").

case—from the Sixth Circuit—in support of this assertion.  See id. (citing Trident Int'l Corp. v. Kentucky, 467 F.3d 547, 555, 559 (6th Cir. 2006)).  The trade associations' argument on this point is unconvincing for at least three reasons.

First, it makes little sense to reach the question of whether a given restraint would be a per se violation of the Sherman Act before determining whether or not it is unilateral and thus entirely outside the scope of federal antitrust law.

Second, whatever the law may be in the Sixth Circuit, the trade associations' preferred analytical framework is not mandated by relevant Second Circuit precedent. See Freedom Holdings IV, 624 F.3d at 52–53 (characterizing issue of whether "challenged statutes are unilateral acts of a state falling outside of federal antitrust law" as "the threshold question at trial"); Freedom Holdings, Inc. v. Spitzer ("Freedom Holdings I"), 357 F.3d 205, 223–26 (2d Cir. 2004) (concluding that complaint sufficiently alleged that challenged statutes were hybrid restraints, before addressing other aspects of "the first question[: ] whether the scheme alleged to have been created . . . would constitute a per se violation of federal antitrust law if brought about by an agreement among private parties").

Third, notwithstanding the Sixth Circuit's interpretation of Supreme Court precedent as requiring "that the Rice preemption analysis—that is, whether the state statute at issue mandates or authorizes unlawful anticompetitive behavior—must precede the analysis under the hybrid-restraint theory," other circuit courts have reached the opposite conclusion.  See, e.g., Costco Wholesale Corp. v. Maleng, 522 F.3d 874, 892–96 (9th Cir. 2008) (determining first that Washington's post and hold law was hybrid restraint, and then that it was per se violation of Sherman Act); TFWS, Inc.

v. Schaefer ("TFWS I"), 242 F.3d 198, 207 (4th Cir. 2001) ("Our analysis under [section] 1 has two steps.  We first decide whether the regulatory system at issue is a 'unilateral restraint' or a 'hybrid restraint.'  Second, if it is a hybrid restraint, we must decide whether it involves a per se violation of [section] 1." (citations omitted)).  The Ninth and Fourth Circuits offer a more persuasive reading of the relevant Supreme Court precedent in this regard.

In sum, therefore, the court's preemption analysis has two steps.  First, the court must determine whether the challenged statutes impose unilateral or hybrid restraints.  If they impose unilateral restraints, they are not preempted, and the court's inquiry is at an end.  However, if the state statutes are hybrid restraints, the court must determine whether they are per se violations of the Sherman Act, and thus preempted, or subject to rule of reason analysis and not preempted.

IV.    **DISCUSSION**

Before engaging in the preemption analysis outlined above, the court must first determine whether the challenged provisions are to be analyzed individually and in turn, or collectively.  The defendants and intervenors made clear at oral argument that they believe the statutes should be evaluated separately, while Total Wine urged the court to read them together.  Here, there can be little doubt that the three challenged sets of provisions function, at least to some extent, together to effectuate the legislature's policy goals.  See Trade Ass'ns Mem. in Supp. at 8 ("The common purpose of this trio of alcohol beverage pricing statutes is to preclude wholesalers from discriminating in prices among retailers."); Opp'n at 1 ("[T]hree aspects of the [Liquor Control] Act, taken together, serve to effectively compel industry-wide horizontal and vertical price fixing

among alcohol wholesalers and retailers in Connecticut . . . .").  However, several factors inform the court's conclusion that the challenged statutes should be analyzed individually rather than collectively.

First, federalism principles undergirding the preemption doctrine counsel in favor of addressing the statutes in turn.  "In determining whether the Sherman Act pre-empts a state statute, [federal courts] apply principles similar to those which [they] employ in considering whether any state statute is pre-empted by a federal statute pursuant to the Supremacy Clause."  Norman Williams, 458 U.S. at 659.  Federal courts frequently note that, while they do not hesitate to find state law preempted when the Supremacy Clause so requires, their analysis includes "due regard for the presuppositions of our embracing federal system, including the principle of diffusion of power not as a matter of doctrinaire localism but as a promoter of democracy."  City of Milwaukee v. Illinois & Michigan, 451 U.S. 304, 316 (1981) (quoting San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236, 243 (1959)).  "[B]ecause the States are independent sovereigns in our federal system, [federal courts] have long presumed that Congress does not cavalierly pre-empt state law causes of action."  Wurtz v. Rawlings Co., LLC, 761 F.3d 232, 238 (2d Cir. 2014) (quoting Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996)).  In this case, the caution with which federal courts properly approach claims that state laws should be struck down as preempted is best given effect by addressing each provision separately. In doing so, the court will give "due regard" for the policy judgments of the people of the state of Connecticut by addressing the provisions individually, in an effort to strike down no more of state law than is required by the Supremacy Clause.

Moreover, the framework by which the court analyzes antitrust preemption claims requires that the court classify the challenged provisions as unilateral or hybrid restraints, and, if hybrid, whether they are horizontal or vertical restraints, subject to per se scrutiny or a rule of reason analysis.  Application of the Second Circuit and Supreme Court precedents cited by all parties in this case is impossible if the court is required to evaluate the entire corpus of challenged provisions together.  It makes little sense, for example, to conceive of the post-and-hold provisions as having vertical effect, whereas the minimum retail price provisions clearly do have vertical effect.  Total Wine's suggested way to resolve this issue—by concluding that the combination of statutes are hybrid, horizontal and vertical restraints, subject to per se scrutiny—is unconvincing.  The antitrust preemption analysis outlined above is more appropriately performed on each challenged provision in turn, with the court determining whether each one conflicts with the Sherman Act.

These two justifications for analyzing the challenged provisions separately are further buttressed by the fact that the Connecticut legislature has codified its preference that the invalidity of certain portions of state statutes should, as a general matter, not infect other portions of that statute.  Conn. Gen. Stat. § 1-3 ("If any provision of any act passed by the general assembly or its application to any person or circumstances is held invalid, such invalidity shall not affect other provisions or applications of such act.").  "To overcome the presumption of severability, a party must show that the portion declared invalid is 'so mutually connected and dependent on the remainder of the statute as to indicate an intent that they should stand or fall together' and that the interdependence is such that the legislature would not have adopted the statute without

the invalid portion." Payne v. Fairfield Hills Hosp., 215 Conn. 675, 685 (1990) (quoting State v. Menillo, 171 Conn. 141, 145 (1976)).  Relatedly, the challenged provisions are each codified in separate sections or subsections of the Connecticut General Statutes, see supra at Part II.A, further supporting the view that the challenged provisions should be analyzed separately.

Thus, the court concludes, in light of federalism concerns animating preemption analyses as well as the necessity of categorizing the challenged provisions for the antitrust inquiry the court must undertake here, that the challenged provisions should be addressed individually, rather than collectively.

A.    Post and Hold Provisions

First, the court turns to the post and hold provisions.  For the reasons set forth in detail below, the court concludes: (1) that Total Wine has plausibly alleged that the post and hold provisions are a hybrid restraint, but (2) that the Complaint does not plausibly allege, under controlling Second Circuit law, that post and hold provisions constitute per se violations of the Sherman Act.  Therefore, Total Wine's claims that the post and hold provisions are preempted are dismissed.

1.    Unilateral or Hybrid Restraint

As noted above, see supra Part III.B, unilateral restraints are "imposed by government . . . to the exclusion of private control," Freedom Holdings IV, 624 F.3d at 50 (quoting Fisher, 475 U.S. at 266), while hybrid restraints "grant[ ] private actors a degree of regulatory control over competition," id.  "[T]he federal antitrust laws may preempt state laws that authorize or compel private parties to engage in anticompetitive behavior."  Freedom Holdings I, 357 F.3d at 223–24 (discussing 324 Liquor, 479 U.S. at

345–46 & n.8). "As Judge Boudin of the First Circuit has artfully noted, '[w]hat is centrally forbidden is state licensing of arrangements between private parties that suppress competition—not state directives that by themselves limit or reduce competition.'" Costco Wholesale Corp., 522 F.3d at 889 (quoting Mass. Food Ass'n v. Mass. Alcoholic Beverages Control Comm'n, 197 F.3d 560, 566 (1st Cir. 1999)).

Given the somewhat opaque language that characterizes the definitions of unilateral and hybrid restraints, the best way to determine how to classify the provisions at issue in this case would appear to be by comparison with the provisions at issue in Fisher v. City of Berkeley, Cal., 475 U.S. 260 (1986), and 324 Liquor Corp. v. Duffy, 479 U.S. 335 (1987).[9] The Supreme Court held that the ordinance discussed in Fisher was a unilateral restraint, 475 U.S. at 269–70, while the statute analyzed in 324 Liquor was a hybrid restraint, 479 U.S. at 345 n.8.

In Fisher, the challenged City of Berkeley ordinance "place[d] strict rent controls on all real property that [was] being rented or [was] available for rent for residential use in whole or in part, . . . establish[ing] a base rent ceiling reflecting the rents in effect at the end of May 1980." 475 U.S. at 262 (quotation marks and citations omitted). A landlord who did not "adhere to the maximum allowable rent set under the Ordinance

_____

[9] The intervenors suggest that the court ignore 324 Liquor. They argue that "324 Liquor was, in all respects relevant to this motion, abrogated by" Leegin Creative Leather Products, Inc. v. PSKS, Inc., 551 U.S. 877 (2007), because 324 Liquor "was decided at a time when resale price maintenance was still deemed per se unlawful under the Sherman Act . . . ." Intervenors Reply at 2. Accepting the intervenors' contention that "Leegin announced that a categorical rule of reason applied to all vertical restraints, and expressly overturned Dr. Miles," id. at 2, overturning Dr. Miles had no effect on the 324 Liquor court's determination that the provisions there qualified as hybrid restraints, see 324 Liquor, 479 U.S. at 345 n.8. In the wake of the Court's opinion in Fisher—which was less than one year old when 324 Liquor was decided—the Supreme Court could not have held the New York provisions at issue in 324 Liquor were inconsistent with the Sherman Act absent a conclusion that they constituted a hybrid restraint. See Fisher, 475 U.S. at 267–68 (contrasting hybrid restraints with "unilateral action outside the purview of § 1" of the Sherman Act).

[could] be fined by the [Rent Stabilization] Board, sued by his tenants, or have rent legally withheld from him." Id. at 262–63.

The Court distinguished the ordinance at issue in Fisher from the restraints it had previously determined were hybrid in Schwegmann Brothers v. Calvert Distillers Corp., 341 U.S. 384 (1951), and in California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc. ("Midcal"), 445 U.S. 97 (1980). Unlike the hybrid restraints in Schwegmann and Midcal, Berkeley's ordinance "place[d] complete control over maximum rent levels exclusively in the hands of the Rent Stabilization Board. Not just the controls themselves but also the rent ceilings they mandate[d] [had] been unilaterally imposed on landlords by the city." Fisher, 475 U.S. at 269.

By contrast, in 324 Liquor, the Supreme Court invalidated parts of New York's liquor pricing system, having determined that the challenged provisions constituted a hybrid restraint. See Freedom Holdings I, 357 F.3d at 223–24 (discussing and interpreting 324 Liquor). New York statutes required liquor wholesalers to "file, or 'post,' monthly price schedules with the State Liquor Authority," in which the wholesalers reported the bottle and case prices they would charge retailers. See 324 Liquor, 479 U.S. at 337–38. Retailers were not permitted to sell below "cost," which was statutorily defined by reference to the posted bottle price. See id. at 338–39. "Each wholesaler [set] its own 'posted' prices; [New York did] not control month-to-month variations in posted prices." Id. at 345. In 324 Liquor, "[t]he only private acts involved were the individual determinations of each wholesaler as to what bottle price to post." See Freedom Holdings I, 357 F.3d at 224.

The post and hold provisions at issue here are remarkably similar to the statutes that the Supreme Court concluded constituted a hybrid restraint in 324 Liquor.  The Connecticut post and hold provisions, much like the New York statutes analyzed in 324 Liquor, require wholesalers to post their prices which, in turn, set lower bounds on the prices to be charged by retailers.  Unlike Berkeley's involvement in the rent-stabilization ordinance challenged in Fisher, Connecticut does not set the posted prices themselves, but merely "police[s] the procedures of posting and the adherence to the posted prices . . . which are left exclusively . . . within the control of the particular wholesaler." See Costco Wholesale Corp., 522 F.3d at 894 (citing Midcal, 445 U.S. at 105, and 324 Liquor, 479 U.S. at 345).  The decision-making authority afforded to liquor wholesalers by Connecticut's post and hold provisions is more than sufficient for those provisions to qualify as a hybrid restraint, in light of the hybrid restraint identified in 324 Liquor.

The trade associations and Total Wine disagree as to the relevance of the Second Circuit's decision in Battipaglia v. New York State Liquor Authority, 745 F.2d 166 (2d Cir. 1984), to the question of whether the post and hold provisions are a hybrid restraint.  On one hand, the trade associations claim that Battipaglia "analyzed New York's substantively identical post and hold statute as if the conduct at issue were unilaterally mandated by state statute."  Trade Ass'ns Mem. in Supp. at 27.  On the other hand, Total Wine disputes this characterization of Battipaglia, emphasizing that it was issued before 324 Liquor and that, "even applying pre-324 Liquor law, Battipaglia effectively held that the post-and-hold statute at issue was hybrid, and not unilateral." Opp'n at 14 n.6 (citing Battipaglia, 745 F.2d at 172).  Notably, the state defendants have not argued that Battipaglia is relevant to the question of whether the challenged

provisions are hybrid or unilateral restraints.  <u>See generally</u> State Defs. Mem. in Supp. at 6–7.

Total Wine comes closer to the mark: <u>Battipaglia</u> is, indeed, of little relevance in determining whether the post and hold provisions are a hybrid restraint.  Judge Friendly—writing for the panel majority in <u>Battipaglia</u>—did not have reason to address the question directly, because the Supreme Court only adopted the unilateral and hybrid restraint construct two years after <u>Battipaglia</u>, in <u>Fisher</u>.  <u>See</u> <u>Fisher</u>, 475 U.S. at 267–68 (citing <u>Rice v. Norman Williams Co.</u>, 458 U.S. 654, 665–66 & n.1 (1982) (Stevens, J., concurring in judgment)).  As such, and contrary to the trade associations' argument, <u>see</u> Trade Ass'ns Mem in Supp. at 29, <u>Battipaglia</u> neither compels nor suggests a conclusion that the post and hold statute is a unilateral restraint.

Given the similarity between the statutory scheme at issue in <u>324 Liquor</u> and the Connecticut post and hold provisions at issue here, the court concludes that the post and hold provisions are best characterized as a hybrid restraint.

### 2.   <u>Per Se</u> Violation or Rule of Reason Analysis

Total Wine's Complaint includes two counts.  Count One alleges that the "challenged provisions facilitate and impel horizontal price-fixing among Connecticut wholesalers," and are preempted by the Sherman Act.  <u>See</u> Compl. ¶ 25–28.  Count Two alleges that "the challenged provisions facilitate and impel vertical price-fixing and resale price maintenance among Connecticut manufacturers, wholesalers, and retailers," and thus are preempted by the Sherman Act.  <u>See</u> <u>id.</u> ¶ 29–33.  Total Wine has made clear that these counts should be interpreted as they are most logically read: to raise claims that "<u>each</u> of the three challenged provisions authorizes, mandates or

otherwise pressures industry participants to engage in horizontal price fixing (Count One) <u>and</u> industry-wide vertical price fixing (Count Two) . . . ."  Opp'n at 25 (second emphasis added).

Determinations of whether alleged Sherman Act violations will receive <u>per se</u> scrutiny or rule of reason analysis rely in large part on whether the challenged restraint relates to horizontal or vertical price fixing.  <u>See</u> <u>Leegin Creative Leather Prods., Inc. v. PSKS, Inc.</u>, 551 U.S. 877, 888 (2007) (noting that Supreme Court has "rejected the approach of reliance on rules governing horizontal restraints when defining rules applicable to vertical ones").  In challenging the post and hold provisions as both horizontal and vertical restraints, Total Wine has alleged that liquor wholesalers collude with other wholesalers, on the one hand, and with manufacturers and retailers, on the other.  Therefore, the court will separately analyze Total Wine's allegations that the post and hold provisions mandate or authorize horizontal and vertical price fixing.

a. Count One: Horizontal Price Fixing

The case law setting out the standard to be applied to Total Wine's allegations that the post and hold provisions mandate or authorize unlawful horizontal price fixing appears to this court as less than clear.  Although the Second Circuit's ruling in <u>Battipaglia</u> is directly on point, Total Wine urges this court to read <u>324 Liquor</u> and <u>Freedom Holdings I</u> as implicitly abrogating <u>Battipaglia</u>.  <u>See</u> Opp'n at 26–29.  That invitation is not without some appeal.  To determine whether <u>Battipaglia</u> remains good law—and whether the post and hold provisions are subject to rule of reason analysis under it, rather than a <u>per se</u> rule—a more detailed analysis of <u>Battipaglia</u> is necessary.

The post and hold provisions at issue in Battipaglia are substantively identical to Connecticut's post and hold provisions challenged in this case: liquor wholesalers had to file price schedules for their sales to retailers to which they then had to adhere for a month, although they were given an opportunity to amend their initial, posted prices to meet lower prices filed by competing wholesalers. See Battipaglia, 745 F.2d at 168. In the portion of the opinion relevant to this case, Judge Friendly, writing for a divided panel, held that New York's post and hold provisions were not in direct conflict with the Sherman Act. See id. at 174–75. As noted above, see Part IV.A.1, supra, Judge Friendly did not perform the now-required analysis—originally set out in Fisher, 475 U.S. at 267–68 (citing Rice v. Norman Williams Co., 458 U.S. 654, 665–66 & n.1 (1982) (Stevens, J., concurring in judgment))—of whether the provisions were unilateral or hybrid restraints. Instead, the court grounded its holding that the plaintiff "failed to make out a case of facial invalidity" because New York's post and hold provisions were subject to rule of reason analysis, see Battipaglia, 745 F.2d at 174–75, in a determination that is now the second step of the antitrust preemption analysis, see supra Part III.B.

The Battipaglia court made clear several times in its opinion that it was aware of the New York law's requirements that wholesalers both post and hold to their announced prices. See, e.g., id. at 175 ("[The New York statute] requires only that, having announced a price independently chosen by him, the wholesaler should stay with it for a month."). The court assumed arguendo that "an exchange of price information and price adherence compelled by a state are to be treated for the purpose of antitrust preemption analysis, as if they were voluntary." Id. at 174. It then concluded

that the rule of reason nevertheless provided the appropriate analytical framework.  See id. at 174.  Curiously, in reaching its conclusion that the New York law was not a per se violation of the Sherman Act, the court relied on cases that applied rule of reason scrutiny to arrangements by which competitors only shared price information, rather than grappling with the additional complexity stemming from the state's requirement that wholesalers hold their posted prices.  See, e.g., id. at 174 ("The Supreme Court has never held that the exchange of price information, in the language of Norman Williams, 'necessarily constitutes a violation of the antitrust laws in all cases.'").

In dissent, Judge Winter acknowledged that "arrangements that merely call for the exchange of price information are subject to rule of reason, rather than per se, analysis."  Id. at 179.  However, he pointed out that, contrary to what one might believe based on the relevant portion of the majority opinion, "the challenged legislation not only mandates the exchange of price information but also requires adherence to publicly announced prices until thirty days after notice is given of a new price."  Id.  Agreements to adhere to announced prices had "been uniformly held illegal without regard to [their] reasonableness."  Id. (citing Sugar Inst. v. United States, 297 U.S. 553, 601 (1936)).  Indeed, other circuit courts to address this issue have agreed with Judge Winter.  See Costco Wholesale Corp., 522 F.3d at 895–896 ("The Supreme Court has held that an agreement to adhere to posted prices is a per se violation without regard to its reasonableness." (citing, inter alia, Catalano, Inc. v. Target Sales, Inc., 446 U.S. 643, 649 (1980); Sugar Inst., 297 U.S. at 601)); TFWS I, 242 F.3d 198, 209 (4th Cir. 2001) ("If liquor wholesalers entered into private agreements to accomplish what is required (and allowed) under the Maryland scheme, a per se Sherman Act violation would

result. . . . Maryland's post-and-hold regime is subject to § 1 as a hybrid restraint, and we hold that it is illegal per se.").  Also in agreement is the leading antitrust treatise. See 1 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 217b2 (4th ed. 2013) ("Given the great danger that agreements to post and adhere will facilitate horizontal collusion, the dissent's position [in Battipaglia] is more consistent with [Supreme Court precedent].").

While this court might be inclined to agree with the analysis of Judge Winter, it is ultimately bound by the Second Circuit's holding in Battipaglia.  It cannot distinguish the statute in Battipaglia from the one at issue in this case in any meaningful way.  This court thus concludes that the post and hold provisions are subject to rule of reason analysis, because Connecticut's post and hold provisions are in all material respects identical to those upheld by the Second Circuit in Battipaglia.  They are therefore not preempted by the Sherman Act.

Total Wine argues, as it must, that the legal foundations supporting Battipaglia have been so eroded in the intervening years as to permit this court to reach a different conclusion than did Judge Friendly, in writing for the majority in Battipaglia.  See United States v. Moore, 949 F.2d 68, 71 (2d Cir. 1991) (noting that "prior opinions of a panel of [the Second Circuit] are binding upon [future panels] in the absence of a change in the law by higher authority or . . . in banc proceeding[s] (or [their] equivalent) . . .").  However, neither 324 Liquor nor Freedom Holdings I, both cited by Total Wine, undermines Battipaglia's holding in the ways Total Wine suggests.

First, 324 Liquor analyzed "a regime of resale price maintenance [imposed] on all New York liquor retailers" as a vertical restraint.  See 479 U.S. at 341–42.  Indeed, the

Supreme Court's references to the dangers of "[m]andatory industrywide resale price fixing" are repeatedly contextualized by reference to the wholesaler–retailer relationship. This language has little, if any, relevance to the question of whether Connecticut's post and hold provisions, when viewed as horizontal restraints, are per se violations of the Sherman Act.[10]  Thus, 324 Liquor simply does not overrule Battipaglia's determination that post and hold provisions substantially identical to the ones at issue and analyzed as horizontal restraints are subject to rule of reason scrutiny.

Nor does Freedom Holdings I implicitly abrogate Battipaglia.  Total Wine insists that framing the analysis as the court did in Freedom Holdings I—asking whether "[e]ach of the three challenged statutes 'contemplate[s]' conduct that, 'if done by private agreement,' would constitute horizontal price fixing"—provides adequate grounds for a conclusion that the post and hold provisions should be considered per se violations of the Sherman Act.  See Opp'n at 26–29 (quoting Freedom Holdings I, 357 F.3d at 225).[11]

---

[10] Total Wine suggests that the Ninth and Fourth Circuits have correctly understood 324 Liquor as mandating a determination that post and hold provisions are horizontal restraints that constitute per se violations of the Sherman Act.  See Opp'n at 28–29.  Whatever the relevance of 324 Liquor to other parts of those courts' decisions, neither opinion cited or referenced 324 Liquor in determining that post and hold provisions are per se violations of the Sherman Act.  See Costco Wholesale Corp., 522 F.3d at 895–96; TFWS, Inc. v. Schaefer ("TFWS I"), 242 F.3d 198, 209–10 (4th Cir. 2001).  As such, Total Wine's suggestion that 324 Liquor was relevant to these determinations rings hollow.

[11] Total Wine is correct, however, that after Battipaglia, "the Supreme Court has made it clear that an actual 'contract, combination or conspiracy' need not be shown for a state statute to be preempted by the Sherman Act."  Freedom Holdings I, 357 F.3d 205, 223 n.17 (citing 324 Liquor, 479 U.S. at 345–46 n.8).  Despite contrary suggestions from the defendants, see, e.g., State Defs. Mem. in Supp. at 12 (discussing Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 907 (2007)), subsequent Supreme Court decisions do not undermine the Second Circuit's interpretation of 324 Liquor in Freedom Holdings I.

Relatedly, the state defendants contend that Total Wine was required to plead "enough factual matter (taken as true) to suggest that an agreement was made," in the wake of Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007).  See State Defs. Mem. in Supp. at 14 (quoting Twombly, 550 U.S. at 556).  However, Twombly was not a preemption case; rather, it involved allegations of wholly private antitrust violations, see Twombly, 550 U.S. at 550–51.  As such, Twombly is of limited relevance, apart from its elucidation of Rule 8's pleading standard.  Total Wine does not dispute that "plaintiffs [must] plausibly plead, and prove, an actual agreement to fix or control prices" in antitrust cases related to private

However, this language in <u>Freedom Holdings I</u> does not undermine <u>Battipaglia</u> because Judge Friendly assumed, without deciding, "that an exchange of price information and price adherence compelled by the state are to be treated, for the purpose of antitrust preemption analysis, <u>as if they were voluntary</u>," <u>i.e.</u> by private agreement. 745 F.2d at 174 (emphasis added). Far from undermining <u>Battipaglia</u>, <u>Freedom Holdings I</u> is consistent with it.

Thus, <u>Battipaglia</u> remains good law, insofar as the Second Circuit determined that post and hold provisions, as horizontal restraints, are subject to rule of reason analysis. Whether or not this court would reach a different conclusion if it were writing on a blank slate is immaterial: <u>Battipaglia</u> constitutes binding precedent. In light of the foregoing, the Complaint does not sufficiently allege that the post and hold provisions are horizontal restraints preempted by the Sherman Act.

b.      Count Two: Vertical Price Fixing

Next, the court addresses Total Wine's contention that the post and hold provisions authorize or compel vertical price fixing in violation of the Sherman Act. <u>See</u> Opp'n at 25 ("The Complaint alleged that <u>each</u> of the three challenged provisions authorizes, mandates or otherwise pressures industry participants to engage in horizontal price fixing (Count One) and industry-wide vertical price fixing (Count Two), both of which are <u>per se</u> illegal."). Notwithstanding Total Wine's insistence that the post and hold provisions can be interpreted as vertical restraints that are preempted by the Sherman Act, nothing in the Complaint plausibly supports such a claim.

---

conduct. Opp'n at 21. <u>Freedom Holdings I</u>, by contrast, makes clear that no actual agreement needs to be pleaded or shown for a plaintiff to succeed on a preemption claim. <u>See</u> 357 F.3d at 223 n.17.

Total Wine's Opposition makes clear that the touchstone of Count Two is vertical resale price maintenance. The cases to which Total Wine points the court relate to statutory schemes or private claims much like the minimum retail price provisions. <u>See, e.g.,</u> Opp'n at 33 (citing and discussing <u>324 Liquor Corp. v. Duffy</u>, 479 U.S. 335 (1987), and <u>Leegin Creative Leather Prods., Inc. v. PSKS, Inc.</u>, 551 U.S. 877 (2007)).

Total Wine attempts to bridge the gap between the post and hold provisions—most logically read as authorizing, if any, horizontal price-fixing—and the minimum retail price provisions—most logically read as authorizing, if any, vertical price-fixing—when it explains: "the minimum retail price provisions, especially in conjunction with the post-and-hold regime, create irresistible pressure on retailers to collude 'vertically' with wholesalers to decide what wholesalers should post as the minimum 'bottle' price in any given month." <u>See</u> Opp'n at 36. Even here, where Total Wine comes closest to clarifying how the post and hold provisions might constitute a vertical restraint, its arguments are grounded in the minimum retail price provisions. This makes perfect sense, as the post and hold provisions by themselves contemplate no interaction between actors at different tiers of Connecticut's liquor market; the minimum retail price provisions, by contrast, explicitly tie together the prices posted by wholesalers and those charged by retailers.

Therefore, absent any plausible allegation that the post and hold provisions are vertical restraints, the court need not evaluate whether this restraint is subject to rule of reason analysis or is a <u>per</u> <u>se</u> violation of the Sherman Act. Insofar as Count Two articulates a claim relating to the post and hold provisions, it is dismissed.

B.     Minimum Retail Price Provisions

Next, the court analyzes the minimum retail price provisions.  Again, the court concludes that Total Wine has plausibly alleged that they are a hybrid restraint, but not that they are per se violations of the Sherman Act.  As was the case with the post and hold provisions, Total Wine's claims challenging the minimum retail price provisions are dismissed for failure to state a claim.

1.     Unilateral or Hybrid Restraint

The parties disagree as to whether the minimum retail price provisions qualify as a unilateral or hybrid restraint.  Compare State Defs. Mem. in Supp. at 5, and Trade Ass'ns Mem. in Supp. at 25–26, and Brescome Mem. in Supp. at 13–15, with Opp'n at 16–17.  To reiterate, unilateral restraints are "imposed by government . . . to the exclusion of private control," Freedom Holdings IV, 624 F.3d at 50 (quoting Fisher, 475 U.S. at 266), whereas hybrid restraints "grant[ ] private actors a degree of regulatory control over competition," id.

The court's discussion above summarized Fisher, 475 U.S. 260 (1986), and 324 Liquor, 479 U.S. 335 (1987), in some detail.  See supra Part IV.A.1.  Though the court does not repeat it here, that analysis informs the court's efforts to answer the question of whether the minimum retail price provisions are best characterized as a unilateral or hybrid restraint.  The Supreme Court's decision in 324 Liquor is of particular importance, as Connecticut's minimum retail price provisions are remarkably similar to the New York statute challenged in that case.  The New York statute "impose[d] a regime of resale price maintenance on all New York liquor retailers."  324 Liquor, 479 U.S. at 341. Connecticut's liquor retailers are similarly bound by the bottle prices posted by

wholesalers.  See Conn. Gen. Stat. § 30-68m(a)(1) (defining "cost" in part by reference to "bottle price").[12]  There is no reason to believe that the portion of 324 Liquor classifying New York's statute as a hybrid restraint, see 479 U.S. at 345 n.8, is no longer good law, even though its holding that the statute authorized per se violations of the Sherman Act has been overruled, see infra Part IV.B.2.b.

Nor do the cases cited by the trade associations compel a contrary determination.  See Trade Ass'ns Mem. in Supp. at 26–27.  In Serlin Wine & Spirit Merchants, Inc. v. Healy, 512 F. Supp. 946 (D. Conn. 1981), the court had no occasion to opine on whether the challenged liquor pricing scheme was a unilateral or hybrid restraint, because its ruling preceded both Fisher and 324 Liquor.  Those two cases— which are, of course, binding on this court—significantly altered the analytical framework courts apply when addressing Sherman Act preemption claims.  Next, the Seventh Circuit's opinion in Flying J, Inc. v. Van Hollen, 621 F.3d 658 (7th Cir. 2010), explicitly distinguished the challenged motor vehicle fuel minimum markup from the liquor minimum markup ruled invalid in 324 Liquor.  The Seventh Circuit pointed out that, "[a]lthough New York's scheme [in 324 Liquor] involved a minimum markup just

---

[12] The intervenors contend that Connecticut's Liquor Control Act is not "functionally identical" to the New York scheme analyzed in 324 Liquor, because the latter "allowed wholesalers to manipulate bottle prices untethered to any case prices, effectively controlling resale prices for the same month."  See Intervenors Reply at 4 n.3.  The portion of 324 Liquor that the intervenors cite for this proposition, see id. (citing 324 Liquor, 479 U.S. at 341), offers no support for their characterization of the scheme at issue in 324 Liquor.  Indeed, it appears that New York's scheme did tether bottle prices to case prices, at least to some extent, see 324 Liquor Corp., 479 U.S. at 338 ("The [New York State Liquor Authority], however, has promulgated a rule stating that for cases containing 48 or fewer bottles, the posted bottle price multiplied by the number of bottles in a case must exceed the posted case price by a 'breakage' surcharge of $1.92."  (citations omitted)), much like Connecticut's Liquor Control Act does, see Conn. Gen. Stat. § 30-68m(a)(3) (computing bottle price by adding "an amount that is not less than" a statutory minimum, to quotient determined by dividing case price by number of units or bottles).  Therefore, to suggest that Connecticut's statutory regime meaningfully differs from New York's scheme analyzed in 324 Liquor on the grounds that bottle prices in Connecticut are tethered to case price is not helpful.

like Wisconsin requires for motor vehicle fuel, the unique nature of New York's scheme authorized wholesalers to manipulate the prices to which the markup was applied." Flying J, 621 F.3d at 665 (citing 324 Liquor, 479 U.S. at 348–50); see also id. at 666 ("The great vice of the New York scheme was . . . that the wholesalers could sell to the retailers at one price and force the retailers to apply the minimum markup to another." (citing 324 Liquor, 479 U.S. at 345 n.6)).  Clearly then, the Seventh Circuit's opinion in Flying J cannot be read to support a determination that Connecticut's minimum retail price provisions—which share the same "great vice" as New York's scheme—are a unilateral restraint.[13]

Because 324 Liquor determined that a very similar statute was a hybrid restraint, the court concludes that Connecticut's minimum retail price provisions also constitute a hybrid restraint.

### 2.    Per Se Violation or Rule of Reason Analysis

Having determined that the minimum retail price provisions are a hybrid restraint, the court must next determine whether they authorize or compel per se violations of the Sherman Act or instead qualify for rule of reason analysis.  The court will again address Total Wine's claims that the minimum retail price provisions authorize or compel impermissible horizontal and vertical price fixing.  See Opp'n at 25.

---

[13] The final case cited by the trade associations—Little Rock School District v. Borden, Inc., No. LR-76-C-41, 1980 WL 1882 (E.D. Ark. Aug. 5, 1980)—is easily distinguished.  First, as was the case with Serlin, the court's opinion in Little Rock School District preceded both Fisher and 324 Liquor. Second, like the markup scheme upheld in Flying J, the markup challenged in Little Rock School District did not allow "wholesalers [to] sell to the retailers at one price and force the retailers to apply the minimum markup to another," Flying J, 621 F.3d at 666.  See Little Rock Sch. Dist., 1980 WL 1882, at *1 ("[The] Arkansas statute establishe[d] that it is a criminal violation to price milk at less than cost plus four per cent." (citation omitted)).

a.    Count One: Horizontal Price Fixing

Total Wine's Complaint alleges that the minimum retail price provisions "facilitate and impel horizontal price-fixing among Connecticut wholesalers and are hybrid, per se restraints of trade." See Compl. ¶ 26. Yet, as was the case with Total Wine's allegations that the post and hold provisions authorized or mandated vertical price fixing, see supra Part IV.A.2.b, Total Wine has not plausibly alleged that the minimum retail price provisions authorize or mandate horizontal price fixing.

The bulk of Total Wine's response to arguments for dismissal of the horizontal price fixing claim focuses, quite logically, on the post and hold provisions. There is comparatively little discussion of the minimum retail price provisions. See generally Opp'n at 25–32. Total Wine has not plausibly alleged that the minimum retail price provisions authorize or mandate any horizontal activity among wholesalers. The closest Total Wine comes to putting forth an explanation for its horizontal price fixing claim regarding the minimum retail price provisions is its argument that "it would be per se illegal for alcohol wholesalers in Connecticut to privately agree (a) to collectively set the prices, each month, at which they would sell their products to retailers, and then hold (i.e. fix) those prices, and not compete on price, for a full month; (b) to also collectively set and hold minimum retail prices for those products and (c) to refuse to afford volume-based discounts to any retailers." See id. at 26–27 (final emphasis added). It is clear that Total Wine's horizontal price fixing claim is grounded in the requirement that wholesalers "set and hold . . . prices," rather than the requirement that retailers refrain from selling their products below their statutorily defined "cost."

The minimum retail price provisions dictate the relationship between the prices set by wholesalers and retailers, but clearly do not mandate or authorize any horizontal activity by wholesalers. Total Wine's dogged claims to the contrary are unavailing: it has not plausibly alleged that the minimum retail price provisions mandate or authorize horizontal price fixing of any kind. As such, the court grants the defendants' and intervenors' Motions to Dismiss Count One, insofar as that count challenges the minimum retail price provisions.

b.    Count Two: Vertical Price Fixing

Next, the court turns to Total Wine's claim that the minimum retail price provisions mandate or authorize vertical price fixing among manufacturers, wholesalers, and retailers. See Compl. ¶¶ 29–33.[14] The defendants and intervenors argue that the Supreme Court's opinion in Leegin Creative Leather Products, Inc. v. PSKS, Inc., 551 U.S. 877 (2007), mandates that this court apply rule of reason analysis to the challenged, vertical restraints. See, e.g., State Defs. Reply at 5–6; Intervenors Reply at 2–4, 9–10. Total Wine retorts that 324 Liquor—which held that similar arrangements were per se violations of the Sherman Act—remains good law, as Leegin did not overturn 324 Liquor and thus does not govern the court's determination in this case. See Opp'n at 33–37.

In Leegin, the Supreme Court held that its opinion in "Dr. Miles [Medical Co. v. John D. Park & Sons Co., 220 U.S. 373 (1911)] should be overruled and that vertical

_____

[14] Notwithstanding Total Wine's references to manufacturers in Count Two, the minimum retail price provisions operate only in the context of the relationships between wholesalers—who set the bottle price—and retailers—who are not permitted to sell below "cost." See Conn. Gen. Stat. §§ 30-68m(a)(1), 30-68m(a)(3), 30-68(b).

price restraints are to be judged by the rule of reason."  551 U.S. at 882.  For nearly a

century, Dr. Miles had mandated that resale price maintenance agreements were per se

illegal, rather than subject to rule of reason analysis.  See id.  In overturning Dr. Miles,

the Supreme Court remarked that "it cannot be stated with any degree of confidence

that resale price maintenance 'always or almost always tend[s] to restrict competition

and decrease output.'"  Id. at 894 (quoting Bus. Elecs. Corp. v. Sharp Elecs. Corp., 485

U.S. 717, 723 (1988)).  Moreover, "[t]he Court's treatment of vertical restraints has

progressed away from Dr. Miles' strict approach . . . [and] from the opinion's rationales."

Id. at 900.  The Supreme Court concluded with the broad pronouncement that "the

Court's decision in Dr. Miles . . . is now overruled.  Vertical price restraints are to be

judged according to the rule of reason."  Id. at 907.

Despite this lack of equivocation in the Court's Leegin opinion, Total Wine

suggests that 324 Liquor still mandates a conclusion that the minimum retail price

provisions are per se unlawful.  See Opp'n at 33.  Total Wine's attempts to buttress this

argument are unpersuasive.

First, Total Wine believes that, because Leegin did not specifically mention 324

Liquor, 324 Liquor remains good law.  See id. ("Nowhere in Leegin did the Supreme

Court suggest it was overruling 324 Liquor.").  This justification for continuing to apply

324 Liquor is entirely unconvincing.  Leegin repeatedly made clear that it overruled Dr.

Miles.  See, e.g., 551 U.S. at 882, 900, 902, 907.  Though the Supreme Court did not

explicitly note all of its prior decisions that relied on Dr. Miles—and explicitly note that

those decisions were also overruled, insofar as they relied on Dr. Miles—it is absolutely

clear that such holdings are no longer good law.  324 Liquor explicitly relied on Dr.

Miles, among other cases, as support for its starting premise that "[r]esale price maintenance [had] been a per se violation of § 1 of the Sherman Act 'since the early years of national antitrust enforcement.'" 324 Liquor, 479 U.S. at 341 (quoting Monsanto Co. v. Spray-Rite Svc. Corp., 465 U.S. 752, 761 (1984)) (citing Dr. Miles, 220 U.S. at 404–09). This now-overruled premise was essential to the 324 Liquor Court's conclusion that the New York statute it analyzed was per se illegal. See id. at 342–43 (discussing Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97 (1980), which invalidated a California statute because "it mandated resale price maintenance, an activity that has long been regarded as a per se violation of the Sherman Act" (quoting Rice v. Norman Williams Co., 458 U.S. 654, 659–60 (1982))). Therefore, 324 Liquor does not bind this court to a determination that vertical resale price maintenance schemes are per se illegal.

Second, Total Wine asserts that Leegin is inapposite because "the leather manufacturer in Leegin was the only company at its 'tier' in the market that was a party to the price maintenance agreement. The agreement was purely vertical; there was not even a theoretical risk of horizontal collusion." Opp'n at 33. This attempt to distinguish 324 Liquor from Leegin is, again, unconvincing.

Total Wine attempts to carve out exceptions to Leegin's holding that "[v]ertical price restraints are to be judged according to the rule of reason," see 551 U.S. at 907, for "industry-wide restraints" and for restraints with "both vertical and horizontal components," see Opp'n at 33–34. However, neither carve out has any basis in Leegin. Whatever the force of 324 Liquor's logic regarding the economic impact of "[m]andatory industrywide resale price fixing," see Opp'n at 34 (quoting 324 Liquor, 479 U.S. at 341–

42), Leegin makes clear that 324 Liquor's reliance on the holding in Dr. Miles—that vertical price restraints are per se illegal—is no longer valid.  Similarly, in the portion of Leegin that Total Wine interprets as "[taking] pains to identify several facts that were not present" in Leegin, see Opp'n at 35 (citing Leegin, 551 U.S. at 897–98), the Court was simply identifying factors for lower courts to consider when they undertook the rule of reason analysis that the Court mandated in that case, see Leegin, 551 U.S. at 897 ("If the rule of reason were to apply to vertical price restraints, courts would have to be diligent in eliminating their anticompetitive uses from the market.  This is a realistic objective, and certain factors are relevant to the inquiry.").  There is thus no suggestion in Leegin that the Supreme Court's broad pronouncements should be limited to the facts of the case, or that this court should not apply rule of reason analysis to the minimum retail price provisions at issue here.

Nor do the lower court cases cited by Total Wine offer support for its contention that the minimum retail price provisions are per se unlawful.  For example, the Seventh Circuit's opinion in Toys "R" Us v. Federal Trade Commission, 221 F.3d 928 (7th Cir. 2000), issued seven years before Leegin, actually undermines Total Wine's invitation to distinguish "vertical price fixing that also involves horizontal collusion [as] fundamentally different from the type of agreement at issue in Leegin," see Opp'n at 35.  In Toys "R" Us, the court's very first words noted that "antitrust laws . . . have long drawn a sharp distinction between contractual restrictions that occur up and down a distribution chain—so-called vertical restraints—and restrictions that come about as a result of agreements among competitors, or horizontal restraints."  221 F.3d at 930.  Despite the fact that "[t]he agreements took the form of a network of vertical agreements between

TRU and the individual manufacturers," see id., the Seventh Circuit ultimately affirmed the FTC's conclusion "that the essence of the agreement network TRU supervised was horizontal," see id. at 936. Thus, the Seventh Circuit's conclusion did not rest on a classification of the vertical restraints as "inextricably tied" to the horizontal restraints. See Opp'n at 36. Rather, the Seventh Circuit fit the conspiracy in Toys "R" Us—which had both vertical and horizontal elements—into just one of those two categories: having determined that their "essence . . . was horizontal," the court then applied per se scrutiny to the arrangements. See Toys "R" Us, 221 F.3d at 936.[15]

Here, the court—much like the Toys "R" Us court—has classified the minimum retail price provisions as just one of the two types of restraints. The court determined that the Complaint did not plausibly allege that the minimum retail price provisions mandated or authorized horizontal price fixing, but rather that the provisions could be challenged regarding their vertical characteristics. See supra Parts IV.B.2.a & IV.B.2.b. However, in the wake of Leegin, these types of vertical restraints are subject to rule of reason scrutiny, see Leegin Creative Leather Prods., Inc., 551 U.S. at 907, and thus are not preempted. Therefore, Total Wine's Complaint fails to state a claim of vertical price fixing, with respect to the minimum retail price provisions. Insofar as Count Two challenges the minimum retail price provisions, it is dismissed.

---

[15] Similarly, though the conspiracy in United States v. Apple Inc., 952 F. Supp. 2d 638 (S.D.N.Y. 2013), had horizontal and vertical elements, the primary issue was the manner in which the "vertical actor [was] alleged to have participated in an unlawful horizontal agreement." See 952 F. Supp. 2d at 690–91 (emphasis added).

C.    Price Discrimination Prohibition

Finally, the court addresses the lawfulness of the price discrimination prohibition challenged by Total Wine.  The price discrimination prohibition mandates that wholesalers sell a given product to all retailers at the same price.  See Conn. Gen. Stat. § 30-68k.  As described in the following discussion, the court concludes: (1) that Total Wine has not plausibly alleged that the price discrimination prohibition is a hybrid restraint, but is instead a unilateral restraint outside the scope of the Sherman Act; and (2) having determined that the price discrimination prohibition is a unilateral restraint, the court need not undertake the inquiry of whether it is per se illegal or would be subject to rule of reason analysis.

As was the case with each of the previously discussed provisions, the parties dispute whether the price discrimination prohibition is a unilateral or hybrid restraint. Compare State Defs. Mem. in Supp. at 4–5, and Trade Ass'ns Mem. in Supp. at 25–26, and Brecome Mem. in Supp. at 13–15, with Opp'n at 17–19.  The court will not repeat its analysis of the framework governing this question.  See supra Part IV.A.1.  That discussion is incorporated here by reference.  Briefly, however, the relevant case law provides that unilateral restraints are those "imposed by government . . . to the exclusion of private control," Freedom Holdings IV, 624 F.3d at 50 (quoting Fisher, 475 U.S. at 266), while hybrid restraints "grant[ ] private actors a degree of regulatory control over competition," id.

Again, the court believes this question is best approached by using the Supreme Court's decisions in Fisher v. City of Berkeley, California, 475 U.S. 260 (1986), and 324 Liquor Corp. v. Duffy, 479 U.S. 335 (1987), as guideposts.  Unlike the post and hold

provisions and the minimum retail price provisions, the price discrimination prohibition is more like the restraint at issue in Fisher than the one analyzed in 324 Liquor. The city ordinance upheld in Fisher set a ceiling, capping the rents that residential landlords could charge. See 475 U.S. at 262. The court noted that Berkeley's ordinance "place[d] complete control over maximum rent levels exclusively in the hands of the Rent Stabilization Board. Not just the controls themselves but also the rent ceilings they mandate[d] [had] been unilaterally imposed on landlords by the city." Fisher, 475 U.S. at 269. By contrast, in 324 Liquor, wholesalers were obligated by statute to post their own monthly price schedules, but New York did not monitor or regulate those posted prices. See 324 Liquor, 479 U.S. at 345.

Here, the price discrimination prohibition does not "grant[ ] private actors a degree of regulatory control over competition," such that the prohibition is a hybrid restraint. See Freedom Holdings IV, 624 F.3d at 50 (citing, inter alia, 324 Liquor, 479 U.S. at 345–46 & n.8). Instead, Connecticut simply prohibits liquor wholesalers from charging different prices to different retailers. Although wholesalers may choose what price they will charge all retailers, they are prohibited from charging different prices.

Total Wine is incorrect that the price discrimination prohibition is a hybrid restraint, let alone "a quintessential hybrid restraint." Opp'n at 17. In support of this contention, Total Wine first claims that, "[t]o constitute a unilateral restraint, a statute must lodge exclusive authority to set prices with public officials." Opp'n at 17–18 (citing Midcal, 445 U.S. at 105–06).[16] This statement is squarely at odds with Fisher, where

_____

[16] The section of Midcal to which Total Wine cites offers no support for its assertion: Total Wine points the court to a section of the decision discussing Parker immunity, not the distinction between unilateral and hybrid restraints. See Midcal, 445 U.S. at 105–06.

the city ordinance bestowed on local officials the authority to set a ceiling on rents to be charged, but certainly did not lodge exclusive authority to set prices with them.  See Fisher, 475 U.S. at 262–63.

The Fourth Circuit's view that a similar price discrimination prohibition was inseparable from Maryland's post and hold provisions is also unpersuasive.  See Opp'n at 18 (quoting TFWS, Inc. v. Schaefer ("TFWS I"), 242 F.3d 198, 209 (4th Cir. 2001); TFWS, Inc. v. Franchot ("TFWS II"), 572 F.3d 186, 193 (4th Cir. 2009)).  Maryland apparently did not raise the issue of severance in its initial appeal.  See TFWS II, 572 F.3d at 193.  That being the case, the Fourth Circuit was bound in the later appeal by its conclusion in the first appeal that the price discrimination prohibition was so wrapped up in the hybrid post and hold provisions as to also be a hybrid restraint.  See id. at 193–94 ("Maryland presents its argument for severance of its volume discount ban as though for review in the first instance, and does not attempt to meet the high burden of showing that our holding in TFWS I was clearly erroneous and would work a manifest injustice.").  By contrast, the state defendants here have raised the issue of severability in briefing their Motion to Dismiss.  See State Defs. Reply at 3–4 ("[A] court must look at each specific state law separately . . . .").

As the state defendants point out, the challenged provisions "act separately and address different conduct."  See State Defs. Reply at 4.  The fact that the challenged provisions are all related does not mandate a conclusion that, having determined that two of them are hybrid restraints, the third is as well.  In Costco Wholesale Corp., the Ninth Circuit was unpersuaded that other challenged provisions of Washington's liquor regulations needed to "be considered part-and-parcel of the posting scheme . . . ."  522

F.3d at 897–98.  Indeed, relying in part on principles of severability, the court determined that the Washington provisions analogous to Connecticut's price discrimination prohibition were a unilateral restraint.  See id. at 898–99.[17]

Ultimately, the fact that the challenged provisions govern related aspects of the liquor market does not render them analytically inseparable.  Analyzing the price discrimination prohibition on its own, the court concludes that Total Wine has not plausibly alleged that the prohibition is a hybrid rather than a unilateral restraint.  That being the case, it need not proceed to the second step of the preemption analysis and decide whether the restraint is a per se violation of the Sherman Act: because the price discrimination prohibition is a unilateral restraint, it is entirely outside the scope of the Sherman Act.  See supra Part III.B.  Therefore, the state defendants' and intervenors' Motions to Dismiss Total Wine's challenge to the price discrimination prohibition are granted.

## V.      CONCLUSION

For the reasons set forth above, the Motions to Dismiss (Doc. Nos. 38, 66, 80) are **GRANTED**.  Total Wine's challenges to the post and hold provisions and minimum retail price provisions are dismissed, because these provisions constitute hybrid restraints that receive rule of reason scrutiny and therefore cannot be preempted.  Total Wine's claim that the price discrimination prohibition is preempted is also dismissed, because that provision is a unilateral restraint outside the scope of the Sherman Act.

---

[17] Admittedly, the Ninth Circuit's analysis relied in part on its conclusion that the post and hold provisions were preempted by the Sherman Act.  See Costco Wholesale Corp., 522 F.3d at 898.  Most relevantly here, however, the Ninth Circuit did not view the challenged restraints as impossible to separate from one another, as Total Wine suggests the court should consider the challenged provisions in this case.

**SO ORDERED.**

Dated at New Haven, Connecticut this 6th day of June, 2017.

                    _/s/ Janet C. Hall_____
                    Janet C. Hall
                    United States District Judge