17-2003
*Connecticut Fine Wine and Spirits LLC v. Seagull*

# UNITED STATES COURT OF APPEALS
### FOR THE SECOND CIRCUIT

———————

August Term, 2017

(Argued: February 1, 2018     Decided: February 20, 2019
Amended: July 29, 2019)

Docket No. 17-2003-cv

———————

CONNECTICUT FINE WINE AND SPIRITS, LLC, d/b/a, TOTAL WINE & MORE,

*Plaintiff-Appellant*,

— v. —

COMMISSIONER MICHELLE H. SEAGULL, DEPARTMENT OF CONSUMER
PROTECTION, JOHN SUCHY, DIRECTOR, DIVISION OF LIQUOR CONTROL,

*Defendants-Appellees*,

WINE & SPIRITS WHOLESALERS OF CONNECTICUT, INC., CONNECTICUT
BEER WHOLESALERS ASSOCIATION, INC., CONNECTICUT RESTAURANT
ASSOCIATION, CONNECTICUT PACKAGE STORES ASSOCIATION, INC.,
BRESCOME BARTON, INC.,

*Intervenors-Defendants-*
*Appellees.*[*]

———————

[*] The Clerk of Court is respectfully directed to amend the official caption in this
case as set forth above.

1

2

3  B e f o r e :

4

5      POOLER, SACK, *Circuit Judges*, and ENGELMAYER,[**] *District Judge*.

6

7  ———————

8      Connecticut Fine Wine and Spirits, d/b/a Total Wine & More ("Total

9  Wine"), challenged certain provisions of Connecticut's Liquor Control Act and

10  related regulations.  Total Wine alleged that these provisions were preempted by

11  the Sherman Act, 15 U.S.C. § 1.  The United States District Court for the District

12  of Connecticut, Janet Hall, J., granted the defendants' motion to dismiss the

13  complaint, holding, *inter alia*, that the post-and-hold provisions and the

14  minimum-retail-price provisions of the Connecticut Liquor Control Act were

15  hybrid restraints on trade, but that Total Wine failed to plead facts that plausibly

16  support the conclusion that those provisions constitute *per se* violations of, and

17  therefore were preempted by, the Sherman Act.  The District Court also held that

18  Total Wine did not plausibly allege that the price discrimination provision was a

19  hybrid restraint on trade; therefore, that provision imposes a unilateral restraint

20  on trade that falls outside the scope of the Sherman Act.  We agree with the

---

1  [**] Judge Paul A. Engelmayer, of the United States District Court for the Southern
2  District of New York, sitting by designation.

1    District Court that the post-and-hold, minimum-retail-price, and price-

2    discrimination provisions are not preempted by the Sherman Act.  We therefore

3    AFFIRM.

4
5                                    _____
6
7            WILLIAM J. MURPHY (John J. Connolly, Adam B. Abelson, *on the brief*)
8                    Zuckerman Spaeder LLP, Baltimore, Maryland; James T. Shearin,
9                    Edward B. Lefebvre, Pullman & Comley, LLC, New York, New
10                   York, *for* Plaintiff-Appellant Connecticut Fine Wine & Spirits,
11                   LLC.
12
13           GARY M. BECKER, ASSISTANT ATTORNEY GENERAL (Robert Deichert,
14                   Assistant Attorney General, *on the brief*), George Jepsen, Attorney
15                   General for the State of Connecticut *for* Defendants-Appellees
16                   Michelle H. Seagull, Commissioner, Department of Consumer
17                   Protection; John Suchy, Director, Division of Labor, Hartford,
18                   Connecticut.
19
20           DEBORAH SKAKEL (Craig M. Flanders, *on the brief*) Blank Rome LLP,
21                   New York, New York; David S. Hardy, Damian K.
22                   Gunningsmith, Carmody Torrance Sandak & Hennessey LLP,
23                   New Haven, Connecticut; Robert M. Langer, Benjamin H.
24                   Diessel, Wiggin and Dana LLP, Hartford, Connecticut; Meredith
25                   G. Diette, Siegel, O'Connor, O'Donnell & Beck P.C., Hartford,
26                   Connecticut; Patrick A. Klingman, Klingman Law, LLC,
27                   Hartford, Connecticut, *for* Intervenors-Defendants-Appellees
28                   Wine & Spirits Wholesalers of Connecticut, Inc.; Connecticut
29                   Beer Wholesalers Association, Inc.; Connecticut Restaurant
30                   Association, Connecticut Package Stores Association, Inc.
31
32           Jeffrey J. Mirman, John F. Droney, Hinckley, Allen & Snyder, LLP,
33                   Hartford, Connecticut, *for* Intervenor-Defendant-Appellee
34                   Brescome Barton, Inc.

3

1

———————————

2    PAUL A. ENGELMAYER, *District Judge*:

3         Connecticut Fine Wine and Spirits, d/b/a Total Wine & More ("Total

4    Wine") appeals from a judgment of the United States District Court for the

5    District of Connecticut (Janet C. Hall, District Judge) dismissing its complaint

6    against the Connecticut Department of Consumer Protection ("DCP") and the

7    Director of the Connecticut Division of Liquor Control ("DLC").  Total Wine

8    claimed that certain statutory and regulatory provisions that govern the

9    distribution and sale of alcoholic beverages in Connecticut, and which often

10   result in common retail-level pricing across the state for particular such

11   beverages, are preempted by federal antitrust law.  For the reasons that follow,

12   we hold that these laws are not preempted.  We therefore affirm.

13                              **BACKGROUND**

14   **A.     Connecticut's Laws Regarding Alcohol Distribution and Sale**

15         Like many other states, Connecticut heavily regulates the distribution and

16   sale of alcoholic beverages within its borders.  The state's Liquor Control Act

17   prohibits the sale of alcoholic beverages in a manner that fails to comply with

18   that statute.  *See* Conn. Gen. Stat. § 30-74(a).

1    At issue here are three sets of provisions under Connecticut statutes and

2    regulations that bear on the price at which alcoholic beverages may lawfully be

3    sold: "post-and-hold" provisions; minimum retail pricing provisions; and

4    provisions prohibiting price discrimination and volume discounts.[1]  These, in

5    tandem, establish the method by which alcoholic beverage prices are set by the

6    manufacturer, the wholesaler, and the retailer.

7    The three sets of provisions at issue are as follows:

8    ***Post-and-hold provisions***:  Connecticut's "post and hold" provisions

9    require state-licensed manufacturers, wholesalers, and "out-of-state permittees"

10    (together, "wholesalers") to post a "bottle price" and a "case price" each month

11    with the DCP for each alcoholic product that the wholesaler intends to sell

12    during the following month.   (For beer, the wholesaler must post a "can price.")

13    Posted prices are then made available to industry participants.  During the four

14    days after the posting of the prices, wholesalers may "amend" their posted prices

---

[1] Total Wine challenges the following provisions: (1) section 30-63 of the
Connecticut General Statutes and section 30-6-B12 of the Regulations of
Connecticut State Agencies (referred to here as the "post-and-hold" provisions);
(2) sections 30-68m(a)(1) and 30-68m(b) of the Connecticut General Statutes (the
"minimum retail price" provisions); and (3) sections 30-63(b), 30-68(k), and 30-
94(b) of the Connecticut General Statutes and section 30-6-A29(a) of the
Regulation of Connecticut State Agencies (the "price discrimination prohibition"
provisions).  In the ensuing discussion, the Court reproduces the central
provisions.

1    to "match" competitors' lower prices—specifically, "to meet a lower price posted

2    by another wholesaler with respect to alcoholic liquor bearing the same brand or

3    trade name." Those amended prices, however, may not be "lower than those

4    [prices] being met." Wholesalers are obligated to "hold" their prices at the

5    posted price (amended or not) for a month. These post-and-hold

6    provisions—variations of which are found in many states—are the heart of the

7    Connecticut regulatory regime that Total Wine challenges.[2]

---

1    [2] Section 30-63(c) of the Connecticut General Statutes provides:
2
3            For alcoholic liquor other than beer, each manufacturer, wholesaler and
4            out-of-state shipper permittee shall post with the department, on a
5            monthly basis, the bottle, can and case price of any brand of goods
6            offered for sale in Connecticut, which price when so posted shall be the
7            controlling price for such manufacturer, wholesaler or out-of-state
8            permittee for the month following such posting. On and after July 1,
9            2005, for beer, each manufacturer, wholesaler and out-of-state shipper
10           permittee shall post with the department, on a monthly basis, the
11           bottle, can and case price, and the price per keg or barrel or fractional
12           unit thereof for any brand of goods offered for sale in Connecticut
13           which price when so posted shall be the controlling price for such
14           brand of goods offered for sale in this state for the month following
15           such posting. Such manufacturer, wholesaler and out-of-state shipper
16           permittee may also post additional prices for such bottle, can, case, keg
17           or barrel or fractional unit thereof for a specified portion of the
18           following month which prices when so posted shall be the controlling
19           prices for such bottle, can, case, keg or barrel or fractional unit thereof
20           for such specified portion of the following month. Notice of all
21           manufacturer, wholesaler and out-of-state shipper permittee prices
22           shall be given to permittee purchasers by direct mail, Internet web site
23           or advertising in a trade publication having circulation among the retail

1    ***Minimum-retail-price provisions***: Connecticut's minimum-retail-price

2    provisions require that retailers sell to customers at or above a statutorily defined

3    "[c]ost." "Cost," however, is not defined as the retailer's actual cost. Instead,

4    generally, a retailer's "[c]ost" for a given alcoholic beverage, is determined by

5    adding the posted bottle price—as set by the wholesaler—and a markup for

6    shipping and delivery. The post-and-hold provision, because it supplies the

7    central component of the "[c]ost" at which the retailer may sell its product, thus

---

1    permittees except a wholesaler permittee may give such notice by hand
2    delivery. Price postings with the department setting forth wholesale
3    prices to retailers shall be available for inspection during regular
4    business hours at the offices of the department by manufacturers and
5    wholesalers until three o'clock p.m. of the first business day after the
6    last day for posting prices. A manufacturer or wholesaler may amend
7    such manufacturer's or wholesaler's posted price for any month to meet
8    a lower price posted by another manufacturer or wholesaler with
9    respect to alcoholic liquor bearing the same brand or trade name and
10   of like age, vintage, quality and unit container size; provided that any
11   such amended price posting shall be filed before three o'clock p.m. of
12   the fourth business day after the last day for posting prices; and
13   provided further such amended posting shall not set forth prices lower
14   than those being met. Any manufacturer or wholesaler posting an
15   amended price shall, at the time of posting, identify in writing the
16   specific posting being met. On and after July 1, 2005, all wholesaler
17   postings, other than for beer, for the following month shall be provided
18   to retail permittees not later than the twenty-seventh day of the month
19   prior to such posting. All wholesaler postings for beer shall be
20   provided to retail permittees not later than the twentieth day of the
21   month prior to such posting.
22

1    largely dictates the price at which Connecticut retailers must sell their alcoholic

2    products.[3]

3         Plaintiffs allege that wholesalers will occasionally lower their posted case

4    prices for a given month, without lowering posted bottle prices, during what are

5    called "off-post" months.  Although retailers buy almost exclusively by the case,

---

1    [3] Section 30-68m of the Connecticut General Statutes provides, in pertinent part:

2

3         (a) For the purposes of this section:
4         (1) "Cost" for a retail permittee means (A) for alcoholic liquor other
5         than beer, the posted bottle price from the wholesaler plus any charge
6         for shipping or delivery to the retail permittee's place of business paid
7         by the retail permittee in addition to the posted price, and (B) for beer,
8         the lowest posted price during the month in which the retail permittee
9         is selling plus any charge for shipping or delivery to the retail
10        permittee's place of business paid by the retail permittee in addition to
11        the price originally paid by the retail permittee;

12

13        (b) No retail permittee shall sell alcoholic liquor at a price below his or
14        her cost.

15   Relatedly, Section 30-68m(a)(C) defines "bottle price" as:

16

17        [the] price per unit of the contents of any case of alcoholic liquor, other
18        than beer [which] shall be arrived at by dividing the case price by the
19        number of units or bottles making up such case price and adding to the
20        quotient an amount that is not less than the following: A unit or bottle
21        one-half pint or two hundred milliliters or less, two cents; a unit or
22        bottle more than one-half pint or two hundred milliliters but not more
23        than one pint or five hundred milliliters, four cents; and a unit or bottle
24        greater than one pint or five hundred milliliters, eight cents.

25

1    their prices remain fixed by the minimum-retail-price provisions, which are

2    keyed to bottle prices.

3         ***Price discrimination/volume discounts***:  Finally, Connecticut bans volume

4    discounts and other forms of price discrimination.  Wholesalers must sell a given

5    product to all retailers at the same price.  Wholesalers may not offer discounts to

6    retailers who are high-volume purchasers.[4]

_____

1    [4] Section 30-68k of the Connecticut General Statutes provides:
2
3         No holder of any wholesaler's permit shall ship, transport or deliver
4         within this state or any territory therein or sell or offer for sale, to a
5         purchaser holding a permit for the sale of alcoholic liquor for on or off
6         premises consumption, any brand of alcoholic liquor, including
7         cordials, as defined in section 30-1, at a bottle, can or case price higher
8         than the lowest price at which such item is then being sold or offered
9         for sale or shipped, transported or delivered by such wholesaler to any
10        other such purchaser to which the wholesaler sells, offers for sale,
11        ships, transports or delivers that brand of alcoholic liquor within this
12        state.
13
14   Similarly, Section 30-63(b) of the Connecticut General Statutes provides:
15
16        No manufacturer, wholesaler or out-of-state shipper permittee shall
17        discriminate in any manner in price discounts between one permittee
18        and another on sales or purchases of alcoholic liquors bearing the same
19        brand or trade name and of like age, size and quality, nor shall such
20        manufacturer, wholesaler or out-of-state shipper permittee allow in any
21        form any discount, rebate, free goods, allowance or other inducement
22        for the purpose of making sales or purchases. Nothing in this
23        subsection shall be construed to prohibit beer manufacturers, beer

1       While multiple policy interests have been asserted in support of these

2    provisions, they (particularly the post-and-hold and minimum-retail-price

3    provisions) commonly have been justified as means of guarding against

4    escalating price wars among alcohol retailers that may lead to excessive

5    consumption.  *See Slimp v. Dep't of Liquor Control*, 687 A.2d 123, 129 (Conn. 1996)

6    (noting "legislature's concern that artificial inducements to purchase liquor will

7    result in increased consumption"); *Eder Bros. v. Wine Merchants of Conn., Inc.*, 800

8    A.2d 138, 147 (Conn. 2005) (noting that "price wars among retail dealers" for

9    liquor "may induce persons to purchase, and therefore consume, more liquor

10   than they would if higher prices were maintained"); *Eder Bros.*, 800 A.2d at

11   147–48 (noting that "the cutthroat competition" characteristic of price wars "is

12   apt to induce the retailers to commit such infractions of the law as selling to

13   minors and keeping open after hours in order to withstand the economic

14   pressure").  These provisions (particularly the price-discrimination provision)

15   have also been justified as guarding against favoritism within the liquor industry

16   and protecting smaller retailers.  *See Slimp*, 687 A.2d at 129.  Unsurprisingly,

---

1    wholesalers or beer out-of-state shipper permittees from differentiating
2    in the manner in which their products are packaged on the basis of on-
3    site or off-site consumption.

10

1  countervailing arguments have also been made, including ones noting the anti-

2  competitive nature of these price restraints.

3  **B.    Total Wine's Complaint**

4       Total Wine is the largest retailer of wine and spirits in the United States.

5  Headquartered in Bethesda, Maryland, Total Wine, with its affiliates, owns and

6  operates wine and liquor stores in 21 states.

7       In December 2012, Total Wine opened a retail beverage store in Norwalk,

8  Connecticut, its first such store in the state.  Since then, Total Wine has opened

9  additional stores, in Milford, Manchester, and West Hartford, Connecticut.

10       On August 23, 2016, Total Wine filed suit against Jonathan Harris, the

11  Commissioner of the DCP, and John Suchy, Director of the DLC, in their official

12  capacities.[5]  Seeking injunctive and declaratory relief, it brought a facial challenge

13  to the three sets of statutory and regulatory provisions reviewed above

14  governing the distribution and sale of alcoholic beverages in Connecticut:   (1) the

15  post-and-hold provisions, (2) the minimum-retail-price provisions, and (3) the

16  price-discrimination and volume-discount-prohibition provisions.  Total Wine

---

1  [5] Michelle H. Seagull replaced Jonathan Harris as Commissioner of the DCP on May 1,
2  2017.

1    alleged that these provisions bring about *per se* violations of § 1 of the Sherman

2    Antitrust Act, 15 U.S.C. § 1, and so are preempted by that statute.

3         Total Wine's claim was that the Connecticut regulatory scheme eliminates

4    incentives for alcoholic beverage wholesalers to compete on the basis of price and

5    invites wholesalers to maintain prices "substantially above what fair and

6    ordinary market forces would dictate."  App. at 19, Compl. ¶ 16.  Total Wine

7    further claimed that Connecticut's regulations inhibit meaningful price

8    competition at the retail level.

9         Specifically, Total Wine claimed, the regulations, in two ways, bring about

10   prices that exceed those that a competitive market would produce.

11        First, it argued, the post-and-hold provisions—and the opportunity they

12   give wholesalers to match a lower price during the forthcoming month for a

13   given product with no risk of sparking a price war—reduce any wholesaler's

14   incentive to be the first to reduce price.  The post-and-hold provisions, Total

15   Wine argued, effectively bring about horizontal price fixing.  As it put the point

16   on appeal:  "If a wholesaler were to drop its price on a particular product, its

17   competitors would know immediately (from having seen the posted price), and

18   would have four days to match the posted price."  Appellant Br. at 8–9.  Even if

the wholesaler who had been the first to reduce its price still wished to set a price

beneath its competitors, Total Wine noted, it would then be required to "hold the

lower price for an entire month—during which it would have no competitive

advantage because its competitors would be charging the same price."[6] *Id.* at 9.

Second, Total Wine argued, Connecticut's system precludes retailers from

competing on the basis of cost. Fundamentally, Total Wine noted, the minimum-

retail-price provision is keyed to a definition of "[c]ost" that turns not on the

retailer's actual cost but on the price charged to the retailer by the wholesaler.

This, Total Wine argued, prevents a high-volume, lower-average-cost retailer

such as itself from attracting customers by offering discounts enabled by its

lower-cost structure. This result is exacerbated, Total Wine alleged, by a practice

in which wholesalers often engage: They set high minimum bottle prices, and

then lower the case prices for the product without making corresponding

reductions to the bottle price. While retailers (who buy almost exclusively by the

case) take advantage of the reduced case price and buy larger quantities during

---

[6] Total Wine's claim that the Connecticut regulations promote horizontal price
fixing was substantially developed in its briefs on the motion to dismiss and
further refined on appeal. Its Complaint overwhelmingly focused instead on its
claims as to vertical price fixing. We conclude, however, that the Complaint
satisfactorily pled both theories.

months where the case price is lower, this, Total Wine alleged, does not benefit

the consumer because retailers are required to sell the product at a margin fixed

by the higher minimum bottle price, which has effectively been set by the

wholesaler.   In this manner, Total Wine alleged, "wholesalers effectively control

both retail price and retailers' profit margins," and retailers like Total Wine that

wish to use their business efficiencies to reduce the prices offered to consumers

are blocked from doing so.  App. at 20, Compl. ¶ 17.

The end result, Total Wine alleged, is a market without meaningful price

competition:  "Competing wholesalers for the same brands routinely set the same

bottle and case prices down to the penny, month after month, with each

wholesaler exactly tracking its competitors' . . . case prices."  *Id.*, Compl. ¶ 19.  In

other words, Total Wine argued, the regulatory scheme promotes vertical price

fixing.   Total Wine's complaint attached data tables reflecting that, over long

periods, leading wholesalers often have charged the same amount for each

alcoholic beverage product—*e.g.*, Bombay Sapphire, Grey Goose, Jose Cuervo

Gold—and have adjusted prices in lockstep.  These prices, Total Wine claimed,

exceed those which a competitive market would produce:  Citing a study, Total

Wine alleged that Connecticut's regulatory scheme "result[s] in retail prices for

14

1  wine and spirits in Connecticut that are as much as 24% higher than prices

2  offered for identical products in the surrounding states."  *Id.*, Compl. ¶ 18.

3          Finally, Total Wine alleged, the Connecticut regulatory scheme does not

4  entail active supervision by any state agency or instrumentality.  Wholesalers

5  post and retailers charge the prices they see fit, it alleged, without any review or

6  intervention by regulators, save where a lawsuit has been brought claiming

7  noncompliance with the state's regulations.

8      **C.    The Motion to Dismiss**

9          On October 14, 2016, the defendants moved to dismiss.  They were

10 supported in this motion by five intervenors, four of which were trade

11 associations and the fifth of which was a liquor distributor.[7]

12         On June 6, 2017, the district court, following argument, granted the motion

13 to dismiss.  *See Conn. Fine Wine & Spirits v. Harris, LLC*, 255 F. Supp. 3d 355 (D.

---

1  [7] These were: the Wine & Spirit Wholesalers of Connecticut ("WSWC"), the
2  Connecticut Beer Wholesalers Association ("CBWA"), the Connecticut
3  Restaurant Association ("CRA") and the Connecticut Package Stores Association
4  ("CPSA") (collectively, "the trade associations"), as well as Brescome Barton, Inc.
5  ("Brescome" and, with the trade associations, "intervenors").
6

1    Conn 2017). Analyzing the challenged provisions separately,[8] the district court

2    applied as to each the first step in the two-step framework used to assess claims

3    of preemption by § 1 of the Sherman Act in this Circuit.[9]  As a threshold matter,

4    the court inquired whether the restraints are unilateral ("imposed by the

5    government . . . to the exclusion of private control") and hence immune from

6    preemption by § 1, or hybrid (imposed by both the government and by granting

7    "private actors a degree of regulatory control over competition" and hence

8    capable of preemption.  *Id.* at 364.  Then, the court inquired whether the

9    challenged provision brought about facially, or *per se*, unlawful restraints on

10    trade, in which case they are preempted, or restraints that are subject to rule of

11    reason scrutiny, in which case they are not.  *Id.*

---

1  [8] The district court stated that separate consideration of each challenged
2  provision was required (1) under principles of federalism, (2) because each
3  provision presented distinct analytic issues under principles of antitrust
4  preemption, and (3) because Connecticut's general rule of statutory construction
5  provides that the invalidity of some sections of a statute should not invalidate the
6  statute as a whole.  *See Conn. Fine Wine & Spirits*, 255 F. Supp. 3d at 366–67; Conn.
7  Gen. Stat. § 1-3.
1  [9] The district court dismissed Total Wine's claims at the first step of the
2  preemption analysis and neither the defendants nor any of the intervenors have
3  argued that Total Wine's claims should be dismissed at the second step.

1        As to the post and hold restraint, the district court held that it is a hybrid

2   restraint, but that the conduct it brings about is not *per se* unlawful, and so is

3   subject to rule of reason analysis.  *Id.* at 371.  Therefore, it is not preempted.  *Id.*

4   The district court relied on *Battipaglia v. New York State Liquor Authority*, 745 F.2d

5   166 (2d Cir. 1984), in which we upheld New York State's post-and-hold provision

6   as similarly not preempted.

7        As to the minimum resale price restraint, the district court held that it too

8   was hybrid, but that it also implicated only the rule of reason, not condemnation

9   *per se*.  *Id.* at 373.  The district court held that this provision imposed a vertical

10  restraint.  And, it noted, recent Supreme Court cases, in particular *Leegin Creative*

11  *Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007), have held that courts are to

12  apply rule of reason, not *per se*, analysis to vertical restraints, meaning that this

13  provision is not facially preempted.  *Id.* at 378.

14       Finally, the district court held that Connecticut's provisions forbidding

15  price discrimination amounted to a unilateral restraint on trade, imposed solely

16  by the state and not involving private conduct.  *Id.*  That was because these

17  provisions "simply prohibit[] liquor wholesalers from charging different prices to

18  different retailers," and do not "grant[] private actors a degree of regulatory

17

1    authority over competition." *Id.* at 379. Thus, it held that these provisions, too,

2    are not preempted. *Id.* at 380.

3          Accordingly, the district court upheld all challenged aspects of

4    Connecticut's alcoholic beverage regulatory regime.

5          On June 26, 2017, Connecticut Fine Wine appealed.

6

7                                  **DISCUSSION**

8          This case presents questions of preemption:  Does § 1 of the Sherman

9    Antitrust Act, 15 U.S.C. § 1, which makes illegal "[e]very contract, combination

10   . . . or conspiracy, in restraint of trade or commerce," preempt the challenged

11   provisions of Connecticut's Liquor Control Act?

12         We begin by reviewing the two key precedents that frame the § 1

13   preemption inquiry:  *Rice v. Norman Williams Co.*, 458 U.S. 654 (1982), and *Fisher v.*

14   *City of Berkeley, California*, 475 U.S. 260 (1986).  Then, because the analysis differs

15   by provision, we review serially the three sets of challenged provisions.  We first

16   address the minimum-resale-price restraint and then the prohibition on price

17   discrimination.  We last address the post-and-hold provisions, which are the

primary focus of plaintiffs' challenge.  None of the provisions, we hold, are

preempted.[10]

### A.    Principles of Preemption Under § 1:  *Rice* and *Fisher*

The Supreme Court's decisions in *Rice* and *Fisher* frame the § 1 preemption

inquiry.

### 1.  *Rice*:  The Requirement That the State Law "Mandate or Authorize," or "Place Irresistible Pressure" on Private Parties to Bring About, a *Per Se* Violation of § 1

In *Rice,* the Court held that the preemption inquiry under § 1 requires

courts to

> apply principles similar to those which we employ in considering
> whether any state statute is pre-empted by a federal statute pursuant
> to the Supremacy Clause.  As in the typical pre-emption case, the
> inquiry is whether there exists an irreconcilable conflict between the
> federal and state regulatory schemes.  The existence of hypothetical
> or potential conflict is insufficient to warrant the pre-emption of the
> state statute.  A state regulatory scheme is not pre-empted by the
> federal antitrust laws simply because in a hypothetical situation a
> private party's compliance with the statute might cause him to
> violate the antitrust laws.  A state statute is not preempted by the

---

[10] While we address the three areas separately here, we have also considered them in tandem.  The outcome is the same: considered separately or as a whole, the provisions are not preempted.  We therefore do not reach the question of which analysis would have been the right one had the difference been determinative.

1   federal antitrust laws simply because the state scheme might have an
2   anticompetitive effect.
3
4   458 U.S. at 659 (citations omitted).  Rather, the Court held, "[a] party may

5   successfully enjoin the enforcement of a state statute only if the statute on its face

6   irreconcilably conflicts with federal antitrust policy."  *Id.*  In other words, for a

7   state statute to be preempted by § 1, the statute must bring about conduct that

8   would require *per se* condemnation under § 1:

9   Our decisions in this area instruct us, therefore, that a state statute,
10   when considered in the abstract, may be condemned under the
11   antitrust laws only if it mandates or authorizes conduct that
12   necessarily constitutes a violation of the antitrust laws in all cases, or
13   if it places irresistible pressure on a private party to violate the
14   antitrust laws in order to comply with the statute.    Such
15   condemnation will follow under § 1 of the Sherman Act when the
16   conduct contemplated by the statute is in all cases a *per se* violation.
17   If the activity addressed by the statute does not fall into that
18   category, and therefore must be analyzed under the rule of reason,
19   the statute cannot be condemned in the abstract.  Analysis under the
20   rule of reason requires an examination of the circumstances
21   underlying a particular economic practice, and therefore does not
22   lend itself to a conclusion that a statute is facially inconsistent with
23   federal antitrust laws.
24
25   *Id.* at 661.

26   Applying these principles, the *Rice* Court upheld the codes at issue:

27   California Alcoholic Beverage Control provisions which prohibited a licensed

1    importer from importing any brand of distilled spirits for which it was not a

2    designated importer.  These, the Court explained, would not give rise in all

3    instances to *per se* illegal conduct.  *Id.* at 661–62.

4                    **2.  *Fisher*: The Requirement of Concerted Action**

5            In *Fisher*, the Court identified a related hurdle that a claim of preemption by

6    § 1 must clear.  At issue was a rent stabilization law enacted by the City of

7    Berkeley, California, that placed strict controls on certain classes of real property

8    rented for residential use.  The ordinance required landlords to adhere to the

9    prescribed rent ceilings; violators were subject to civil and criminal penalties.  475

10   U.S. at 262–63.  A group of landlords sued the city, arguing that the ordinance

11   was a traditional—and *per se* invalid—form of fixing prices.

12           The Supreme Court rejected that argument.  Sherman Act § 1, it noted, can

13   be violated only by collective action: "unreasonable restraints of trade effected by

14   a 'contract, combination . . ., or conspiracy' between *separate* entities."  *Id.* at 266

15   (quoting *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984)).  But, the

16   Court held, Berkeley's unilateral imposition of rent control did not amount to

17   agreement or "concerted action."  *Id.*  The Court acknowledged that, had the

18   Berkeley landlords banded together to fix rental prices in the absence of an

21

ordinance, their action would have been a *per se* violation of the Sherman Act.  *Id.*

But the fact that the price-fixing ordinance resulted from the city acting

unilaterally, not the landlords acting concertedly, saved it from preemption:

> A restraint imposed unilaterally by government does not become concerted-action within the meaning of the [Sherman Act] simply because it has a coercive effect upon parties who must obey the law. The ordinary relationship between the government and those who must obey its regulatory commands whether they wish to or not is not enough to establish a conspiracy.  Similarly, the mere fact that all competing property owners must comply with the same provisions of the Ordinance is not enough to establish a conspiracy among landlords.  Under Berkeley's Ordinance, control over the maximum rent levels of every affected residential unit has been unilaterally removed from the owners of these properties and given to the Rent Stabilization Board.

*Id.* at 267.  In sum, the challenged rent control laws could exist, alongside § 1,

because "the rent ceilings imposed by the Ordinance and maintained by the Rent

Stabilization Board have been unilaterally imposed by government upon

landlords to the exclusion of private control."  *Id.* at 266.  As the Court put the

point: "There is no meeting of the minds here."  *Id.* at 267.

The Supreme Court in *Fisher* was careful to limit its holding to unilateral

action by a government entity.  It recognized that a governmentally imposed

restraint on trade that enforces private pricing decisions would be a "hybrid

restraint" that fulfills the Sherman Act's "concerted action" requirement. The

Court explained:

> Not all restraints imposed upon private actors by government units
> necessarily constitute unilateral action outside the purview of § 1.
> Certain restraints may be characterized as 'hybrid,' in that
> nonmarket mechanisms merely enforce private marketing decisions.
> *See Rice*, 458 U.S. at 665 (Stevens, J., concurring in the judgment).
> Where private actors are thus granted "a degree of private
> regulatory power," *id.* at 66 n.1, the regulatory scheme may be
> attacked under § 1."

*Id.* at 267–68.

We have previously read *Rice* and *Fisher* to constitute the first step in a

two-step inquiry to decide whether a statute is preempted by § 1. *See, e.g.,*

*Freedom Holdings Inc. v. Spitzer*, 357 F.3d 205, 223 (2d Cir. 2004).[11]

**B.    Connecticut's Minimum-Retail-Price Provisions**

The Court applies these principles, first, to the minimum-retail-price

provisions. As noted, these provisions (*e.g.*, Conn. Gen. Stat. § 30-68m) dictate

---

[11] In cases in which alcoholic-beverage laws are claimed to be preempted by § 1,
states have sometimes additionally defended by asserting state action immunity,
which is the second step in our Circuit's two-step preemption inquiry, and
immunity derived from the Twenty First Amendment to the U.S. Constitution.
Connecticut has not raised such defenses in connection with this appeal.

1 the relationship between the liquor prices set by wholesalers and those set by

2 retailers.

3   In *324 Liquor v. Duffy Corp.*, 479 U.S. 335 (1987), the Supreme Court

4 considered a similar New York statute, which "impose[d] a regime of resale price

5 maintenance on all New York liquor retailers" and required them to charge at

6 least 112% of the wholesaler's posted bottle price. *Id*. at 337, 341. The Supreme

7 Court classified the New York statute, under *Fisher*, as a hybrid restraint. *Id*. at

8 345 n.8 (describing provisions as having granted "'private actors . . . a degree of

9 private regulatory power'") (quoting *Fisher*, 475 U.S. at 268). Then, applying the

10 *Rice* framework, the Court found the statute was "inconsistent with § 1" because

11 it authorized *per se* violations of § 1 under precedents that, "'since the early years

12 of national antitrust enforcement,'" had so treated resale price maintenance

13 agreements. *Id.* at 341 (quoting *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S.

14 752, 761 (1984)). Hence, the New York statute was preempted. *Id.* at 343.

15   The Supreme Court's classification in *324 Liquor* of the minimum-retail-

16 price restraints as hybrid, and hence capable of preemption by § 1, binds the

17 Court here. The New York statute there is substantively identical to the

18 Connecticut statute here. And the hybrid classification in *324 Liquor* remains

1    good law.  *See Freedom Holdings*, 357 F.3d at 223–24 (noting that *324 Liquor* found

2    a hybrid arrangement based on limited private acts: "the individual

3    determinations of each wholesaler as to what bottle price to post").

4         The same, however, cannot be said for the Supreme Court's application of

5    *Rice* in *324 Liquor*.  The Court's premise, that the New York statute mandated *per*

6    *se* violations of § 1, has been overtaken by a change in antitrust law.  In 2007, the

7    Supreme Court, culminating a line of decisions, held that rule of reason—and not

8    *per se*—analysis applies to all vertical restraints.  *See Leegin*, 551 U.S. at 882.

9    *Leegin* overruled *Dr. Miles Medical. Co. v. John D. Park & Sons Co.*, 220 U.S. 373

10   (1911), the precedent cited by *324 Liquor* as the fount of the doctrine that vertical

11   price fixing arrangements are *per se* illegal.  *See 324 Liquor*, 479 U.S. at 341.

12   Henceforth, the Supreme Court stated, "vertical price restraints are to be judged

13   by the rule of reason."  *Leegin*, 551 U.S. at 882.  Justifying the doctrinal change, the

14   Court explained that "it cannot be stated with any degree of confidence that

15   resale price maintenance 'always or almost always tend[s] to restrict competition

16   and decrease output,'" *id*. at 894 (quoting *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485

17   U.S. 717, 723 (1988)), noting that *Leegin* capped a gradual doctrinal move "away

18   from *Dr. Miles*' strict approach," *id*. at 900.

25

1    In light of *Leegin*, *324 Liquor*'s holding that minimum-retail-price provisions

2    constitute a *per se* violation of antitrust laws in all cases, 479 U.S. at 343, is,

3    necessarily, no longer good law.  The need to analyze vertical pricing

4    arrangements under the rule of reason means that § 1 cannot preempt as *per se*

5    unlawful even a statute that overtly mandates such arrangements.  *See Rice*, 458

6    U.S. at 658 ("If the activity addressed by the statute . . . must be analyzed under

7    the rule of reason, the statute cannot be condemned in the abstract.  Analysis

8    under the rule of reason requires an examination of the circumstances underlying

9    a particular economic practice, and therefore does not lend itself to a conclusion

10   that a statute is facially inconsistent with the federal antitrust laws.").

11   We therefore hold that Connecticut's minimum-retail-price provisions,

12   compelling as they do only vertical pricing arrangements among private actors,

13   are not preempted under § 1.[12]

14

15

---

1    [12] Total Wine alternatively attempts to characterize minimum-retail-price
2    provisions such as Connecticut's as impelling horizontal price-fixing.   For the
3    reasons given by the district court, this characterization is wrong.  *Conn. Fine*
4    *Wine & Spirits*, 255 F. Supp. 3d at 375.

1    **C.       Connecticut's Provisions Prohibiting Price Discrimination**

2         The Court next considers Connecticut's provisions prohibiting price

3    discrimination.  These provisions, as noted, require that wholesalers sell a given

4    alcoholic product to all retailers at the same price.

5         For two reasons, we hold that these provisions are not preempted.

6         First, as the district court recognized, these provisions impose a unilateral

7    restraint.  They leave each wholesaler at liberty to choose the price it will charge

8    all retailers for a product while prohibiting each from charging different prices to

9    different retailers.  Although limiting a wholesaler's range of motion, this

10   provision does not grant any private actor "a degree of regulatory control over

11   competition." *Freedom Holdings Inc. v. Cuomo*, 624 F.3d 38, 50 (2d Cir. 2010).

12   Rather, like the rent cap set by the Berkeley municipality in *Fisher*, it is a restraint

13   "imposed by government . . . to the exclusion of private control." *Id*. (citing

14   *Fisher*, 475 U.S. at 266).  Such a restraint does not implicate the concerns of

15   concerted activity animating § 1.

16        Second, the price restraint worked by § 30-68k is purely vertical in

17   operation.  It limits the ability of a wholesaler that has already charged one

18   retailer a given price to charge another retailer a different price.  Therefore, even

27

1     if this provision could be viewed as a hybrid, rather than a unilateral, price-fixing

2     provision, after *Leegin*, it would no longer implicate a category of conduct that

3     remains *per se* unlawful.  While its impact may be to harmonize prices at a retail

4     level of beverages sold by a common wholesaler, the provision does not

5     mandate—or even incent—collaboration among horizontal competitors.  For this

6     separate reason, under *Rice*, it is not preempted by § 1.

7     **D.    Connecticut's Post-and-Hold Provisions**

8           The Court finally considers the post-and-hold provisions, described above.

9     On the question whether § 1 preempts these provisions, the parties primarily

10    dispute whether, as the district court held, *Battipaglia*, 745 F.2d 166, which

11    rejected a claim that § 1 preempted a New York liquor-pricing statute, is

12    controlling here.

13           **1.    Review of *Battipaglia***

14           In *Battipaglia,* decided after *Rice* and before *Fisher*, a divided panel of this

15    Court, per Judge Friendly, upheld a New York statute whose price restraint

16    components governing the sale of liquor were strikingly similar to those at issue

17    here.  The New York law contained post-and-hold provisions that obliged

18    wholesalers to file monthly price schedules with the state liquor authority by the

1    fifth day of the preceding month, *Id.* at 168 (citing N.Y. Alco. Bev. Cont. § 101-

2    b(3)(b)), and authorized wholesalers to amend their filed schedules "to meet

3    lower competing prices and discounts 'provided such amended prices and

4    discounts are not lower and discounts are not greater than those to be met,'" *id.*

5    (quoting N.Y. Alco. Bev. Cont. Law § 101-b(4)).  The New York law also

6    contained price-discrimination and minimum-retail-price provisions that

7    constrained sales prices at the retail level.  *See id.* (citing N.Y. Alco. Bev. Cont. §

8    101-b(2)).

9        In the relevant portion of its analysis,[13] *Battipaglia* held that the challenged

10   post-and-hold provisions were not preempted. It noted that these provisions "do

11   not compel any agreement" among wholesalers.  *Id.* at 170.  Rather, the Court

12   stated: "The schedules required to be filed by the wholesalers are their individual

13   acts." *Id.*  And the *Battipaglia* plaintiffs (a liquor store owner and a wholesaler)

---

1    [13] *Battipaglia* addressed two other issues not presented here.  It discussed—but
2    did not resolve—whether, if the New York law were in conflict with § 1, it was
3    nonetheless insulated from attack by the "state action" doctrine of *Parker v.
4    Brown*, 317 U.S. 341 (1943).  *See Battipaglia*, 745 F.2d at 176–77.  And it addressed
5    whether, if the New York law were in conflict with § 1, the state's important
6    policy interests warranted deference under § 2 of the Twenty-First Amendment.
7    *Id.* at 177–79 (holding that, on the case record, such deference was warranted).

29

1  had not alleged that "any agreement among the wholesalers" arose as a result of

2  these laws.  *Id.*

3      *Battipaglia* addressed and rejected two arguments the plaintiffs had made

4  for preemption.

5      First, the Court distinguished *California Retail Liquor Dealers Ass'n v. Midcal*

6  *Aluminum*, 445 U.S. 97 (1980), which, like *324 Liquor,* had held preempted a state

7  statute that "created a resale price maintenance system for wine."  *Battipaglia*, 745

8  F.2d at 170; *see also id.* at 171 (describing California statute as having forced "all

9  persons at various levels of the chain of distribution . . . to establish identical

10  prices fixed by the brand owner for each brand of wine" and stating that this

11  type of "vertical control" was impermissible under § 1).  In contrast, the Court

12  stated, New York's post-and-hold provisions "plainly are not a resale price

13  maintenance scheme."  *Id.* at 172.  And, the Court again noted, the New York law

14  did not constrain wholesalers, each of which "is completely free to file whatever

15  price schedule he desires."  *Id.*  As Judge Friendly put the point: "*Midcal* simply

16  did not deal with a statute like New York's which merely requires wholesalers to

17  post and adhere to their own unilaterally determined prices and nothing more."

18  *Id.*

30

1       Second, the Court addressed the argument that the post-and-hold law gave

2  rise to a *per se* violation of § 1 because (1) it "forces each wholesaler to inform

3  other wholesaler[s] of its prices and then to adhere for a month to them (or a

4  lowered price meeting that of a competitor filed within three days)" and (2) "if

5  this had been done pursuant to an agreement [among wholesalers], the

6  agreement would have constituted a violation of § 1."  *Id.*   Rejecting this

7  argument, the Court reiterated that § 1 "is directed only at joint action and does

8  not prohibit independent business actions and decisions."  *Id.*  (internal citations

9  omitted).

10       The Court then paused on the conceptual issue of whether, to be

11  preempted by § 1, a state law must compel an actual agreement among

12  competitors.  The Court described as "appealing" the reasoning that:

13       Section 1 requires an agreement, state compulsion of individual
14       action is the very antithesis of an agreement, and the argument that
15       an agreement could have been inferred if the wholesalers had
16       voluntarily done what they been compelled to do is simply too 'iffy.'
17

1    *Id.* at 173.[14]   At the same time, the Court acknowledged "some force" to the

2    counterargument: that "a statute compelling conduct which, in its absence,

3    would permit the inference of an agreement unlawful under § 1 is inconsistent

4    with that section."  *Id.*  In the end, the Court stated, there was no need to resolve

5    this conceptual issue.  That was because the New York law did not meet the *Rice*

6    standard for preemption.  *Id.*

7         *Rice*, the Court emphasized, had held that "[a] state regulatory scheme is

8    not pre-empted by the federal antitrust laws simply because in a hypothetical

9    situation a private party's compliance with the statute might cause him to violate

10   the antitrust laws."  *Id.* at 174 (quoting *Rice*, 458 U.S. at 659).  Rather, under *Rice*, a

11   state law could be "condemned under the antitrust laws only if it mandates or

12   authorizes conduct that necessarily constitutes a violation of the antitrust laws in

13   all cases, or if it places irresistible pressure on a private party to violate the

14   antitrust laws in order to comply with the statute."  *Id.* (quoting *Rice*, 458 U.S. at

---

1    [14] As support for this view, the Court cited a district court decision finding
2    against preemption and rejecting the argument that "simply because the statute
3    compelled individual actions which, if taken pursuant to an agreement, might
4    have constituted a violation," the statute was preempted.  *Id*. at 173 (quoting *U.S.
5    Brewers Ass'n, Inc. v. Healy*, 532 F. Supp. 1312, 1329–30 (D. Conn.), *rev'd on other
6    grounds,* 692 F.2d 275 (2d Cir. 1982), *aff'd,* 464 U.S. 909 (1983)).

1    661).  New York's statute did not do that, the Court stated, because the only

2    conduct that it compelled—"the exchange of price information" among

3    competitors—does not "constitute a violation of the antitrust laws in all cases."

4    *Id.* at 174.  Such an exchange might or might not signify an agreement among

5    them.  *See id.* at 175 ("[T]he dissemination of price information is not a per se

6    violation of the Sherman Act." (quoting *United States v. Citizens & S. Nat'l Bank*,

7    422 U.S. 86, 113 (1975) (internal citations omitted)).  That the post-and-hold law

8    might result in common wholesaler pricing did not support inferring an

9    agreement either, the Court stated.  Absent "plus factors" signifying an

10   agreement, "conscious parallelism" among competitors did not equate to an

11   agreement.  *Id.* (citations omitted).

12   The *Battipaglia* Court concluded:

13   Section 101-b thus does not mandate or authorize conduct that
14   necessarily constitutes a violation of the antitrust laws in all cases.
15   New York wholesalers can fulfill their obligations under the statute
16   without either conspiring to fix prices or engaging in consciously
17   parallel pricing.  So, even more clearly, the New York law does not
18   place irresistible pressure on a private party to violate the antitrust
19   laws in order to comply with it.  It requires only that, having
20   announced a price independently chosen by him, the wholesaler
21   shall stay with it for a month.
22
23   *Id.* (internal quotation marks omitted).

33

1    In dissent, Judge Winter faulted Judge Friendly's majority opinion for

2    dwelling on the "post" component of New York's law and paying too little heed

3    to the law's "hold" component.  Were competitors to enter into an agreement to

4    hold their prices in place for 30 days, he observed, such a private agreement

5    would be horizontal price fixing and *per se* illegal.  *See* 745 F.2d at 179–80 (Winter,

6    J., dissenting).  The Fourth and Ninth Circuits, the only two circuit courts to

7    address similar laws, have sided with Judge Winter.  Each has emphasized that

8    the statutory requirement of adherence to posted prices, were it adopted by

9    private agreement, would be *per se* illegal price fixing.  *See Costco Wholesale Corp.*

10   *v. Maleng*, 522 F.3d 874 (9th Cir. 2008) (holding Washington provisions

11   preempted by § 1); *Miller v. Hedlund*, 813 F.2d 1344 (9th Cir. 1987) (holding

12   Oregon provisions not exempt from § 1 and remanding the case to the district

13   court for a determination whether the Twenty First Amendment shielded the

14   challenged regulations); *TFWS, Inc. v. Schaefer*, 242 F.3d 198, 210 (4th Cir. 2001)

15   (holding Maryland provisions preempted by § 1, while reserving on whether,

16   under the Twenty First Amendment, Maryland's regulatory interests with

17   respect to alcohol trumped federal interest under the Sherman Act); *see also* 1

18   Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 217, at 388–89 &

34

1    nn.45–53 (4th ed. 2013) (reviewing reported decisions, including lower court

2    decisions in each direction).

3            **2.**    *Battipaglia* **Controls Here**

4        We find *Battipaglia* controlling authority here.

5        Connecticut's post-and-hold provisions are substantially identical to the

6    New York post-and-hold provisions upheld in that case.  Total Wine does not

7    contend otherwise.  Both sets of provisions required the wholesaler to set and

8    publicly file a price that it is going to charge the retailer; both provided a brief

9    time window in which wholesalers may match a lower price set by a competitor;

10    and both required the wholesaler to hold that price for one month.

11        Further, as the above discussion reflects, the Court in *Battipaglia* considered

12    at length the § 1 preemption question in the face of similar arguments to those

13    Total Wine makes here.  The Court applied the controlling standards, from *Rice*,

14    to these provisions.  The Court held that the post-and-hold provisions did not

15    "mandate or authorize conduct 'that necessarily constitutes a violation of the

16    antitrust laws in all cases'" or "place[ ] irresistible pressure on a private party to

17    violate the antitrust laws in order to comply" with it.  *Id*. at 175 (quoting *Rice*, 458

18    U.S. at 661).   Those are the questions presented here.

1    Finally, Total Wine has not identified any later precedent of the Supreme

2    Court or this Court that fairly calls *Battipaglia*'s vitality into question.

3    Total Wine argues that *324 Liquor* and our decision in *Freedom Holdings*, 357

4    F.3d at 223 (Winter, J.) are such precedent.  A footnote in *324 Liquor* suggested

5    that a statute need not bring about an actual agreement between private parties

6    to be preempted by § 1.  *See 324 Liquor*, 479 U.S. at 345–46 n.8 (rejecting New

7    York's defense that provisions at issue had not yielded a "contract, combination,

8    or conspiracy in restraint of trade").  *Freedom Holdings* picked up on that footnote

9    to suggest, in a footnote of its own, that "an actual 'contract, combination, or

10   conspiracy' need not be shown for a state statute to be preempted by the

11   Sherman Act."  *See* 357 F.3d at 223 n.17 (Winter, J.) (citing *324 Liquor*, 479 U.S. at

12   345–46 n.8).   Total Wine argues, on account of these statements, that these

13   decisions vitiate *Battipaglia*.

14   For three reasons, they do not.

15   First, *Freedom Holdings* itself distinguished *Battipaglia* and treated it as good

16   law. *Freedom Holdings* recognized that, although the *Battipaglia* majority had

17   discussed whether a state law must give rise to an actual agreement for § 1 to

18   preempt it, *Battipaglia* ultimately did not resolve nor rule on the basis of that

36

1    conceptual issue.  Rather, *Battipaglia* had relied on its application of the *Rice*

2    standard to New York's post-and-hold provision.  *See id.* (recognizing that

3    *Battipaglia* "did not reach the question" whether "a private contract, combination,

4    or conspiracy" must be shown for Sherman Act preemption to occur (internal

5    citation omitted)).

6          Second, to the extent that *Freedom Holdings* and *324 Liquor* opine on

7    whether the state law at issue must give rise to an actual private agreement for

8    there to be preemption, these cases are readily distinguished factually because

9    they involved express or readily implied agreements.  *Freedom Holdings* involved

10    an express contract among horizontal competitors—a "Master Settlement

11    Agreement" among major tobacco manufacturers pursuant to which the

12    challenged New York legislation had been enacted.  *Freedom Holdings*, 357 F.3d at

13    208.  Its discussion of whether the state law must give rise to such an agreement

14    was, therefore, *dicta*.  *See id.* at 224 ("Even if a 'contract' among private parties is

15    required in the first step of preemption analysis, therefore, it exists in the present

16    matter.").  As for *324 Liquor*, it addressed vertical restraints affecting a

17    wholesaler-retailer relationship.  In that context, the wholesaler and each of its

18    retailers were in privity and necessarily had an agreement to buy from and/or

Case 17-2003, Document 164-2, 09/13/2019, 2654666, Page38 of 44

1    sell to each another.  They entered into these agreements against the backdrop

2    (and presumably with the knowledge) of the price-fixing term that state law

3    would supply.  In fact, every Supreme Court case to hold state liquor laws

4    preempted by § 1, has done so on the ground that these laws either mandated or

5    authorized forms of then *per se* unlawful vertical price-fixing arrangements

6    between wholesalers and retailers.  *See, e.g.*, *Midcal*, 445 U.S. 97 (California law

7    mandated resale price maintenance among wholesaler and its retailers); *324*

8    *Liquor*, 479 U.S. 335 (same as to New York law); *Schwegmann Bros. v. Calvert*

9    *Distillers Corp.*, 341 U.S. 384 (1951) (same as to Louisiana law per an interpretation

10   of § 1 as amended by the now-repealed Miller-Tydings Act).  Of course, as noted

11   earlier, the application of preemption doctrine to vertical price fixing

12   arrangements has been overtaken by *Leegin*'s removal of vertical restraints from

13   *per se* condemnation.

14       Third, and finally, two post-*Battipaglia* decisions of the Supreme Court,

15   each involving claims of horizontal price-fixing, lend support to Judge Friendly's

16   reasoning in finding against preemption.  One, *Fisher*, discussed earlier, does so

17   by narrowing the scope of state action within § 1's preemptive reach.  The other,

1    *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), does so by underscoring the

2    limited scope of private conduct capable of *per se* violating § 1.

3        *Fisher*, as noted, upheld Berkeley's rental-cap ordinance in the face of a § 1

4    preemption claim that it brought about horizontal price fixing.  The Supreme

5    Court recognized that "[h]ad the owners of residential rental property in

6    Berkeley voluntarily banded together to stabilize rents in the city," that concerted

7    activity would have worked a *per se* violation of § 1.  *Fisher*, 475 U.S. at 266.  But,

8    the Court emphasized, more was required.  There needed to be concerted action.

9    "A restraint imposed unilaterally by government does not become concerted-

10   action within the meaning of the statute simply because it has a coercive effect

11   upon parties who must obey the law."  *Id.* at 267.  "[T]he mere fact that all

12   competing property owners must comply with the same provisions of the

13   Ordinance is not enough to establish a conspiracy among landlords."  *Id.*

14       This requirement is significant here.  We do not take issue with the holding

15   of the district court here that, given the participation that a post-and-hold law

16   requires of each wholesaler in connection with the posting component,

39

Connecticut's law, viewed as a whole, qualifies as hybrid under *Fisher*.[15]  But we

doubt that such a law mandates or authorizes "concerted action" among the

wholesalers subject to it.  Particularly as to the "hold" component of the law that

was the basis of the *Battipaglia* dissent, Connecticut's prohibition on altering

prices for a 30-day period is a purely negative restraint.  It does not call for any

private action, let alone concerted action.  *See Hertz Corp. v. City of New York*, 1

F.3d 121, 127 (2d Cir. 1993) (finding hybrid, but upholding, city statute that

"eliminate[d] an element of price competition" among rental-car industry

competitors); *cf. Flying J, Inc. v. van Hollen*, 621 F.3d 658, 662--63 (7th Cir. 2010)

("[I]t is only when a state law *mandates* or *authorizes* collusive conduct that it is

preempted by federal antitrust law." (citing *Fisher*, 475 U.S. at 265)).  *Fisher*'s

emphasis on the need for concerted action reinforces that Judge Friendly was

right both to focus on the posting, rather than the holding, component of New

York's post-and-hold law, and to find the law non-preempted.

---

[15] In finding that the statute grants private actors "a degree of private regulatory
power" so as to qualify as hybrid, *Fisher*, 475 U.S. at 268, the district court relied
on *324 Liquor*, which had held hybrid a resale-price maintenance law with similar
price-posting features.  *See Conn. Fine Wines & Spirits*, 255 F. Supp. 3d at 369.

40

1    As to *Twombly*, although it is more commonly cited for its articulation of

2    pleading standards, the Court in its substantive discussion homed in on the

3    discrete evil prohibited by § 1.  "§ 1 of the Sherman Act does not prohibit [all]

4    unreasonable restraints of trade." *Twombly*, 550 U.S. at 553.  It prohibits "only

5    restraints *effected by a contract, combination, or conspiracy*." *Id.* (emphasis added).

6    The Court explained, therefore, that in § 1 cases, "[t]he crucial question is

7    whether the challenged anticompetitive conduct stem[s] from independent

8    decision or from an agreement." *Id.* (internal citations omitted).  Even conscious

9    parallel acts based on competitors' mutual recognition of "shared economic

10   interests" are not "'in [themselves] unlawful.'"  *Id.* at 553--54 (quoting *Brooke Grp.*

11   *Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U. S. 209, 227 (1993)); *see also United*

12   *States v. Apple, Inc.*, 791 F.3d 290, 315 (2d Cir. 2015)  ("[P]arallel behavior that does

13   not result from an agreement is not unlawful even if it is anticompetitive.").  In

14   other words, under § 1, that conscious parallel conduct can create an equally

15   uncompetitive market to parallel conduct achieved by agreement is of no

16   moment.  The gravamen of § 1 is an agreement among competitors.

17      On this basis, *Twombly* upheld the dismissal of a complaint that alleged

18   consciously parallel decisions among recently deregulated telecommunications

41

1    carriers not to compete in one another's (horizontal) regional markets.  The

2    complaint had not alleged actual agreement among the carriers, and its

3    allegations were consistent with "natural" and "unilateral" behavior by each

4    carrier, as each had good reason to appreciate that its self-interest lay in

5    forebearing from initiating competition.  *See* 550 U.S. at 564, 566; *see also id*. at 568

6    ("[The carriers] doubtless liked the world the way it was, and surely knew the

7    adage about him who lives by the sword.  Hence, a natural explanation for the

8    noncompetition alleged is that the former Government-sanctioned monopolists

9    were sitting tight, expecting their neighbors to do the same thing.")

10         *Twombly*'s reasoning resonates here because, under a post-and-hold law,

11    there is a "natural" explanation—independent of any agreement or coordination

12    among liquor wholesalers—for these competitors to arrive at common monthly

13    product prices.  Such a law authorizes a wholesaler, during the four days after

14    initial posting, to match a competitor's lower price, with such prices then held for

15    a month.  Under these circumstances, the law itself invites and facilitates

16    conscious parallelism in pricing.  It puts in public view each competing

17    wholesaler's price quotes.  And it authorizes, but it does not oblige, wholesalers

18    during a defined window unilaterally to match (or parallel) a competitor's lower

42

1   price as the "held" price for the coming month.  Nothing about this arrangement

2   requires, anticipates, or incents communication or collaboration among the

3   competing wholesalers.  Quite the contrary:  A post-and-hold law like

4   Connecticut's leaves a wholesaler little reason to make contact with a competitor.

5   The separate, unilateral acts by each wholesaler of posting and matching instead

6   are what gives rise to any synchronicity of pricing.  To mirror *Twombly*: "[A]

7   natural explanation for the noncompetition alleged," *id*. at 568, is that the state-

8   regulated wholesalers are independently making pricing decisions within a

9   framework aimed at avoiding price wars that invites them, before being held to a

10  price for a month, to match that of their competitors.  A post-and-hold law,

11  therefore, does not implicate the evil against which § 1 guards: an agreement to

12  unreasonably restrain trade.  It would make little sense to preempt a state statute

13  which facilitates parallel conduct that parties can legally undertake on their own

14  under § 1.

15          Under these circumstances, we do not find reason to conclude that

16  *Battipaglia* has been, *sub silentio*, overruled.  If anything, its reasoning has been

17  fortified by intervening decisions like *Fisher* and *Twombly*.  *Battipaglia* therefore

18  controls Total Wine's challenge to Connecticut's post-and-hold provisions.  *See*

1    *United States v. Moore*, 949 F.2d 68, 71 (2d Cir. 1991) (prior opinions of a Second

2    Circuit panel bind future panels "in the absence of a change in the law by higher

3    authority" or a ruling by the en banc Court).  Any application to revisit *Battipaglia*

4    is beyond this panel's authority.  *Battipaglia* remains good—and persuasive—law.

5

6                                    **CONCLUSION**

7            For the reasons above, we affirm the decision below.  We hold that the

8    challenged provisions of Connecticut law governing liquor pricing are not

9    preempted by § 1 of the Sherman Act.

10